## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |  |
|---|---|---|
| | x | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, | : : : | |
| | : | |
| Plaintiffs, | : : | |
| | : | Court No. 24-0106 |
| v. | : : | |
| UNITED STATES, | : : | |
| Defendant. | : : | |
| | : | |
| | x | |

## <u>PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation (collectively, "Baroque") respectfully move for judgment on the administrative record. For the reasons set forth in the accompanying Memorandum of Law in support of its motion, Baroque requests that the Court determine that the U.S. Department of Commerce's results in *Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,939 (May 14, 2024) ("Final Results"), and the accompanying Issues and Decision Memorandum, is not supported by substantial evidence on the record and is otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Francis J. Sailer

Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

Dated: January 23, 2025

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | | |
|---|---|---|
| | x | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, | : : : | |
| | : | |
| Plaintiffs, | : | |
| | : | Court No. 24-0106 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | x | |

### ORDER

Upon consideration of the Motion for Judgment on the Administrative Record filed by Plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation (collectively "Baroque") and upon all other papers and proceedings herein, the Court

**ORDERS** that Baroque's Motion is granted; and further

**FINDS** that the contested results of the U.S. Department of Commerce ("Commerce") in *Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,939 (May 14, 2024) ("Final Results"), is not supported by substantial evidence on the record, and is not otherwise in accordance with law; and further

**ORDERS** that this matter is remanded to Commerce for reconsideration of the Final

Results in accordance with the decision of this Court.

**SO ORDERED.**

_____
                                        Timothy M. Reif, Judge


Dated: _____, 2025
        New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| ‎ | x |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| | x |

Court No. 24-0106

**PUBLIC VERSION**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Andrew T. Schutz
Francis J. Sailer
Jordan C. Kahn
Michael S. Holton

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: January 23, 2025

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................1

A. ADMINISTRATIVE DECISION UNDER APPEAL ....................................................1

B. REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION ...............................1

C. ISSUES PRESENTED AND SUMMARY OF ARGUMENT ............................................1

    1. Was Commerce's selection of the tier 2 benchmark for plywood, fiberboard and veneer unlawful? ........................................................................... 1

    2. Was Commerce's application of adverse facts available to consider certain of Baroque's input suppliers to be governmental authorities unlawful? ...................... 2

STATEMENT OF FACTS ........................................................................................2

STANDARD OF REVIEW ......................................................................................6

ARGUMENT ......................................................................................................6

I. INTRODUCTION ..........................................................................................6

II. COMMERCE'S REJECTION OF ITTO TTMR AS A TIER 2 WORLD MARKET PRICE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW ........................................................................................8

    A. COMMERCE'S BENCHMARK SELECTION REGIME ......................................8

    B. COMMERCE'S REJECTION OF ITTO .....................................................10

    C. COMMERCE'S FINDINGS WITH REGARD TO ITTO EXPORT PRICES ARE CONTRADICTED BY THE RECORD ........................................................12

    D. COMMERCE'S DETERMINATION REGARDING DOMESTIC PRICES IS DIRECTLY CONTRARY TO THE PREVIOUS REVIEW AND PAST PRACTICE ..................................15

    E. ITTO SHOULD NOT BE REJECTED FOR PLYWOOD BECAUSE IT IS THE ONLY GRADE SPECIFIC SOURCE ........................................................................16

III. COMMERCE UNLAWFULLY APPLIED AFA TO WHETHER CERTAIN OF BAROQUE'S INPUT SUPPLIERS WERE GOVERNMENT AUTHORITIES ............19

    A. LEGAL FRAMEWORK FOR AFA DETERMINATIONS IN CVD PROCEEDINGS............19

    B. THE APPLICATION OF AFA TO THE GOC FOR THE GOVERNMENT AUTHORITY STATUS OF SPECIFIC INPUT SUPPLIERS IS UNSUPPORTED BY SUBSTANTIAL

EVIDENCE ...........................................................................................................22

    1.    Background and Relevant Facts................................................ 22

    2.    Argument ................................................................................. 28

        a.    Commerce Did Not Address Specific Input Suppliers, Rendering its Determination Unreviewable ....................................................28

        b.    Necessary Information Is Not Missing From the Record ............29

CONCLUSION........................................................................................................36

## TABLE OF AUTHORITIES

**Cases**

*Baroque Timber Industries (Zhongshan) Co., Ltd. et al v. United States,*
Ct. No. 23-00136 ................................................................................................ 2, 23

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.,*
61 F. Supp. 3d 1306 (CIT 2015) ...................................................................... 11, 27

*Changzhou Trina Solar Energy Co. v. United States,*
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .............................................. 22, 25, 33

*Consol. Edison Co. v. NLRB,*
305 U.S. 197, 217 (1938) ........................................................................................ 7

*Matsushita Elec. Indus. Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984) ................................................................................. 7

*Elec. Consumers Res. Council v. FERC,*
747 F.2d 1511 (D.C. Cir. 1984) ............................................................................ 34

*F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States,*
216 F.3d 1027 (Fed. Cir. 2000) ............................................................................ 26

*Gerald Metals, Inc. v. United States,*
132 F.3d 716 (Fed. Cir. 1997) ................................................................................. 7

*GODACO Seafood Joint Stock Co. v. United States,*
435 F. Supp. 3d 1342 (CIT 2020) ......................................................................... 34

*Guizhou Tyre Co. v. United States,*
348 F. Supp. 3d 1261 (CIT 2018) ......................................................................... 26

*Ningbo Dafa Chem. Fiber Co. v. United States,*
580 F.3d 1247 (Fed. Cir. 2009) ............................................................................ 25

*Nippon Steel Corp. v. United States,*
337 F.3d 1373 (Fed. Cir. 2003) ...................................................................... 24, 25

*NSK Ltd. v. United States,*
910 F.Supp. 663 (1995) ........................................................................................ 36

*Risen Energy Co. v. United States,*
570 F. Supp. 3d 1369 (CIT 2022) ......................................................................... 11

*Risen Energy Co. v. United States,*
658 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) ........................................................ 39

*Save Domestic Oil, Inc. v. United States,*
357 F.3d 1278 (Fed. Cir. 2004) ............................................................................... 7

*Shandong Huarong Mach. Co. v. United States,*
435 F. Supp. 2d 1261 (CIT 2006) ......................................................................... 24

*SKF USA Inc. v. United States,*

263 F.3d 1369 (Fed. Cir. 2001) ............................................................................ 19

*SKF USA, Inc. v. United States,*
263 F.3d 1369 (Fed. Cir. 2001) ........................................................................ 8

*SKF USA, Inc. v. United States,*
630 F.3d 1365 (Fed. Cir. 2011) ........................................................................ 8

*Ta Chen Stainless Steel Pipe, Ltd. v. United States,*
23 CIT 804 (1999) ............................................................................................ 36

*Timken U.S. Corp. v. United States,*
421 F.3d 1350 (Fed. Cir. 2005) ...................................................................... 34

*WelCom Prods., Inc. v. United States,*
865 F. Supp. 2d 1340 (CIT 2012) .................................................................... 8

*Zhejiang DunAn Hetian Metal Co. v. United States,*
652 F.3d 1333 (Fed. Cir. 2011) ....................................... 18, 25, 33, 36

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .............................................................................. 7

19 U.S.C. § 1677(5)(B) ...................................................................................... 27

19 U.S.C. § 1677(5)(E)(iv) ........................................................................... 10, 21

19 U.S.C. § 1677e .................................................................................................. 2

19 U.S.C. § 1677e(a) ..................................................................................... 23, 35

19 U.S.C. § 1677e(b) ..................................................................................... 24, 25

**Regulations**

19 C.F.R. § 351.511 ......................................................................................... 4, 8

19 C.F.R. § 351.511(a)(2) .................................................................................. 10

19 C.F.R. § 351.511(a)(2)(ii) .......................................................................... 2, 15

19 C.F.R. 351.511(a)(2)(ii) .................................................................................. 5

19 CFR 351.511(a)(2)(iv) .............................................................................. 14, 18

**Administrative Decisions**

*Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
86 Fed. Reg. 35,741 (July 7, 2021) ................................................................ 38

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
81 Fed. Reg. 3,110 (Jan. 2, 2016) .................................................................. 12

*Citric Acid and Certain Citrate Salts {from the People's Republic of China}: Final Results* 40, 41

*Countervailing Duties; Final Rule,*
63 Fed. Reg. 65,348 (Nov. 25, 1998) ............................................................. 27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018) ................................................................................ 11

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 7,060 (Feb. 2, 2023) ................................................................................ 3

*Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,692 (Dec. 8, 2011) ................................................................................ 3

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,306 (June 16, 2022) ................................................................................ 13

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2021, 89 Fed. Reg. 41,939* (May 14, 2024) ................................................................................ 1

*Multilayered Wood Flooring From the People's Republic of China: Final Results of; Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (May 31, 2023) ................................................................................ 14

*Multilayered Wood Flooring from the People's Republic of China: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 89,664 (Dec. 28, 2023) ................................................................................ 4

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Oct. 27, 2021) ................................................................................ 13

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) ................................................................................ 27

**PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED**

Plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") and

Riverside Plywood Corporation ("Riverside") (collectively "Baroque") submit this

Memorandum of Law to support their Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A.    ADMINISTRATIVE DECISION UNDER APPEAL

Baroque seeks review of the U.S. Department of Commerce's ("Commerce") final results

of the eleventh administrative review ("AR11") of the countervailing duty ("CVD") order on

multilayered wood flooring ("MLWF") from the People's Republic of China ("China"),

published as *Multilayered Wood Flooring from the People's Republic of China: Final Results of*

*Countervailing Duty Administrative Review; 2021, 89 Fed. Reg. 41,939* (May 14, 2024) **(PR**

**332)** ("Final Results"), accompanying Issues and Decision Memorandum (May 7, 2024) **(PR**

**326**) ("IDM").

### B.    REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Baroque's reasons for contesting the administrative decision are set forth in the Summary

of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.    ISSUES PRESENTED AND SUMMARY OF ARGUMENT

#### 1.    Was Commerce's selection of the tier 2 benchmark for plywood, fiberboard and veneer unlawful?

Yes.  Commerce for the first time in this proceeding rejected export and domestic prices

of plywood, fiberboard and veneer from the International Tropical Timber Organization's

("ITTO") Tropical Timber Market Report ("TTMR") as a viable tier 2 benchmark under 19

C.F.R. § 351.511(a)(2)(ii).  This finding was unsupported by substantial evidence and otherwise

contrary to law.  Specifically, record evidence demonstrates that Commerce was wrong in

concluding that certain ITTO TTMR export prices contained prices to China.  Record evidence

very clearly shows, for Peru pricing and Brazil pricing in particular, that these represent export

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

prices to Mexico and the EU, respectively.  Moreover, Commerce's finding that domestic prices cannot be used is directly contrary to the previous review where these prices were used and to past practice.  For these reasons, Commerce's determination should be remanded.

### 2. Was Commerce's application of adverse facts available to consider certain of Baroque's input suppliers to be governmental authorities unlawful?

Yes. Commerce unlawfully applied adverse facts available ("AFA") to consider certain of Baroque's input suppliers to be governmental authorities. Necessary information for these eighteen suppliers was not missing from the record and the Government of China ("GOC") responded to all questions related to these suppliers. Thus, substantial evidence exists to demonstrate that these individually owned suppliers (including two affiliates) are not government authorities. This issue is identical to Baroque's challenge of the previous review currently before this court.  *See Baroque Timber Industries (Zhongshan) Co., Ltd. et al v. United States*, Ct. No. 23-00136.

### STATEMENT OF FACTS

Commerce issued its countervailing duty order on multilayered wood flooring from China on December 8, 2011.  *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,692 (Dec. 8, 2011).

On February 2, 2023, Commerce initiated its administrative review of the CVD order on MLWF from China, covering the period of review ("POR") from January 1, 2021, through December 31, 2021.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 7,060 (Feb. 2, 2023).

On April 3, 2023, Commerce selected Plaintiff Riverside and one other Chinese manufacturer/exporter, Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), as

**PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED**

mandatory respondents to individually investigate in the review, issuing the initial CVD questionnaire on the same day.

Riverside (and its cross-owned affiliated producer/exporter, Baroque Timber) timely filed their response to the affiliation portion of Commerce's initial CVD questionnaire on April 17, 2023, and on May 26, 2023, timely filed the remainder of their response to Commerce's initial questionnaire, identifying subsidy programs from which the companies received benefits during the POR.

Plaintiffs timely responded to all additional supplemental questionnaires issued by the Department to the companies.

Plaintiffs submitted timely factual information on November 15, 2023, (refiled on December 5, 2023) for Commerce's use in the valuation of the benchmarks under the applicable less than adequate renumeration subsidy programs (19 C.F.R. § 351.511) for reported plywood, veneer, fiberboard, paint/stain, and adhesive/glue purchases, including monthly ocean shipping rates. **PR 283-287**. This included monthly ITTO TTMR reports for the POR that contained prices for plywood, fiberboard and veneers. *Id*. at Exh. 3. Rebuttal benchmark information was filed on November 27, 2023, in response to the benchmark data submitted by Petitioners.

Commerce published its Preliminary Results of the administrative review on December 28, 2023. *Multilayered Wood Flooring from the People's Republic of China: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 89,664 (Dec. 28, 2023) ("Preliminary Results"), along with its accompanying Preliminary Decision Memorandum ("PDM") (**PR 295**).

In its Preliminary Results, Commerce preliminarily found that Plaintiffs had received countervailable benefits during the POR, calculating a preliminary CVD rate of 23.65% for the

companies.  Prelim. Calc Memo. (**PR 296**). A vast majority of this rate was the various input for less than adequate remuneration ("LTAR") programs:

| | |
|---|---|
| Provision of Veneers for LTAR | 2.03% |
| Provision of Wood Glue and Adhesives for LTAR | 0.75% |
| Provision of Paint, Primer, and Stain for LTAR | 0.14% |
| Provision of Plywood for LTAR | 10.45% |
| Provision of Fiberboard for LTAR | 7.80% |
| **Sub-Total** | **21.17%** |

*Id.* at Attachment 1.   In calculating the rates for these five programs, Commerce followed a similar methodology as in previous reviews.  Specifically:

1) For the tier 2 benchmarks under 19 C.F.R. § 351.511(a)(2)(ii), for veneers, plywood and fiberboard, Commerce averaged monthly prices contained in the ITTO TTMR from Ghana, Peru and Brazil with monthly UN Comtrade world export data under various Harmonized System (HS) subheadings.  PDM at 41-46 (**PR 295**). Commerce also included on-line ITTO pricing submitted by Petitioners.  *Id.* The online ITTO pricing, as compared to the TTMR reports, had never before been placed on the record in these proceedings.

2) Commerce considered all of Baroque's input suppliers to be government authorities on the basis of adverse facts available ("AFA"), thereby countervailing all reported input purchases.  PDM at 13-16 (**PR 295**).  The application of AFA was based on the preliminary finding that the Government of China ("GOC") had failed to provide certain requested information or cooperate to the best of its ability.  *Id.*  This is the same finding Commerce had made in all previous reviews.

On February 20, 2024, Plaintiffs filed their administrative case brief challenging certain decisions and findings in the Department's Preliminary Results, including, among other things that: (1) the Department should adjust its calculation of the benchmark for plywood and veneers using ITTO TTMR grade prices only, rather than a combination of ITTO and UNComtrade data; (2) The Department Should Reject Petitioner's ITTO Export Data for the veneer and plywood Benchmarks; and (3) the Department should reverse its adverse facts available ("AFA") finding that certain of Plaintiffs' input suppliers were government authorities. **CR 194, PR 313**.

Petitioners filed their administrative case brief on the same day.  Petitioners argued that certain adjustments be made to the benchmarks, including that domestic prices from the ITTO

should not be used. **PR 312**.  Petitioners did not argue that the ITTO data Baroque submitted should be rejected in its entirety.

Plaintiffs filed their rebuttal brief on February 20, 2024, rebutting Petitioner's arguments, which primarily related to how ITTO prices should be averaged with other prices and whether domestic prices should be used. **PR 318**.

On May 14, 2024, Commerce published its Final Results, assigning Plaintiffs a final CVD rate of 30.85% to . 89 Fed. Reg. 41,940.  Again, the rate consisted primarily of the various LTAR programs:

|  | Prelim | Final |
|---|---|---|
| Provision of Veneers for LTAR | 2.03% | 1.83% |
| Provision of Wood Glue and Adhesives for LTAR | 0.75% | 0.73% |
| Provision of Paint, Primer, and Stain for LTAR | 0.14% | 0.12% |
| Provision of Plywood for LTAR | 10.45% | 12.68% |
| Provision of Fiberboard for LTAR | 7.80% | 13.01% |
| **Sub-Total** | **21.17%** | **28.37%** |

**PR 328** at Attachment 1.

In these Final Results, Commerce accepted some of Plaintiffs' arguments and rejected others. Specifically, Commerce (1) rejected Plaintiffs' arguments that ITTO TTMR should be the only source to value the benchmarks for plywood and veneer. IDM at Cmt. 5A (**PR 326**). Commerce rejected this argument by rendering it moot.  **For the very first time in this proceeding**, Commerce rejected the ITTO TTMR data as a tier 2 source altogether and limited the plywood, veneer and fiberboard benchmarks to UNComtrade export data only.  Commerce similarly rejected Petitioners' online ITTO export data (i.e., BRS data); and (2) as it had in all previous reviews, rejected Plaintiffs' argument that AFA was not applicable and that substantial evidence demonstrated that certain of Plaintiffs' input suppliers were not government authorities. *Id*. at Cmt. 4.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

## STANDARD OF REVIEW

The court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012).

## ARGUMENT

## I.    INTRODUCTION

This is now the fifth appeal brought before this Court regarding the CVD order on MLWF.  All of those previous appeals – Ct. Nos. 23-136, 22-210, 21-600, 20-3889 – are

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

currently pending. Many of those appeals involve claims and facts that are substantially similar to the issues raised in this appeal.

Here, Plaintiffs raise two issues related to Commerce's determinations regarding the provision of inputs for less than adequate remuneration under 19 C.F.R. § 351.511. The *ad valorem* CVD rate assigned to Baroque in the contested Final Results for these programs was 28.37%.[1] Plaintiffs first challenge the "tier 2" benchmark Commerce selected pursuant to Section 351.511(a)(2)(ii) for plywood, veneers and fiberboard. Plaintiffs other appeals of previous reviews involved similar challenges. *See* Ct. Nos. 23-136, 22-210 and 21-600. However, the challenge in this appeal is unique. While other appeals involve whether Commerce should have used UNComtrade export prices in combination with ITTO prices, or ITTO prices alone, the current challenge addresses whether Commerce should have rejected ITTO outright as a viable tier 2 source for plywood, veneers and fiberboard. As outlined below, this refusal to use ITTO as a benchmark not only departs from past practice in this proceeding but is unsupported by substantial evidence.[2]

The second challenge that Plaintiffs raise is identical to their challenge in Ct. Nos. 23-136 and 22-210. In this challenge, Plaintiffs submit that Commerce finding based on AFA that all of Plaintiiffs input suppliers are "government authorities" is not supported by substantial evidence. The underlying facts, Commerce's determination, and the legal arguments presented are very similar in this appeal to the other pending appeals. As Plaintiffs have argued in their previous appeals, necessary information is not missing from the record with regard to certain suppliers

---

[1] **PR 328** at Attachment 1.
[2] Because the Department rejected outright ITTO as a tier 2 source, it did not address the arguments Plaintiffs raised below that ITTO alone should be used as the benchmark for plywood.

and Commerce's AFA finding that these suppliers are government authorities is unsupported by substantial evidence.

## II. COMMERCE'S REJECTION OF ITTO TTMR AS A TIER 2 WORLD MARKET PRICE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW

In its Final Results, Commerce concluded for the first time in this proceeding that monthly prices reported by ITTO TTMR cannot be used as tier 2 world market price benchmarks for plywood, veneer or fiberboard.  IDM at 5A (**PR 326**). Commerce's rationale for excluding the various prices within the ITTO TTMR was that (1) the export prices included prices to China, that could not be removed, and (2) that inland freight values were not on the record to covert domestic prices into export prices.  *Id*.  Commerce's determination regarding the ITTO export pricing categories is both replete with factual errors and contrary to past reviews finding these very same price categories acceptable.  With regard to the domestic pricing, the determination is the exact opposite finding Commerce made in the previous review where it *refused* to reject the ITTO domestic pricing.  Commerce offers no explanation for why it changed its determination on the same issue from the previous review rendering the decision arbitrary and capricious.

### A.    COMMERCE'S BENCHMARK SELECTION REGIME

The statute governing the selection of benchmarks for LTAR programs provides as follows:

> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

> include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E)(iv). Under its regulations, Commerce sets forth the basis for identifying appropriate market-determined benchmarks for measuring the adequacy of remuneration for government-provided goods or services. 19 C.F.R. § 351.511(a)(2). These potential benchmarks are listed in hierarchical order by preference: (1) "a market-determined price for the good or service resulting from actual transactions in the country in question" (tier one); (2) "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, *making due allowance for factors affecting comparability*" (tier two); or (3) "assessing whether the government price is consistent with market principles" (tier three). *Id.* (emphasis added).

Other than the statute and regulations, there are few guiding principles in benchmark selection. In assessing different benchmark sources on the record and comparing flaws or issues in the data, Commerce must evaluate the sources to achieve a comparable benchmark that will result in a CVD benefit that is as accurate possible. *See Risen Energy Co. v. United States,* 570 F. Supp. 3d 1369, 1378 (CIT 2022) (explaining that the flaws in a proposed freight source "likely does not add to the accuracy of the benchmark calculation when there is the clearly acceptable Xeneta data available."); s*ee also Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 61 F. Supp. 3d 1306, 1341 (CIT 2015) ("import benchmark's 'comparability' means it must bear a reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute."). Often, this analysis focuses on the specificity of the benchmark source to the input purchased by the respondent. *See*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of*

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

*Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), IDM Comment 3 ("Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product, which, in this case, would be the annual IHS Markit data (which reflects prices for aluminum frames, while the Comtrade data encompasses a broader range of aluminum products)."); *see also Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), IDM at 3 ("Provision of Caustic Soda for LTAR ("As noted above, our approach in this regard is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and when the record evidence indicates that the respondent firm purchases the good in question on a grade-specific basis.")).

In this case, Commerce was faced with two benchmark sources for plywood, veneer and fiberboard – UNComtrade and ITTO (TTMR and on-line export data[3]). Commerce uses export statistics compiled by UNComtrade as tier 2 benchmarks in most CVD proceedings. To derive a benchmark from UNComtrade, Commerce and the parties will identify the appropriate HTS provision and compile a world weighted monthly average by taking the exports from every country in the world to every other country in the world. Exports to and from China are excluded from this average. Prelim Calc. Memo at 3 (**PR 298**).

### B.   COMMERCE'S REJECTION OF ITTO

In addition to UNComtrade, monthly reports from ITTO TTMR were also on the record. Riverside Benchmark Submission at Exh. 3 (**PR 283-287**). These reports contain domestic and export prices from various different tropical countries for different types of wood products, including plywood, veneer and fiberboard. Commerce has used ITTO TTMR data as a tier 2

---

[3] Baroque argued in its administrative case brief that Commerce should not use the ITTO on-line data ("BRS") submitted by Petitioners for various reasons. **CR 194, PR 313**. Commerce did not address these arguments. Since we agree that the BRS should not be used, we focus only on the TTMR rejection in this brief.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

since the 2018 review, noting that "there is nothing on the record that indicates the ITTO data are aberrational and, therefore, unreliable." *See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Oct. 27, 2021), IDM at Cmt. 6. Commerce further noted in that review that it often "used tier two benchmark prices from various sources other than UN Comtrade data, such as the London Metal Exchange, Steel Business Briefing, MEPS, and Steel Orbis." *Id*. Commerce also used ITTO in the 2019 and 2020 reviews of this proceeding. *See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 36,306 (June 16, 2022), IDM at 8; *Multilayered Wood Flooring From the People's Republic of China: Final Results of; Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (May 31, 2023), IDM at Cmts. 6, 7 and 9.

Despite Commerce's use of ITTO TTMR in previous reviews and finding both export and domestic pricing within ITTO reliable, and despite following that practice in its preliminary results, Commerce for the first time in the Final Results refused to rely on ITTO TTMR in the benchmark for plywood, veneers and fiberboard. Commerce explained:

> for the reasons discussed below, we find that it is inconsistent with Commerce's regulations to use either the TTMR or BRS export price data in constructing the benchmarks Commerce uses to determine whether Riverside or Jiangsu Senmao made purchases of veneer, plywood, or fiberboard for LTAR, because the information on the record for these sources does not allow us to exclude exports to China. Second, as addressed below, we also find it inappropriate to use TTMR domestic price data as part of the plywood and fiberboard benchmarks because the record does not contain all the information necessary to construct delivered prices from these data as required by 19 CFR 351.511(a)(2)(iv).

IDM at Cmt. 5A. None of the parties in this proceeding had argued the ITTO TTMR should be rejected as a tier 2 benchmark.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

### C.  COMMERCE'S FINDINGS WITH REGARD TO ITTO EXPORT PRICES ARE CONTRADICTED BY THE RECORD

With regard to the three export pricing categories – Ghana, Peru and Brazil –

Commerce explained its rejection as follows:

> While the BRS data and TTMR export data that are on the record of this review are drawn from different sources, neither the BRS export data nor the TTMR export data were provided in a way that permits Commerce to exclude exports to China.[217]
>
> n. 217 the TTMR data report AUVs for exports of certain species of veneer and plywood from Ghana, Peru, and Brazil to all destinations. The underlying data from both sources provide no means of breaking out and removing exports destined for China.

*Id.*  This statement is wrong and directly contradicted by record evidence.  The monthly ITTO

TTMR reports contained in Exhibit 3 of Riverside's Benchmark submission contain sufficient

information to disprove Commerce's belief (**PR 283-287**).

### 1.  <u>Ghana</u>

There is no evidence that the FOB prices reported for veneer and plywood either include

exports to China or are distorted by the China as a destination.  First, the pricing reported is in

Euros suggesting a non-China destination.  Second, the first report in Exhibit 3 for January states

that the data is from "78 producers who exported 16 different products including sawnwood,

billets, mouldings, veneer and plywood (**to regional markets**)." **PR 283-287** (emphasis added).

Third, the prices are FOB port price rendering the destination irrelevant since all purchasers take

title in Ghana.  In contrast, the UNComtrade data provides prices to specific destinations, all of

which are different and separately reported, permitting Commerce to exclude China.

Moreover, rejecting export prices that could possibly contain exports from China runs

directly contrary to the regulatory requirement that the tier 2 price be price "where it is

reasonable to conclude that such price would be available to purchasers in the country in

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

question." 19 C.F.R. § 351.511(a)(2)(ii).  Absent any evidence that the prices contain exports to China, the speculation that they could be available to Chinese purchasers should not be basis to reject the prices.

In addition, Commerce incorrectly states that "For Ghana, the TTMR offers plywood prices for three different species, none of which are grade-specific." IDm at Cmt 5A. at n. 210. This too is wrong.  The chart below pulled directly from the first January TTMR report on the record clearly shows the plywood prices as BB/CC, which is why Riverside included it the first place.

| Export plywood prices | | | |
|---|---|---|---|
| Plywood, FOB | | Euro per cu.m | |
| BB/CC | Ceiba | Ofram | Asanfina |
| 4mm | 315⬇ | 580 | 641 |
| 6mm | 412 | 535 | 604 |
| 9mm | 377 | 446 | 560 |
| 12mm | 516 | 476 | 480 |
| 15mm | 450 | 414⬆ | 430 |
| 18mm | 450 | 441 | 383 |

Grade AB/BB would attract a premium of 10%, B/BB 5%, C/CC 5% and CC/CC 10%.

| Export rotary veneer prices | | |
|---|---|---|
| Rotary Veneer, FOB | Euro per cu.m | |
| | CORE (1-1.9 mm) | FACE (>2mm) |
| Ceiba | 347⬆ | 366 |
| Chenchen | 540 | 631 |
| Ogea | 443 | 590 |
| Essa | 543 | 626⬆ |
| Ofram | 350 | 435 |

Riverside Benchmark at Exh. 3.

**2.** **Peru**

For Peru, the chart in the TTMR reports very clearly shows that the pricing represents export prices from Peru to Mexico:

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

**Export plywood prices**

| Peru plywood, FOB Callao (Mexican market) | US$ per cu.m |
|---|---|
| Copaiba, 2 faces sanded, B/C, 8mm | 349-379 |
| Virola, 2 faces sanded, B/C, 5.2mm | 487-511 |
| Cedar fissilis, 2 faces sanded, 5.5mm | 766-783 |
| Lupuna, treated, 2 faces sanded, 5.2mm | 396-419 |
| Lupuna plywood | |
| B/C 15mm | 449-495 |
| B/C 9mm | 379-399 |
| B/C 12mm | 350-360 |
| B/C 8mm | 466-487 |
| C/C 4mm | 389-425 |
| Lupuna plywood B/C 4mm Central Am. | 391-407 |

Exhibit 3 (**PR 283-287**).  Thus, there is no concern that this pricing could include China exports. This data also is grade specific.

The chart for veneers does not indicate the decision but Commerce's argument fails for some of the same reasons noted above for Ghana.

**Export veneer prices**

| Veneer  FOB Callao port | US$ per cu.m |
|---|---|
| Lupuna 3/Btr 2.5mm | 221-249 |
| Lupuna 2/Btr 4.2mm | 234-266 |
| Lupuna 3/Btr 1.5mm | 219-228 |

### 3. Brazil

Like Peru, the Brazil pricing very clearly states the destination -  it is for the EU market:

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

**Export plywood prices**

| Pine plywood EU market, FOB | US$ per cu.m |
|---|---|
| 9mm C/CC (WBP) | 257 |
| 12mm C/CC (WBP) | 252 |
| 15mm C/CC (WBP) | 228 |
| 18mm C/CC (WBP) | 217 |

Source: STCP Data Bank

Commerce's failure to consider record evidence that detracts from its determination necessitates a remand in this case. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (the court looks "to the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence"). Not only is it pure speculation that the prices from Ghana include prices to China but record evidence shows that the prices from Peru and Brazil definitely do not.  The Brazil exports are to the EU and the Peru exports are to Mexico.  This makes the prices viable tier 2 benchmarks and Commerce's determination unsupported by record evidence and just plain wrong.

###### D.   COMMERCE'S DETERMINATION REGARDING DOMESTIC PRICES IS DIRECTLY CONTRARY TO THE PREVIOUS REVIEW AND PAST PRACTICE

With regard to domestic prices from Brazil, Commerce explained that:

> We are also excluding these data in these final results because the record does not contain any information to value the cost of transportation from Brazilian mills to ports in Brazil. 19 CFR 351.511(a)(2)(iv) states that Commerce "will include delivery charges" in determining the benchmark price a firm would have paid. Commerce has stated that this regulation "is clear in its requirement to use delivered prices which include all delivery charges and import duties when determining whether the provision of a good provides a benefit," and separately enumerates "foreign inland freight, local inland freight, and ocean freight" as delivery charges that may need to be included to ensure the benchmark price represents a price for "delivering the product to the respondents' factory gate."

IDM at Cmt. 5A.  In the previous review, however, Commerce addressed the very same issue where Petitioners argued that Commerce should exclude domestic prices reported by ITTO. Commerce refused, explaining:

> We disagree with the petitioner that evidence indicating certain ITTO data from Brazil are domestic prices is sufficient to exclude such data from our calculation of a tier two benchmark price. Although we stated in the *Preliminary Results* that we calculated benchmarks based on "ITTO export data,"[514] we intentionally included the domestic ITTO prices, and are continuing to do so for these final results. While the petitioner claims that Commerce's practice is to remove all domestic prices from its tier two "world price" benchmark, this is not an accurate characterization of Commerce's past practice. In fact, Commerce "typically considers third-country domestic prices to be available to purchasers on the world market and in the investigated country unless there is evidence on the record" to indicate otherwise. In instances where Commerce has found a price not to be available to purchasers on the world market, it is usually due to lack of relevant infrastructure or another obstacle, such as a geographic or legal barriers. This practice is demonstrated in the case that the petitioner cites to support its argument, *Certain Uncoated Paper from Indonesia*, as in that case Commerce made the decision to exclude domestic Philippine prices based on record evidence that indicated the Philippine timber market was distorted due to "a high proportion of state-owned forest area, a ban on log exports from natural forests, and stumpage rates that may not reflect timber market conditions." In this case, no evidence on the record indicates such an obstacle that would prevent the export of Brazilian fiberboard to Chinese purchasers. Therefore, we disagree with the petitioner that we should exclude certain ITTO data because they are domestic prices.

2020 MLWF IDM at Cmt. 9. When Commerce makes different determinations based on the same facts in the same proceeding, without explanation, the law considers the action arbitrary and capricious. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]gency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.").

###   E.   ITTO SHOULD NOT BE REJECTED FOR PLYWOOD BECAUSE IT IS THE ONLY GRADE SPECIFIC SOURCE

The ITTO prices are not just viable tier 2 benchmarks with regard to plywood, they are only benchmarks on the record that are grade specific.  Record evidence demonstrates that the plywood market is delineated both by species and by grade and that grade in particular has a significant impact on price. The plywood market around the world and in the United States is

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

divided into Grade A, B, C, and D (hybrid grades like CC, CD, etc. are also present). Riverside Benchmark at Exh. 5 ( **PR 283-287**).  The information contained in this exhibit  demonstrates the importance of grade in plywood valuation. Moreover, this fact is further confirmed by an expert statement of Professor Dai, a Wood Sciences professor at the University of British Columbia, who stated as follows:

6. Unlike in other industries or applications (such as wooden cabinets or wooden furniture), the plywood used in MLWF is of a low-quality because it is used for the core of the product, which cannot be seen by the consumer;

7. Based upon my industry experience, most Chinese producers of MLWF choose low grade, fast growing wood species, such as poplar or eucalyptus, to produce plywood for MLWF;

8. There are several factors that influence the price of plywood. These are species type, grade (A, B, C, D), overall thickness and size. The two biggest influences on price are species type and grade, with grade being the most important. There is a significant price difference between Grade AB plywood and Grade CD plywood.

9. Different wood species types have significantly different prices due to desirability of appearance and growth. Slow growing hardwoods - like oak, cherry and walnut that are desired for their appearance and hardness for use in cabinetry and furniture - are much more expensive than fast growing woods like eucalyptus which is used almost exclusively for non-decorative, structural applications. For example, eucalyptus may be priced as low as one-third or one-fourth of any other popular hardwood (e.g., see Attachment 1: ITTO Report Vol 24, page 17);

10. And for the same type of wood, different grades of plywood vary in cost, and therefore in market prices;

11. Grade of plywood is largely determined by the top face of the plywood, and inner plies are always low, C or D grades (Attachment 2: PS-1-2010-APA, pages 16-17, Tables 2 and 3);

12. *I have requested materials and supporting documents for the plywood Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") used in producing MLWF*;

13. I have examined and analyzed the well-recognized American Plywood Association (APA) Structural Plywood Standard (Attachment 2: PS-1-2010-

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

APA, pages 16-21); Some pictures on which I have relied to make judgment are provided in (Attachment 3: Veneer grade of same species);

14. ***I believe the plywood Baroque Timber used in production of MLWF is Grade D or Grade C/D plywood based upon a review of pictures of Baroque's plywood (Attachment 4: Photos of Eucalyptus veneer used by Baroque Timber) and interviews with employees***;

15. Reviewing the Harmonized Tariff Schedule ("HTS") categories for plywood that were placed on the record – i.e., 4412.33, 4412.39 and 4412.32 – ***the only characteristic accounted for in these categories is species (there is a reference to the per ply thickness but not overall thickness of the plywood)***;

*Id*. The record evidence outlined above establishes the following facts:

- Plywood comes in a variety of different grades and these grades significantly impact price;

- Plywood used for subject merchandise is Grade C or D, generally, since a high-quality face veneer is placed on top of the plywood;

- The plywood that Baroque Timber uses in its production is Grade C/D; and

- The HTS provisions used for plywood do not distinguish grade and therefore include all grades of plywood.

Since grade is a significant factor affecting comparability and reflects "prevailing market conditions," Commerce is mandated by statute to account for it. 19 U.S.C. § 1677(5)(E)(iv).

While Commerce did not address Baroque's arguments in this regard in the Final Results because of the outright rejection of the ITTO TTMR data, this issue should be considered when evaluating that rejection. The ITTO data is the source on the record that most closely matches Baroque's plywood purchase. The UNComtrade plywood pricing data does not delineate between grades and, thus, these categories necessarily cover all grades of plywood, including high priced A grade plywood. When Commerce used UNComtrade pricing, it therefore distorted the plywood benchmark by including this higher priced plywood. Thus, Commerce had before it two datasets, each with their own flaws. UNComtrade is overly broad and distortive whereas ITTO data contains domestic prices and exports process that "could" include exports to China.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

In these circumstances, Commerce must "evaluate and explain the relative adequacy and comparability of both datasets." *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1335 (Ct. Int'l Trade 2018).  Commerce's preference for using sources such as UNComtrade cannot "supersede regulatory considerations requiring the use of adequate data." In *Changzhou Trina Solar Energy Co.*, the court remand the case back to Commerce where it was to reconsider UNComtrade data for solar glass and a more specific solar glass price source, IHS.  The court explained: "Commerce failed to meaningfully assess the reliability of the Comtrade data and included it despite indications that it is overinclusive in regards to the types of glass included in the data, underinclusive in failing to include solar glass-producing countries, and by failing to assess whether the monthly fluctuations were due to price variability of solar glass or merely related to other merchandise contained in the HTS headings at issue."

## III.    COMMERCE UNLAWFULLY APPLIED AFA TO WHETHER CERTAIN OF BAROQUE'S INPUT SUPPLIERS WERE GOVERNMENT AUTHORITIES

In its Final Results, Commerce applied AFA to the GOC for failing to provide requested information on any government ownership in, or government influence over, the respondents' input suppliers. As AFA, Commerce found that all of Baroque's input suppliers were government authorities. This determination is identical to the finding in the previous review currently before this court in Ct. No. 23-00136. The facts are virtually identical.  Like in that case, Commerce's AFA determination is not supported by substantial evidence or in accordance with law.

### A.    LEGAL FRAMEWORK FOR AFA DETERMINATIONS IN CVD PROCEEDINGS

To be consistent with the law, Commerce's AFA finding must satisfy three criteria: (1) it must identify a gap in the record; (2) it must identify how the offending party failed to cooperate to the best of its ability; and (3) the application of AFA to *each* element of the subsidy analysis

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

(financial contribution, specificity, government authority, etc.) must be supported by substantial evidence.

The statutory provisions for the application of facts otherwise available and for the application of adverse inferences are separate, but related. The use of facts otherwise available is governed by 19 U.S.C. § 1677e(a):

> (a) In general
>
> If-
> (1) necessary information is not available on the record, or
> (2) an interested party or any other person-
>> (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
>> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
>> (C) significantly impedes a proceeding under this subtitle, or
>> (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
>> the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

The use of "adverse inferences" (*i.e.*, AFA), is governed by 19 U.S.C. § 1677e(b):

> (b) Adverse inferences. If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

The statute accordingly requires satisfaction of both of these separate findings, *i.e.*, an adverse inference cannot be applied unless it is appropriate to use facts otherwise available. *See, e.g.*, *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1289 (CIT 2006) ("Absent a valid decision to use facts otherwise available, Commerce may not use an adverse

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

inference"). Moreover, reliance on facts otherwise available is only appropriate to "fill gaps" in the record necessary for Commerce to complete its calculation. *See Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003) (stating that the use of facts otherwise available is to "fill in the gaps" when "Commerce has received less than the full and complete facts needed to make a determination"); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1255 (Fed. Cir. 2009) ("The legislative history of the URAA thus reveals that Congress intended § 1677e(a) to provide Commerce with gap-filling power to facilitate its implementation of the antidumping laws"); *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) ("Commerce can only use facts otherwise available to fill a gap in the record").

In addition to showing that the information is missing from the record, Commerce is also required to show that the interested party "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). In determining whether a party cooperated to the best of its ability, the courts have instructed that Commerce cannot apply AFA for a "failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel*, 337 F.3d at 1381; *see Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1326 (CIT 2018) ("The use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA"); *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (CIT 2018) ("Compliance with the 'best of its ability' standard is determined by assessing whether the respondent puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation"). As the U.S. Court of Appeals for the Federal Circuit has

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

stated, "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

As discussed below, Commerce failed to meet the requisite criteria described above in its Final Results.

### B. THE APPLICATION OF AFA TO THE GOC FOR THE GOVERNMENT AUTHORITY STATUS OF SPECIFIC INPUT SUPPLIERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

In its Final Results, Commerce found every input supplier reported by both mandatory respondents for the various input for LTAR programs (*i.e.*, plywood, veneers, paint, glue and fiberboard) to be government authorities on the basis of AFA. Specifically, Commerce made this determination because the GOC did not provide certain information requested in the Input Producer Appendix for each supplier, particularly with regard the influence, if any, of Chinese Communists Party ("CCP") officials in the company. This finding is unsupported by substantial evidence and unlawful for certain of Baroque's input suppliers. More specifically, for **eighteen** input suppliers that were either owned by individuals or non-Chinese entities, including two that were affiliates of Baroque, the GOC in fact provided all information requested by Commerce. Thus, there is not a gap in the record with regard to these suppliers and necessary information is not missing, preventing the application of AFA. These suppliers were identified and discussed at length in Baroque's administrative case brief at pages 31-59. (**CR 194, PR 313**).

### 1. Background and Relevant Facts

For a countervailable subsidy to be found under the law, the entity providing the subsidy must be an "authority." 19 U.S.C. § 1677(5)(B). "'Authority' is defined {by 19 U.S.C. § 1677(5)(B)} as a country's 'government' or any 'public entity' within the country's territory." *Borusan*, 61 F. Supp. 3d at 1314. Commerce treats entities that are owned by a

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

government as "authorities." *Countervailing Duties; Final Rule,* 63 Fed. Reg. 65,348, 65,402

(Nov. 25, 1998). This is not in dispute here. Where there is no or minimal government

ownership, as is the issue with eighteen of Baroque's input suppliers, Commerce analyzes "the

totality of record evidence and whether it demonstrates that the government has meaningful

control over an entity such that it possesses, exercises, or is vested with government authority in

order to determine whether it is an "authority" under section 771(5)(B) of the Act." *Phosphate

Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*,

86 Fed. Reg. 9482 (Feb. 16, 2021), IDM at Comment 1.

　　　　To assist in this analysis, Commerce requires the GOC to submit an Input Producer

Appendix for each supplier reported by the mandatory respondents. GOC Initial CVD

Questionnaire Response at Exhibit LTAR-1 (June 7, 2023) (**CR 82-112, PR 97-108**). The GOC

submitted this information in its initial questionnaire response at Exhibit LTAR-1 and Exhibit

LTAR-2 (**CR 82-112, PR 97-108**) and confirmed the information in its supplemental response

on September 7, 2023 (**CR 146, PR.217**). At the outset, it is important to understand the

difference between the information the GOC submitted *in this case* and in Ct. No. 23-00136 in

its input supplier appendix responses and the information the GOC submits *in virtually every

other case*. In almost every case, the GOC refuses to provide the requested documents or answer

many of the questions. More specifically, the GOC refuses to provide information regarding the

two most important questions in the appendix. These relate to ownership and CCP/Government

Entity involvement:

　　　　　　2. For all input producers that are not majority Government-owned and
　　　　　　that produced the input purchased by the respondent companies during
　　　　　　the, please provide the original Chinese and full translations of the
　　　　　　following:

　　　　　　a. Full corporate name of the company and address (please include the
　　　　　　address where the company is registered and the address of each facility.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

Identify the address of the facility(ies) where the input product is produced).
b. Articles of Incorporation.
c. Capital Verification Reports.
d. Articles of Groupings.
e. Company by-laws.
f. Annual Report(s) pertaining to the POR, and the two preceding years.
g. Articles of Association.
h. Business group registration.
i. Business license(s).
j. Tax Registration documents

GOC IQR at Exhibit LTAR-2 (**CR 82-112, PR 97-108**) (hereinafter "The Documents Question"). And:

3. Commerce understands that for each level of Government, i.e., central, provincial, municipal, county, township and village ("county, township, and village" will hereafter be referred to collectively as "local"), there are corresponding (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), and (8) the Discipline Inspection Committees of the CCP. Commerce also understands that, in accordance with the CCP Constitution, a (9) CCP committee, branch, or "primary organization" needs to be formed in any enterprise with three or more party members, regardless of state ownership. For the purposes of this questionnaire, we refer to officials of any of these 9 entities as "Government or CCP officials." Please explain whether a CCP committee, branch or "primary organization" has been formed within the enterprise. Please also explain any decisions taken by the entity that are subject to review or approval by the Government or the 9 entities listed above, as either an owner or regulator, or both (*e.g.*, mergers/acquisition, issuance of shares, change in capital structure, change in leadership positions or board composition, *etc.*).

*Id*. at Exhibit LTAR-1 at p. LTAR-51 (hereinafter the "9 Entities Question"). Often the GOC only provides information contained in its Enterprise Credit Information Publicity System ("ECIPS"), which is the country's business registration system that identifies ownership, and outright refuses to provide a response to the 9 Entities Question. This failure to provide

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

information always results in AFA and every input supplier being found to be a government authority. **As in the previous review, this case is different.**

In this case, the GOC provided detailed responses (and documentation where requested) to all questions in the Input Supplier Appendix, including the two questions above. For each of the eighteen suppliers, the GOC provided incontrovertible evidence on each companies' ownership, including ECIPS information for each company and all the documents requested in the Documents Question (where such documents existed). This information showed these companies were owned by individuals or by foreign companies. *See* GOC Initial QRE at Exhibit LTAR-2 (**CR 82-112, PR 97-108**). Two of these suppliers were even affiliates of Baroque. Baroque Affiliation Response at Exhibit 1 (**CR 11-14, PR 68**). Commerce does not appear dispute this evidence and did not find that the ownership information provided was deficient or missing. IDM at Cmt 4.

Then, for each of these suppliers, the GOC responded fully to the 9 Entities Question as follows:

> There is no primary party organization in this producer. There is no decision taken by the producer that are subject to the review or approval by the Government or the 9 entities listed in the question. As demonstrated in the Articles of Association of the producer, the decisions are made within internal organizations of the producer without reference to any external review or approval.

GOC IQR at Exh. LTAR-1, pp. 51-56 (**CR 82-112, PR 97-108**).  The Input Supplier Appendix also asks:

**Key Persons**

1. Identify the senior managers of the entity and the Members of the Board of Directors (if any) during the POR. Explain how these positions are filled in each of the enterprises. What is the role of the CCP Central Organization Department in the selection and monitoring of senior management? Where is the process for filling these positions spelled-out, *e.g.*, company by-laws? Explain the role of minority shareholders in filling these positions. Explain any requirements for Government and/or CCP representation at any level of the enterprises.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

And

> 2. Please identify any individual owners, members of the board of directors, or senior managers who were Government or CCP officials during the POR. Where an owner, member of the board of directors or manager of the input producer, or any owner at any level of ownership of such producer, has been identified as an official of any of the nine entities named in Section F, above, please provide the information requested below with respect to that entity. (Please note that these questions do not pertain to general membership in the CCP.)

The GOC responded *fully* to each of these questions for these eighteen suppliers. *Id*. at pp. 64-73.

The GOC also obtained signed statements from suppliers explaining what the documentation provided establishes, namely, that the company operates according to the *Company Law* of *China*, operates according to its Articles of Association, and certifies that there is no primary party organization at the company. *Id*. at Exh. PLY-1, Exh. FIB-1, Exh. VEN-1, Exh. BACK-1, Exh. GLUE-1 and Exh. PAINT-1  (containing statements from certain suppliers). Each of the suppliers' statements also explain that there are no decisions taken by the company that are subject to the review or approval by the Government or Government entities queried by Commerce. Indeed, as demonstrated in the Articles of Association provided, decisions are made within the internal organizations of the companies without reference to any external review or approval.

Commerce asked additional CCP related questions in a supplemental:

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

14. For all producers from whom the respondents purchased inputs during the POR, please identify whether any owner, director, or manager is a member or representative of any of the following entities: (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), (8) the Discipline Inspection Committees of the CCP, and (9) a CCP committee, branch, or "primary organization." Please also explain any decisions taken by each entity that are subject to review or approval by the GOC or the nine entities listed in the Commerce's questionnaire, as either an owner or regulator, or both (*e.g.*, mergers/acquisition, issuance of shares, change in capital structure, change in leadership positions or board composition, *etc.*).

**Response:** The GOC has confirmed that, for those companies the GOC is able to collect and submit requested documents in the IQR, the owners, directors, or managers are not members or representatives of any of the above mentioned 9 entities. Further, the company has submitted signed statements which confirm that the owners, director, or manager are not members or representatives of any of the nine entities and also, all decisions and operations of the company are made independently, internally by the company, and not subject to any external interference by any third-party organizations, institutions, individuals, etc.

15. For all producers from whom the respondents purchased inputs during the POR, please identify which owners, managers, and directors were Chinese government or CCP officials during the POR.

**Response:** The GOC has confirmed that, for those companies the GOC is able to collect and submit requested documents in the IQR, all of the owners, directors or managers were not Chinese government or CCP officials during the POR

16. For [   ] input producers, you claimed that [
          ] and [
                ]. Please explain what, if any, steps you took to verify or further examine the accuracy of this information, including what, if any, documentation was reviewed. Provide documentation to support your response.

**Response:** The GOC has provided the articles of associations of the input producers which identifies the decision making authority of each of the producers. Neither the decision-maker, nor the decision making process, involves the participation of external parties except the company itself.

GOC Supp Response at 9-10 (**CR 146, PR.217**). The GOC fully responded to theses questions.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

In the Final Results, Commerce maintained its preliminary position that AFA was warranted for the GOC's failure to provide requested information. Specifically, Commerce found that:

> As a result of incomplete responses to Commerce's questionnaires, we find that the GOC failed to cooperate by not acting to the best of its ability to comply with our requests for information. Consequently, we determine that the GOC withheld information, and that an adverse inference is warranted in selecting from the facts available. As AFA, we find that CCP officials are present in each of the mandatory respondents' privately-owned input producers as individual owners, managers, and members of the boards of directors, and that this gives the CCP, as the government, meaningful control over the companies and their resources.

IDM at Cmt. 4.

    2.    **Argument**

        a.    **Commerce Did Not Address Specific Input Suppliers, Rendering its Determination Unreviewable**

The first step in the application of AFA is to determine whether information is missing from the record. *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348; *see Changzhou Trina Solar Energy Co., Ltd.*, 352 F. Supp. 3d at 1326 ("The use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA"). In its Final Results Commerce did not specifically address any of the eighteen input suppliers that Baroque raised in its brief. Instead, Commerce's determination speaks mostly in generalities about the information provided rendering a review of whether and what information was missing or deficient for **each specific input supplier** impossible. *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ("[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review'"); *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (agency decisions must be

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

"reached by 'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choices made").

A determination whether an entity is a government authority within the meaning of the statute is a particular factual finding specific to that entity. Commerce's determination as to *each* input supplier must be supported by substantial evidence. Commerce cannot use the failure to provide certain information for one input supplier (or a certain group of input suppliers) as an imputed finding that information is missing for a different, specific supplier. This is particularly true in this case where the GOC provided different kinds and documentary information for certain input suppliers. This means that in order for Commerce's AFA determination to be supported by substantial evidence it is "Commerce's burden to provide enough information to allow the court to discern reasonably which particular evidence Commerce determined was missing." *GODACO Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1354–55 (CIT 2020). Commerce has not done that here.

### b.    Necessary Information Is Not Missing From the Record

As noted, Commerce must identify what information missing and why that information is necessary.  If necessary and missing, Commerce can only apply adverse inferences if the information is deficient in some way; these include: when (1) "necessary information is not available on the record, or" an interested party (2) "withholds information that has been requested," (3) "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," (4) "significantly impedes a proceeding ... or," (5) "provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a)(1)–(2).

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

The entire focus of Commerce's AFA determination with regard to the eighteen non-government owned suppliers is the existence, or not, of CCP officials' involvement in the companies.  Commerce's conclusion can be distilled to three premises: 1) they believe that primary party organizations must be present in all companies and, thus, consider the GOC's statements that these organizations are not present in the eighteen suppliers untruthful (or unsubstantiated)[4]; 2) they do not believe the GOC that it does not have a central database and otherwise will not accept certifications as evidence of no CCP official involvement[5]; and 3) that the GOC must provide documentary evidence to show that the lack of CCP official involvement but will not advise the GOC on what exactly that documentation is or how to prove a negative.[6] These conclusions are without merit, unreasonable and unsupported by record evidence.

Neither the 9 Entities Question nor any other question in the initial questionnaire related to the CCP official involvement requests documentation.  If the answer is yes, the questions ask the GOC to explain. If the answer is no, Commerce does not provide any further direction on how to respond. It is axiomatic that "it is Commerce, not the respondent, which bears the burden of asking questions[,]" and that Commerce must ask "clear" questions "to let the respondent know what information it really wants". *Ta Chen Stainless Steel Pipe, Ltd. v. United States,* 23 CIT 804, 820 (1999); s*ee also NSK Ltd. v. United States,* 910 F.Supp. 663, 671 (1995) ("[r]espondents should not be required to guess the parameters of Commerce's interpretation of a phrase in the statute").  Commerce cannot lawfully deem information necessary that it does not ask for. The GOC fully responded that none of the eighteen suppliers have any managers, owners or directors that are CCP officials and none of the companies have primary party organizations.  Thus, the GOC's response to the 9 Entities Question and questions

---

[4] IDM at Cmt. 4, p 47.
[5] IDM at Cmt. 4,  p. 48
[6] Id.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

regarding CCP official involvement was not missing from the record or deficient. Commerce

provides no explanation why responding fully to the 9 Entities Question in this manner results in

the information being rendered missing from the record. If the information is not missing, facts

available and adverse inferences cannot be applied. *Zhejiang Dunan Hetian Metal Co.*, 652 F.3d

at 1348.

The only question requesting documentation regarding CCP official involvement came in

a supplemental:

> 16. For [16] input producers, you claimed that [the CCP has no role in the decision making of
> the producers] and [the input producers are not required to carry out obligations on behalf of
> the GOC and/or CCP]. Please explain what, if any, steps you took to verify or further
> examine the accuracy of this information, including what, if any, documentation was
> reviewed. Provide documentation to support your response.

GOC Supp at 9-10 (**CR 146, PR.217**).  Earlier in the response the GOC noted that it had

contacted the companies and obtained certifications to this effect.  In response to this question,

the GOC noted that the companies own articles of association prevented the involvement of

outside parties like the CCP in decision making. *Id*.

In its decision, Commerce found these responses deficient because:

> It is essential for the GOC to respond in full to Commerce's questions
> regarding the role of CCP officials and organizations in the management
> and operations of the input suppliers. As explained in *Metal Lockers*:
>
> > {P}ublicly available information indicates that Chinese law
> > requires  the establishment of CCP organizations "in all companies,
> > whether state, private, domestic, or foreign-invested" and that such
> > organizations may wield a controlling influence in the company's
> > affairs.[194]

IDM at Cmt. 4.  Commerce then explained that in the 2019 review of this proceeding, the GOC

indicated that one supplier had a primary party organization and that the information submitted

showed that the CCP had involvement. *Id*. Commerce then notes that "As explained in the Public

Bodies Memorandum, an entity with significant CCP presence on its board, or in management,

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

or in party committees, may be controlled such that it possesses, exercises, or is vested with governmental authority." *Id*.

This explanation does not adequately explain with legal and factual support how the GOC's statements were deficient, missing or uncooperative when it explained that none of the suppliers have primary party organization and only had certifications to prove a negative. First, there is no evidence on the record that permits Commerce to disregard the GOC's statements that the companies do not have primary party organizations. The CCP Constitution states that a primary party must be formed in an organization where there are three or more party members. *See* Memo to File, Public Bodies Analysis at Section 129, An Analysis of Public Bodies in Peoples Republic of China in Accordance with the WTO Appellate Bodies Findings in WTO DS379, p. 36 (**PR 169**) ("In accordance with the *CPP Constitution*, all organizations, including private commercial enterprises, are required to establish "primary organizations of the party" (or "Party committees") if the firm employs at least three party members.") This means that where there are *not* three party members in the company, no primary party is necessary. Thus, it is neither unreasonable to conclude nor contradicted on the record that there would be private companies without a primary party organization. Indeed, with only about 100 million CCP members in China[7] compared to a population of about 1.4 *billion*[8], this means only 7% of the publication in China are party members. Thus, there are likely *many* companies that do not have three party members.

Second, Commerce's reliance on *Metal Lockers* for the existence of primary party organizations in *all* private companies is misplaced. This case cannot be used to disprove or disavow the GOC's statements in this case that the suppliers have no primary party organization

---

[7] https://www.scmp.com/news/china/politics/article/3183669/chinas-communist-party-grows-near-97-million-its-made-younger
[8] https://data.worldbank.org/indicator/SP.POP.TOTL?locations=CN

or involvement.  In that case, the GOC did not respond to the 9 Entities Question, did not provide information regarding primary party organizations within the respondents' input suppliers, and did not answer questions about CCP officials within the suppliers.  Instead, the GOC simply argued that 1) "the information provided from ECIPS was sufficient for our analysis," and that, *in general,* 2) CCP involvement would not make the company a government authority.  *Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,741 (July 7, 2021), IDM at Cmt. 5.  Thus, Commerce itself in that case was simply responding to the *general, theoretical* argument that CCP involvement in a company could never turn it into a government authority. A theortheical argument is not at issue in this case. In this case, Plaintiffs argue that there was no CCP involvement in their suppliers based on actual record evidence.

Third, Commerce's reference to the *2019 Multilayered Wood Flooring Review* is also misplaced.  Indeed, this case supports Plaintiffs argument. In that case (currently before this court in Ct. No. 22-210), the GOC reported that one of the respondents' suppliers had a primary party organization, while others did not. Commerce uses this fact here to try and demonstrate that the CCP is involved in private companies or that evidence can be submitted to show CCP involvement.  What this case instead demonstrates is that the GOC's answers to the 9 Entities Question can be and is reliable and that documents can be submitted, *if there is CCP involvement*.  If there is no involvement, the GOC's statement is evidence of that fact just as the GOC's statement that the company does have a primary party organization is evidence.

Finally, Commerce concludes that certifications from the supplier cannot be supportive documentation of the absence of CCP official involvement.  At the outset, this is contrary to the courts holding in the numerous cases involving the Export Buyer's Credit Program. *Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364, 1369 (Ct. Int'l Trade 2023). In those cases,

the court found it appropriate to rely on third-party certifications as support for the third-party's non-use of the program. This is no different. Here, Commerce asked the GOC how it "verified or further confirmed the accuracy" of its statements of no CCP official involvement. Obtaining certifications were part of that verification.  There is no basis in the law or facts on the record dictating that these certifications cannot be used to help support a "negative."

Indeed, proving a negative, in general, is exceedingly difficult under normal circumstances.  And, in these CVD cases, even more so. The GOC in CVD proceedings is attempting to prove a fact that never existed (i.e., no officials from any CCP entity in the country or primary party organizations). Commerce asks about involvement in the following CCP entities: (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees, (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), (8) the Discipline Inspection Committees of the CCP, and (9) a CCP committee, branch, or "primary organization."  This covers every level of society in China (i.e., local, provincial, central) and hundreds, if not thousands, of entities.  Moreover, very often there are 100s of suppliers involved in a case. Despite the inherent complexity, and fact that the GOC does not have any sort of centralized database to draw from, Commerce has not provided direction in how to demonstrate these facts, *in any case* since 2007 other than the reference to *Citric Acid from China 2012*[9].  That case, however, has extremely unique facts not transferable to most other situations.

In *Citric Acid from China 2012*, Commerce evaluated whether two individually owned input suppliers had CCP official involvement.  The owner of both had been Secretary of the

---

[9] *See Citric Acid and Certain Citrate Salts {from the People's Republic of China}: Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78,799 (December 31, 2014) (Citric Acid from China 2012 AR), and accompanying IDM at Comment 5B.

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

Party Committee of Liujiadu Village prior to the POR but no longer held that position during the POR. In finding that the Company did not have CCP involvement, Commerce explained the information provided in the IDM:

> GOC provided a certified letter from the CCP Committee of the village indicating that the owner of Companies B and C held the position of Secretary from June 2009 to December 2011. 216 The Department established at verification through official government documentation provided by the GOC and the CCP (e.g., stamped originals of election notification from the CCP Committee of Lijiaxiang Town), that the owner of Companies B and C did not serve as Secretary for the Party Committee of Liujiadu Village in the PRC during the POR and that the village does not geographically overlap with the locations of the producers' operations. 217 The Department was also able to establish at verification that another person was elected to the position of Secretary for the Party Committee of Liujiadu Village on December 28, 2011, ending the owner of Companies B and C's tenure as Secretary before the POR. In addition, the December 28, 2011 election notification announced the approval of another person for Secretary of the Party Committee for the village in which Companies B and C are located.

*Citric Acid from China 2012* at IDM Cmt. 2. This type of "documentation" was only possible because the owner *had been* secretary of a specific government entity and then *was no longer* part of that entity. Commerce failed to specify *in the instant review* what sort of documentation could be provided for a scenario where none of the owners or managers were *ever* part of any of the 9 Entities. Indeed, it is notable that Commerce did not require in *Citric Acid from China 2012* that the GOC demonstrate with official documentation that the owner was not part of any of the other 9 Entities; it only required documentation to show that the owner was no longer part of the one government entity he had previously been involved with. It is therefore entirely unreasonable, and indeed arbitrary and capricious, to use the specific factual scenario presented in *Citric Acid from China 2012* as the basis for determining that the GOC did not act to the best of its ability in this case.

Ultimately, the GOC responded to all questions to the best of its ability and responded to

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

those questions fully.  There is no legal or factual basis to disregard the GOC's responses and no evidence on the record that impeaches the information submitted.  Without any missing information, facts available, let alone AFA, cannot be applied.

## CONCLUSION

For the reasons discussed above, Baroque requests that this Court hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law, and remand the *Final Results* with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*

Andrew T. Schutz
Francis J. Sailer Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  January 23, 2025

PUBLIC VERSION - CONFIDENTIAL INFORMATION HAS BEEN REMOVED

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Memorandum of Law in Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 10,376 words, less than the 14,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Counsel to Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation*

Dated: January 23, 2025