## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ x | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, : | |
| : | |
| Plaintiffs, : | |
| : | Court No. 24-0106 |
| v. : | |
| : | **PUBLIC VERSION** |
| UNITED STATES, : | |
| : | |
| Defendant, : | |
| : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ x | |

## <u>PLAINTIFFS' REPLY BRIEF</u>

Andrew T. Schutz
Francis J. Sailer
Jordan C. Kahn
Michael S. Holton

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: June 12, 2025

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

I.    COMMERCE'S REJECTION OF THE ITTO DATA WAS DIRECTLY CONTRARY TO
      PAST PRACTICE, UNREASONABLE, AND NOT SUPPORTED BY THE RECORD IN
      ANY WAY ............................................................................................................ 1

      A.    Commerce Has a Long Practice of Using Tier 2 Sources Where the Export Destination is
            Unknown .................................................................................................... 2

      B.    Record Evidence Demonstrates that the ITTO Prices Do Not Include China Prices ......... 5

      C.    Grade is Relevant Consideration ................................................................... 7

      D.    Domestic Prices Should Not Be Rejected ....................................................... 9

II.   THE COURT SHOULD REMAND THE GOVERNMENT AUTHORITY ISSUE AS IT
      HAS IN OTHER APPEALS OF THIS PROCEEDING ....................................... 10

      A.    The Court Has An Insufficient Basis On Which To Review Commerce's Determination
            ................................................................................................................ 10

      B.    Requested Information Was Not Missing from the Record ............................... 12

CONCLUSION ............................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baroque Timber Indus. (Zhongshan) Co. v. United States,*
766 F. Supp. 3d 1296 (Ct. Int'l Trade 2025) ...............................................10, 17, 18

*Baroque Timber Indus. (Zhongshan) Co. v. United States,*
No. 22-00210, 2025 WL 999962 (Ct. Int'l Trade Apr. 3, 2025) ...............................10, 16, 17

*Borlem S.A.-Empreedimentos Industrias v. United States,*
913 F.2d 933 (Fed. Cir. 1990)...............................................................................7

*Catfish Farmers of Am. v. United States,*
37 C.I.T. 717 (2013) ...............................................................................5

*Guizhou Tyre Co. v. United States,*
557 F. Supp. 3d 1302 (CIT 2022).........................................................................11

*Hyundai Heavy Indus. Co. v. United States,*
332 F. Supp. 3d 1331 (CIT 2018)...........................................................................2

*Lucent Techs., Inc. v. Gateway, Inc.,*
580 F.3d 1301 (Fed.Cir.2009)...............................................................................5

*PAM S.p.A. v. United States,*
463 F.3d 1345 (Fed. Cir. 2006).............................................................................16

*SKF USA Inc. v. United States,*
263 F.3d 1369 (Fed. Cir. 2001).............................................................................2

*Universal Camera Corp. v. N.L.R.B.,*
340 U.S. 474 (1951)...............................................................................7

**Regulations**

19 C.F.R. § 351.511 ...............................................................................9

**Administrative Decisions**

*53-Foot Domestic Dry Containers From the People's Republic of China:Final*
*Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 21,209 (April
17, 2015) ...............................................................................6

*Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of*
*China:Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg.
51,775 (August 26, 2015) ...............................................................................3

*Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative; 2022*, 89 FR 88957 (Nov. 12, 2024) ............................4

*Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 7537 (January 29, 2021) ..................................................................................................................3, 4

*Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,741 (July 7, 2021) .........................................................................................................................13

*Certain Metal Lockers and Parts Thereof from the People's Republic of China: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 61514 (September 7, 2023).........................3

*Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 89 Fed. Reg. 11,251 (February 14, 2024) .................................................................................3

*Certain Non-Refillable Steel Cylinders from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 Fed. Reg. 53,323 (August 28, 2020)................................................................................3

*Certain Non-Refillable Steel Cylinders from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 15,192 (March 22, 2021) ...............................................................................................................3

*Citric Acid and Certain Citrate Salts {from the People's Republic of China}: Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78,799 (December 31, 2014) .......................................................................14, 15

*High Pressure Steel Cylinders From the People's Republic of China: Final Affirmative Countervailing Duty Determination* 77 Fed. Reg. 26,738 (May 7, 2012)........................................................................................................................3

*High Pressure Steel Cylinders From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 71,373 (Dec. 27, 2019).......................................................................................3

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Oct. 27, 2021).....................................................................................5

*Multilayered Wood Flooring From the People's Republic of China: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022*, 90 Fed. Reg. 13,142 (Mar. 20, 2025)..............................................................................5

*Pentafluoroethane (R-125) from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 87 Fed. Reg. 1110 (January 10, 2022) .................................................................................................................3, 4

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty DeterminationFinal Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 9482 (Feb. 16, 2021) ...............................................................11

*Tool Chests and Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 82 Fed. Reg. 56,582 (November 29, 2017) ....................................................................................................................3

*US – Anti-Dumping and Countervailing Duties (China); United States – Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India,* WT/DS436/AB/R (8 December 2014) .................................................................11

PUBLIC VERSION

## INTRODUCTION

Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation (collectively "Baroque") submit this Reply Brief in response to the Response Brief filed by Defendant (the "Government") ("Gov. Br.").  For the reasons outlined below, and in Baroque's 56.2 motion and brief ("Baroque Br."), the Court should reject the Government's arguments in full.

## ARGUMENT

### I.     COMMERCE'S REJECTION OF THE ITTO DATA WAS DIRECTLY CONTRARY TO PAST PRACTICE, UNREASONABLE, AND NOT SUPPORTED BY THE RECORD IN ANY WAY

The Government in its brief argues that Commerce correctly and lawfully rejected the ITTO TMR data based on the record. Gov. Br. at 12-19. Specifically, the Government states that (1) using the ITTO TMR data is not a "practice" and rejecting the data was otherwise reasonable; (2) using the ITTO TMR data would depart from its prior practice of excluding datasets that may contain Chinese export data; (3) there is no evidence that the ITTO data had sufficient detail to either to back out Chinese exports or provide reasonable certainty that the datasets contained no such Chinese data; and (4) rejecting domestic prices is consistent with past practice. *Id.*

These arguments completely ignore record evidence conclusively showing that the ITTO TMR pricing *does not* include prices to China – Ghana exports are for Regional Markets, Peru exports are for Mexico, and Brazil exports are for the EU.  In light of these facts raised for the first time in Baroque's brief,[1] the Government should have requested a voluntary remand for Commerce to address these arguments, which it clearly did not consider in the Final Results.

---

[1] Since Commerce made this determination for the first time in the Final Results, Baroque did not have an opportunity to address this issue or raise this point.

The Government's refusal to recognize this data and attempts to sweep it away with claims of reasonableness should be rejected.

### A.    COMMERCE HAS A LONG PRACTICE OF USING TIER 2 SOURCES WHERE THE EXPORT DESTINATION IS UNKNOWN

The Government first argues that using the ITTO data in this proceeding is not a practice because it is not a "norm" and that Commerce otherwise provided a "reasoned analysis" for its change citing IDM at pages 50-52.  Commerce's practices do not need to rise to the level of a "norm" for Commerce to be required to follow those practices. It is well settled that Commerce must treat similar factual scenarios the same absent a reasonable explanation for a departure.  *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  This axiom must be followed regardless of whether the factual scenario is a practice or not.  And the reasonable explanation for the departure must be based on substantial evidence.  *Id*.

To establish Commerce's reasonableness in changing positions and treating the same situation differently, the Government then merely repeats Commerce's reasoning from the IDM that the ITTO TMR data was properly rejected because it was unknown whether the ITTO prices included export prices to China.  Def. Br. at 14.  This is not sufficient for the substantial evidence standard.  *See Hyundai Heavy Indus. Co. v. United States*, 332 F. Supp. 3d 1331, 1349 (CIT 2018) ("Commerce's Issues and Decision Memorandum, by itself, does not constitute substantial evidence.").  The Government does not provide any explanation of the cases cited by Commerce in support of its position or how those cases apply to the ITTO TMR data or the facts of this case.  For these reasons, the Government's position must be rejected.

Commerce's IDM cites four main cases for its position that benchmark sources can be

rejected where it is unknown whether China prices are included - *Lockers from China AR 20-21*[2], *Cylinders from China*[3], *Pentafluoroethane (R-125)*[4] , and *Inhibitors from China*[5].  IDM at n. 220, 221 and 222.  These cases are inapposite to the situation here.  First, for both *Lockers from China AR 20-21* (which addressed a steel pricing source SBB/Platts) and *Cylinders from China* (which addressed a steel pricing source MEPS), no party in the proceeding challenged the Department's preliminary determination to exclude the data.  Other Commerce proceedings have used these sources as a viable tier 2 sources[6] and it is not uncommon for Commerce to initially reject certain sources only to reverse itself in the final decision.  *See*, e.g., *Tool Chests and Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 56,582 (November 29, 2017), and accompanying I&D Memo at Cmt. 5 ("Although we

---

[2] *Certain Metal Lockers and Parts Thereof from the People's Republic of China: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 61514 (September 7, 2023) ("*Lockers from China AR 20-21*"), and accompanying PDM at 26, unchanged in *Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 89 Fed. Reg. 11,251 (February 14, 2024), and accompanying IDM at Comment 3.

[3] *See Certain Non-Refillable Steel Cylinders from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 Fed. Reg. 53,323 (August 28, 2020) ("*Cylinders from China*"), and accompanying PDM at 36, unchanged in *Certain Non-Refillable Steel Cylinders from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 15,192 (March 22, 2021), and accompanying IDM).

[4] *Pentafluoroethane (R-125) from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 1110 (January 10, 2022), and accompanying IDM at Comment 5.

[5] *Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 7537 (January 29, 2021) ("*Inhibitors from China*"), and accompanying IDM at Comment 7E.

[6] See *High Pressure Steel Cylinders From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 71,373 (Dec. 27, 2019), accompanying IDM at Cmt. 1 (using a simple average of UN Comtrade, CIS Database, Steel Orbis and Metal Expert); *High Pressure Steel Cylinders From the People's Republic of China: Final Affirmative Countervailing Duty Determination* 77 Fed. Reg. 26,738 (May 7, 2012), and accompanying I&D Memo at p. 18 ("Based on our review of the proposed benchmarks, we are relying on prices from both MEPS and the SBB for hot- rolled strip, hot-rolled coil, and hot-rolled plate/sheet."). *Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 51,775 (August 26, 2015), accompanying I&D Memo at Cmt. VII ("The Department finds the pricing data from American Metal Market ('AMM'), MEPS (International) Ltd., Metal Bulletin, Steel Orbis, and SBB-Platts to be sufficiently reliable and representative").

preliminarily rejected the data from AMM, Steel Orbis, Platts, or CRU, we reconsidered our approach for this final determination. After reviewing the record, we have determined it is appropriate to include the data at issue, consistent with prior cases, given that the data are from commercially published independent sources."). Thus, references to unchallenged preliminary decisions is of little utility.

Second, in *Pentafluoroethane (R-125)*, Commerce rejected petitioner's benchmark data because it undeniably and expressly included China prices and petitioner failed to exclude those China prices. *Pentafluoroethane (R-125)* IDM at Comment 5. Commerce did not reject the data because it was *unknown* whether the data included China prices or not. Similarly, in *Inhibitors from China* the benchmark source submitted undeniably included export prices to China, requiring their rejection as a tier 2 price. Again, the issue was not whether it was *unknown* if China prices were included.

Ultimately, the cases cited by the Commerce in the IDM and implicitly relied upon by the Government in its brief do not support the position that the ITTO data could be rejected because of speculation that the prices could include export prices to China. While there are some anomalous past cases noted above where Commerce has rejected certain pricing because it was unknown whether the prices included Chinese prices, overall Commerce has repeatedly used sources similar to the ITTO as tier 2 benchmark despite not knowing the ultimate destination of the goods. *See, e.g.*, *Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative; 2022*, 89 FR 88957 (Nov. 12, 2024), IDM at Cmt. 6 (using prices published by London Metal Exchange for unknown destinations as a tier 2 benchmark for aluminum ingot). Indeed, the Department has repeatedly found the ITTO prices

reliable, citing other cases with similar sources,[7] and used ITTO in the most recently completed preliminary results. *Multilayered Wood Flooring From the People's Republic of China: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2022*, 90 Fed. Reg. 13,142 (Mar. 20, 2025), PDM at "Input Benchmarks".

Here, no party in the underlying proceeding argued that the ITTO data should be rejected because the data could *theoretically* include prices to China. The Department's *sua sponte* decision to reject the data based on speculation is not reasonable by any measure.  See *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed.Cir.2009) ("It is well established that speculation does not constitute substantial evidence."); *Catfish Farmers of Am. v. United States*, 37 C.I.T. 717, 733 (2013) (acknowledging that, although "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion .... speculation does not amount to reasonable inference, as it provides no factually-grounded basis for sustaining an agency's determination").

## B.    RECORD EVIDENCE DEMONSTRATES THAT THE ITTO PRICES DO NOT INCLUDE CHINA PRICES

After downplaying Commerce's long history of using sources similar to ITTO for tier 2 benchmark, the Government in its brief then *concedes* that "the Brazil and Peru plywood export prices do indicate a destination of the European Union and Mexican markets" and are not destined for China. Gov. Br. at 16. Thus, it is not speculative whether the prices include China prices; these prices categorically *do not* include China prices.  Despite this admission, the

---

[7] *See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 59,362 (Oct. 27, 2021), IDM at Cmt. 6.  Commerce further noted in that review that it often "used tier two benchmark prices from various sources other than UN Comtrade data, such as the London Metal Exchange, Steel Business Briefing, MEPS, and Steel Orbis." *Id.*

Government then states that, "Commerce determined that the ITTO data overall did not sufficiently demonstrate the exclusion of all possible Chinese exports." *Id.* This is blatantly wrong.

The Government cites to the IDM at 49-52 for its suggestion that Commerce reasonably rejected the ITTO data despite being aware that the Brazil and Peru prices were for the EU and Mexican markets only. *Id.* There is no reference, however, in the IDM of this fact or any statement in the IDM that would suggest that Commerce was aware that the Brazil and Peru prices were for specific markets. To the contrary, Commerce's IDM states that "the TTMR export data were {not} provided in a way that permits Commerce to exclude exports to China." IDM at Cmt 5A. Commerce then states that "the TTMR data report AUVs for exports of certain species of veneer and plywood from Ghana, Peru, and Brazil **to all destinations**" and that "The underlying data from both sources provide no means of breaking out and removing exports destined for China." *Id.* at n. 217 (emphasis added). This statement is incorrect.

Similarly, there is no discussion in the IDM of the Ghana prices specifically and that the prices are for "regional markets". **PR 283-287.** Regional markets cannot reasonably be considered to include prices to China, a continent and ocean away from Ghana. *See 53-Foot Domestic Dry Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 21,209 (April 17, 2015), and accompanying I&D Memo at 5. Provision of Hot-Rolled Sheet and Plate for LTAR. (Using region specific benchmarks such as "Metal Bulletin, Steel Orbis (FOB Ukraine), and SBB-Platts (FOB CIS)" to value hot-rolled steel plate)[8].

---

[8] "CIS" refers to the Commonwealth of Independent States, which is a region that includes Armenia, Azerbaijan, Belarus, Kazakhstan, Kirghizstan, Moldavia, Uzbekistan, Russia, Tajikistan, Turkmenistan, Ukraine, and Georgia.

In addition, while we agree that currency alone cannot determine the destination,[9] the currency is only one piece of evidence that should be considered.  It is unlikely that euros would be used in sales to China.  Finally, the Government had no response to Baroque's argument that the prices are FOB port price rendering the destination irrelevant since all purchasers take title *in Ghana*.  This is in contrast to UNComtrade data which provides prices specific to particular destinations, all of which are different and separately reported, permitting Commerce to exclude China.  This is precisely why Commerce has generally treated sources like ITTO differently than UNComtrade data.

Commerce's failure to address conclusive record evidence regarding the identified destinations for Ghana, Brazil, and Peru prices requires a remand.  *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.");  *Borlem S.A.-Empreedimentos Industrias v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990) (upholding the CIT's remand of the Commission's positive material injury determination where "the decision under review rests on an erroneous fact").  There can be no real dispute that Commerce's decision here was based on an erroneous fact.

### C.    GRADE IS RELEVANT CONSIDERATION

In its brief, Baroque argued that "record evidence demonstrates that the plywood market is delineated both by species and by grade and that grade in particular has a significant impact on price" and that the ITTO data is the only price on the record that delineates by grade.  Baroque Br. at 17.  Baroque further noted that Commerce incorrectly stated that "For Ghana, the TTMR

---

[9] Gov. Br. at 16.

offers plywood prices for three different species, none of which are grade-specific." IDm at Cmt 5A. at n. 210. The Government ignored this error and responded to these arguments by arguing that "grade-specificity does not override any and all other considerations." Gov. Br. at 16. Baroque does not argue that grade is the only factor that matters in this inquiry, but it is a significant one and Commerce's claim to the contrary is not reasonable or supported by substantial evidence.

In its brief, to demonstrate that grade is not a significant factor in the pricing of plywood, the Government argues that "Commerce also elaborated that based on data in the record, 'prices of grades better or lesser than BB/CC would lead to a relatively small 5 or 10 percent price variation' and that 'that prices for B/C grade during the{period of review} were, in some instances, priced lower than C/C plywood." Gov. Br. at 17. The Government then states that regardless this pricing difference between grades does not have a "significant" impact on pricing. Baroque strongly disagrees. Baroque reported purchases of plywood during the POR totaling [          ] RMB. *See* Final Calculation at "Baroque Plywood" tab, summing column U (**CR 199[10]**). If prices were 10% higher, the difference would be [                    ]. Thus, for simplicity, if Baroque's plywood purchases were grade C and the purchases were being compared to a grade B benchmark that was 10% higher, this would result in a benefit of [                    ] and an CVD *ad valorem* rate of 1.5% ([                         ]). Thus, this 5-10% price difference caused by a particular physical attribute of the input results in a well above a *de minimis* CVD rate. And, therefore, selecting benchmark prices that include

---

[10] The calculation worksheet does not have a public version.

grades that Baroque does not use, results in benefits caused by product differences rather than subsidization.  Ultimately using a source that does not specify the grade like UNComtrade data leads to the least distortive results.

### D.    DOMESTIC PRICES SHOULD NOT BE REJECTED

Finally, the Government argues that Commerce was correct to reject the domestic ITTO prices because inland freight in Brazil is not included.  Gov. Br. at 18.  The Government further claims that Baroque's references to Commerce's previous, express finding in this proceeding that domestic ITTO prices can be used is inapposite because that decision did not reference 19 C.F.R. § 351.511(a)(2)(iv).  This is without merit.  It is not reasonable to presume that Commerce ignored its own regulation in making its previous determinations. Commerce has used domestic pricing in other cases and the previous decision in this proceeding was not an anomaly. Moreover, this provision is used to adjust the benchmark and cannot be used as the basis for rejecting the benchmark price, particularly where an adjustment such as inland freight has such a nominal impact on the benchmark.

Section 351.511(a)(2)(iv) states that "In measuring adequate remuneration under paragraph (a)(2)(i) or (a)(2)(ii) of this section, the Secretary will adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product. This adjustment will include delivery charges and import duties."  This provision is an adjustment to the comparison price is not the basis to *reject* a comparison price.  Indeed, while there have been irregular cases that have stated that foreign inland freight is a required adjustment to domestic pricing, other cases have not required this freight component and used domestic pricing, including in the 2020 review of this proceeding.  Inland freight in general is an extremely minor component of the benchmark price and its absence should not be the basis to exclude an entire

benchmark source.  For example, the inland freight component for the veneer benchmarks was $0.0026 per kg and the January benchmark price was $1.79 per kg.  *See* Final Calculation at "Veneer Benchmark" tab (**CR 199**).  Thus, inland freight is 0.15% of the benchmark prices.  If a 5-10% price difference as a result of grade is not "significant" and not a basis to reject a price then certainly a 0.15% difference is not a basis to reject a benchmark price.

In sum, there is no new information in this review that would reasonably cause the Department to divert from its practice in this proceeding to use ITTO domestic prices.

## II.    THE COURT SHOULD REMAND THE GOVERNMENT AUTHORITY ISSUE AS IT HAS IN OTHER APPEALS OF THIS PROCEEDING

Baroque explained in its brief that this is the identical issue the company raised in the previous appeals before this Court, with virtually identical facts.  Baroque Br. at 23.  As a result, the Court should reject the Government's arguments that Commerce properly applied AFA to the GOC for the government authority determination for certain Baroque input suppliers and instead remand the issue back to Commerce, consistent with the Court's opinions in *Baroque Timber Indus. (Zhongshan) Co. v. United States*, No. 22-00210, 2025 WL 999962, at *14 (Ct. Int'l Trade Apr. 3, 2025) ("POR 10 Appeal") and *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 766 F. Supp. 3d 1296, 1312–13 (Ct. Int'l Trade 2025) ("POR 9 Appeal").

### A.    THE COURT HAS AN INSUFFICIENT BASIS ON WHICH TO REVIEW COMMERCE'S DETERMINATION

The first challenge that Baroque makes in its brief relates to how Commerce rendered its determination.  Baroque Br. at 33-34.  Specifically, Baroque argued that Commerce erred by failing to make government authority determinations for each input supplier.  Baroque continued that failing to issue specific findings on how the GOC did not provide requested

information or cooperate as to each of the eighteen suppliers (including two affiliates) made

Commerce's determination unreviewable by this Court. As the court has explained:

> A court is obligated to review a decision of an administrative agency
> according to the reasoning the agency puts forth. . . .To do that, a court
> must be able to discern and evaluate that reasoning according to the
> applicable standard of review.

*Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1324 (CIT 2022).

Whether Baroque's input suppliers are government authorities is an individual

determination based on the information provided by the GOC in its questionnaire responses (and

any other information on the record). Indeed, Commerce must determine whether each

individual supplier is "vested with government authority", thereby providing a countervailable

subsidy to Baroque. If a supplier is not an authority, then the purchases from that supplier will

not be countervailed. To determine whether an entity is an "authority" under section 771(5)(B)

of the Act, Commerce reviews "the totality of record evidence and whether it demonstrates that

the government has meaningful control over an entity such that it possesses, exercises, or

is vested with government authority." *Phosphate Fertilizers From the Kingdom of Morocco:*

*Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021), IDM

at Cmt. 13; *see also US – Anti-Dumping and Countervailing Duties (China)*; *United States –*

*Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India*,

WT/DS436/AB/R (8 December 2014) at para. 4.29 ("the term 'public body' in Article 1.1(a)(1)

of the SCM Agreement means 'an entity that possesses, exercises or is vested with governmental

authority.' Whether the conduct of an entity is that of a public body must in each case be

determined on its own merits, with due regard being had to the core characteristics and functions

of the relevant entity, its relationship with the government, and the legal and economic

11

environment prevailing in the country in which the investigated entity operates."). Whether the GOC did or did not provide requested information for each supplier again is an individual determination since this information is used to determine whether ***that specific supplier is a government authority***. The Court must then determine whether Commerce lawfully concluded that the failure to provide that specific information created a gap in the record that needed to be filled to determine whether each supplier is a government authority. Finally, the Court must then determine whether substantial evidence supported Commerce's finding that information provided, or failed to be provided, for each specific supplier constituted the GOC's failure to cooperate to the best of its ability, i.e., whether adverse inferences were warranted. The Government in its brief does not address this claim that determinations must be made individually even though (1) specific information was provided for each specific supplier, creating a unique record for each[11], and (2) **certain suppliers where non-cross-owned affiliates of Baroque, creating a unique factual scenario.**

### B.    REQUESTED INFORMATION WAS NOT MISSING FROM THE RECORD

Both Baroque in its brief and the Government in its brief focus on whether documentation was necessary to respond to Commerce's questions regarding CCP officials' presence in the relevant input suppliers and, if necessary, what form the documentation should take. This is identical to the issue raised and remanded in the POR 10 and POR 9 appeals and should be remanded again here.

In its brief, Baroque argued that Commerce did "not adequately explain with legal and factual support how the GOC's statements were deficient, missing or uncooperative when {the

---

[11] The GOC provided separate responses for each of the eighteen suppliers.

GOC} explained that none of the suppliers have primary party organization and only had
certifications to prove a negative." Baroque Br. at 37. Baroque first explained how Commerce's
apparent presumption of CCP involvement is unreasonable. Specifically, Baroque noted how the
CCP Constitution states that a primary party must be formed in an organization where there are
three or more party members. *See* Memo to File, Public Bodies Analysis at Section 129, An
Analysis of Public Bodies in People's Republic of China in Accordance with the WTO Appellate
Bodies Findings in WTO DS379, p. 36 (**PR 169**) ("In accordance with the *CPP Constitution*, all
organizations, including private commercial enterprises, are required to establish 'primary
organizations of the party' (or 'Party committees') if the firm employs at least three party
members."). With only 7% of the Chinese population CCP members[12] and much fewer CCP
officials, it is unreasonable to presume the involvement of CCP officials in the face of express
denials by the GOC. Baroque Br. at 37-38. The Government did not respond to this argument in
its brief.

Next, Baroque challenged Commerce's reliance on *Metal Lockers*[13] distinguishing that
case from this one. In that case the GOC did not respond to any questions and only raised the
theoretical argument that CCP involvement could never be possible. Baroque Br. at 38. Here, the
GOC responded to all questions and argued based on the record facts that there was no CCP
involvement. The Government again did not respond to this argument.

Baroque then raised several arguments about the difficulty of the GOC needing to prove a
negative and providing documentation of that negative. *Id*. at 39-40. Indeed, Baroque noted that

---

[12] Commerce's concern of CCP involvement is only the involvement of CCP *officials*, not general CCP members.
See Initial CVD Questionnaire at Input Producer Appendix, Q. B(3) (**PR 64**).

[13] *Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing
Duty Determination*, 86 Fed. Reg. 35,741 (July 7, 2021).

the questionnaire requires the Government "prove" that none of the input suppliers involve individuals from 100s if not 1000s of entities.  *Id*.  Baroque argued how in the past reviews the GOC notified Commerce if a supplier did in fact have a primary party organization and how Commerce has accepted certifications of information from third parties in the past.  *Id.*  The Government ignored these arguments other than commenting that the certifications were "pro forma."  Gov. Br. at 25.

Finally, Baroque challenged Commerce's reliance on *Citric Acid from China 2012*[14] as the basis for the type of government information the GOC should provide, which Commerce used as support for the finding that the GOC was uncooperative in this review.  Baroque Br. at 40-41.  Baroque explained, however, that *Citric Acid from China 2012* has extremely unique facts not transferable to most other situations.  Specifically, in that case, the owner was part of a CCP organization prior to the POR but not during the POR.  The CCP organization was able to provide information that the owner was no longer part of the organization.  It is one thing to provide documentation from one specific organization and quite another to provide documentation from hundreds or thousands of entities implicated in Commerce's questionnaire. Rather than address any of this argument, the Government merely cited to *Citric Acid from China 2012* as support for Commerce's determination.  Gov. Br. at 26.

Instead of addressing Baroque's specific arguments, the Government merely argues that "in the supplemental questionnaire, Commerce specifically requested that the GOC provide documentation to support its claims with respect to the subset of input suppliers beyond the

---

[14] *See Citric Acid and Certain Citrate Salts {from the People's Republic of China}: Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78,799 (December 31, 2014) ("*Citric Acid from China 2012*"), and accompanying IDM at Comment 5B.

responses provided previously" and that "The GOC did not provide any such documentation that would serve as a basis for further examination or verification of the responses submitted previously, instead pointing back to the same company documentation provided previously." Id. The question at issue asked the Government to "Please explain what, if any, steps you took to verify or further examine the accuracy of this information, including what, if any, documentation was reviewed. Provide documentation to support your response." GOC Supp Response at 9-10 (**CR 146, PR.217**).[15] It is important to note that this question did not ask about whether any of the owners/managers/directors were part of the 9 entities or to indicate that the company did not have a primary party organization.[16] Instead, the question only asked the GOC to confirm that the "[

]. Id. In response, the GOC indicated that it reviewed the articles of associations, which had already been provided to the Department, and which is likely the only company documentation that dictates [

]. This question decidedly did not ask for government documentation or suggest what sort of documentation would address [

].[17]

The Government counters Baroque's claim that Commerce must specifically request the type of government documentation needed by arguing that "GOC had constructive notice of the

---

[15] This is merely a repetition of question B(4) in the Input Producer Appendix from the Initial Questionnaire (PR 64).

[16] This question that asks this information is question B(3) of the Input Producer Appendix and does not ask for documentation. Id.

[17] We note that the documentation provided in *Citric Acid from China 2012* has nothing to do with [
        ] or [                ]. It only has to do with whether or not the owner was part of the local committee. Thus, Commerce has not specified in this case, or in any case, what sort of documentation would address this question if it was not the company's own articles of associations.

need for government documentation to the extent that the Court finds that the language of the
questionnaire itself did not explicitly provide such notice." Gov. Br. at 26. Constructive notice
is not applicable here. First, the GOC is not a party to this litigation. Second, the Court's
opinions were only issued in March and April of this year and are the only public, published
reference to this argument. These opinions were issued well after the GOC filed its initial
questionnaire response in this proceeding on June 7, 2023. Thus, the GOC could not have been
put on notice of this unstated requirement. This is therefore completely different than *PAM
S.p.A. v. United States*, 463 F.3d 1345, 1349 (Fed. Cir. 2006) where the respondent was on notice
due to publication in the Federal Register.

　　　　The Government also argues that "Commerce has made clear in multiple segments of
proceedings of this countervailing duty order that government documentation is required for
purposes of this question" and "The GOC and other parties should be well aware of Commerce's
expectations at this point." Gov. Br. at 26-27. This is wrong. Commerce has not altered its
initial CVD questionnaire in any way and has never made this clear in any of the proceedings;
the Government does not cite to any documentation to substantiate this claim. The CCP related
questions in the initial questionnaire still do not request *any* documentation and never once has
Commerce used the phrase "government documentation" in any of its questionnaires in this
proceeding.[18] A secret, unstated requirement cannot be the basis of AFA. The Court made this
clear in the POR 10 and POR 9 appeals.

　　　　As the Court explained in the POR 10 Appeal:

> The GOC "cannot logically be faulted for failing to provide information
> beyond the scope of the question that Commerce asked." *Jinan Yipin
> Corp. v. United States*, 31 C.I.T. 1901, 1916, 526 F. Supp. 2d 1347, 1360-

---

[18] See Input Producer Appendix from the Initial Questionnaire (**PR 64**).

61 (2007). If Commerce viewed government documentation from the
GOC as necessary information, Commerce was "obligat{ed} to let the
{GOC} know." *Ta Chen*, 23 C.I.T. at 820; *see also Jinan Yipin Corp.*, 31
C.I.T. at 1914, 526 F. Supp. 2d at 1359 ("If ... it was essential ... for
Commerce to be provided with {certain} information, ... then *Commerce
needed to request that specific information.*" (emphasis supplied)).

*Baroque Timber Indus. (Zhongshan) Co. v. United States*, No. 22-00210, 2025 WL 999962, at

*14 (Ct. Int'l Trade Apr. 3, 2025).  The Court explained further in the POR 9 Appeal:

> In the "Input Producer Appendix" to the Initial Questionnaire, Commerce
> requested information pertaining to the ownership and structure of
> Baroque's input suppliers, as well as the presence or involvement of any
> CCP entities in those suppliers. *See* Initial Questionnaire at II-34 to II-38;
> *see also supra* background Section II.A (detailing the nine entities
> question, the CCP officials question and related records and government
> sources questions). Neither the nine entities question nor the CCP officials
> question requested that the GOC provide supporting government
> documentation and the GOC did not provide any such documentation.
>
> In the government sources question, Commerce did inquire specifically as
> to *whether* there existed government source documents to analyze the
> involvement of CCP-related entities in the input suppliers. *See* Initial
> Questionnaire at II-37. This question did not, however, request that the
> GOC provide supporting documentation in the event that such government
> source documents existed.[7] In response, the GOC provided an admittedly
> nonresponsive answer, stating that there "is no central informational
> database to search for such information." GOC IQR, Ex. LTAR-1 at
> LTAR-69.
> In the cover letter to the Supplemental Questionnaire, Commerce informed
> the GOC that Commerce "identified certain areas in the initial
> questionnaire response submitted by the GOC for which [Commerce]
> require[d] additional information." Supplemental Questionnaire at 1.
> However, Commerce did not elaborate further in the cover letter what
> these "certain areas" were.
>
> In the Supplemental Questionnaire, Commerce then reiterated the nine
> entities question and the CCP officials question nearly verbatim from the
> Initial Questionnaire, without any reference to the GOC's initial responses
> or explanation as to what Commerce found lacking in those responses. *See
> id.* at 7 ("[P]lease identify whether any owner, director, or manager is a
> member or representative of any of the [nine] entities"; "[P]lease identify
> which owners, managers, and directors were Chinese government or CCP
> officials during the POR."). Commerce did not identify a lack of

17

government documentation as a deficiency in the GOC's initial responses nor did Commerce request that the GOC provide any government documentation in its supplemental responses.[8] **1313** Additionally, Commerce did not identify the GOC's response to the government sources question as deficient nor did Commerce reiterate the question in any form. *See id.*

*Baroque Timber Indus. (Zhongshan) Co. v. United States*, 766 F. Supp. 3d 1296, 1312–13 (Ct. Int'l Trade 2025).  This explanation matches the facts in this case, necessitating a remand.

## CONCLUSION

For the reasons discussed above, Baroque requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law and remand the Final Results with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*

Andrew T. Schutz
Francis J. Sailer
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated: June 12, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 5,680 words, less than the 7,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Counsel to Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation*

Dated: June 12, 2025