Slip Op. 26-32

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. AND RIVERSIDE PLYWOOD CORPORATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant. | **Before: Timothy M. Reif, Judge**<br><br>**Court No. 24-00106**<br><br>**PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's final results in the 11th administrative review of the countervailing duty order covering multilayered wood flooring from the People's Republic of China.]

Dated: April 7, 2026

<u>Andrew T. Schutz</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., argued for plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation.  Also on the briefs were <u>Francis J. Sailer</u>, <u>Jordan C. Kahn</u> and <u>Michael S. Holton</u>.

<u>Brendan D. Jordan</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., and <u>JonZachary Forbes</u>, Of Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., argued for defendant United States.  Also on the brief were <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director and <u>Tara K. Hogan</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.

\*    \*    \*

Reif, Judge:  Before the court is the motion for judgment on the agency record by plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation (collectively, "Baroque" or "plaintiff").[1]

Plaintiff invokes this Court's subject matter jurisdiction under 28 U.S.C. § 1581(c) and seeks review of the final results of the 11th  administrative review by the Department of Commerce ("Commerce") of the countervailing duty ("CVD") order on multilayered wood flooring ("MLWF" or "subject merchandise") from the People's Republic of China ("China"), published as *Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2021*, 89 Fed. Reg. 41,939 (Dep't of Commerce May 14, 2024) ("Final Results"), PR 332; accompanying Issues and Decision Memorandum (Dep't of Commerce May 7, 2024) ("IDM"), PR 326.

Plaintiff alleges that Commerce's Final Results were not supported by substantial evidence on the record and were otherwise not in accordance with law in regard to Commerce's: (1) calculation of the benchmark price for plywood, veneer and fiberboard; and (2) application of adverse facts available ("AFA") to find certain of Baroque's input suppliers to be government authorities.  *See* Baroque Mot. for J. on the Agency R. ("Baroque Br."), ECF Nos. 23-24.

For the reasons discussed below, the court sustains in part and remands in part Commerce's Final Results.

---

[1] Baroque Timber is a cross-owned affiliate of Riverside Plywood.

## BACKGROUND

On December 8, 2011, Commerce issued a CVD order on MLWF from China. *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011), amended by *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).[2]

On February 2, 2023, Commerce initiated an administrative review of the CVD order on MLWF from China for the period of review ("POR") January 1, 2021, through December 31, 2021. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 7,060 (Dep't of Commerce Feb. 2, 2023), PR 26.

On April 3, 2023, Commerce selected Baroque as well as Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") as mandatory respondents in the administrative review. Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Respondent Selection Memorandum (Apr. 3, 2023), PR 67.

On December 28, 2023, Commerce published its preliminary results, in which it calculated a preliminary countervailable subsidy rate of 23.65 percent for Baroque. *Multilayered Wood Flooring from the People's Republic of China: Preliminary Results and Partial Recission of Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg.

---

[2] The amendment consisted of removing an incorrect Harmonized Tariff Schedule of the United States ("HTS") number from the scope of the orders. *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders,* 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).

89,644 (Dep't of Commerce Dec. 28, 2023) ("Preliminary Results"), PR 299;

accompanying Preliminary Decision Memorandum (Dep't of Commerce Dec. 21, 2023)

("PDM"), PR 295.

In its preliminary results, Commerce calculated a benchmark price for plywood,

veneer and fiberboard, inputs used to produce MLWF, by averaging datasets that

reflected a "world market price." *See* PDM at 41-46. These datasets included the

International Tropical Timber Organization Tropical Timber Market Report ("ITTO

TTMR") dataset containing plywood, veneer and fiberboard data from Ghana, Brazil and

Peru, and global datasets from the United Nations Comtrade database ("UN

Comtrade"), Global Trade Atlas ("GTA"), and STATS.NZ. *Id*. Additionally, Commerce

preliminarily determined to apply an adverse inference that Baroque's input suppliers

were authorities of the Government of China ("GOC") because the GOC withheld

information that Commerce deemed necessary for analyzing Chinese Communist Party

("CCP") involvement in those suppliers. *Id.* at 13-16.

On May 14, 2024, Commerce published its Final Results, in which it calculated a

final countervailable subsidy rate 30.85 percent for Baroque. *Final Results*, 89 Fed.

Reg. at 41,940. In its Final Results, Commerce rejected the ITTO TTMR dataset as a

tier two source altogether[3] and limited the plywood, veneer and fiberboard benchmarks

to the UN Comtrade, GAT and STATS.NZ datasets only. IDM at 49-58. Regarding the

---

[3] Commerce rejected both the ITTO Biennial Review Statistics ("BRS") dataset submitted by petitioner, American Manufacturers of Multilayered Wood Flooring ("AMMWF") and the ITTO TTMR. IDM at 49-58. However, only the ITTO TTMR dataset is at issue in this case.

application of AFA to find Baroque's input suppliers to be government authorities,

Commerce made no changes from the preliminary results.  *See id*. at 42-48.

On June 13, 2024, and on July 15, 2024, Baroque filed summons and complaint,

respectively, before the Court seeking judicial review of certain aspects of the Final

Results.  Summons, ECF No. 1; Complaint, ECF No. 10.

On January 23, 2025, plaintiff filed its motion for judgment on the agency record.

Baroque Br.

On January 15, 2026, the court heard oral argument. *See* Oral Arg. Tr., ECF No.

44.

As noted, in its motion, plaintiff maintains that Commerce's Final Results were

not supported by substantial evidence on the record and were otherwise not in

accordance with law regarding Commerce's: (1) calculation of the benchmark price for

plywood, veneer and fiberboard; and (2) application of AFA to find certain input

suppliers to be government authorities.  *See* Baroque Br. at 1-2.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 28 U.S.C. §1581(c).

The court will uphold Commerce's determinations in CVD proceedings unless

they are "unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more

than a mere scintilla.  It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Consol. Edison Co. of N. Y. v. NLRB*, 305

U.S. 197, 229 (1938) (citations omitted).  "The substantiality of evidence must take into

account whatever in the record fairly detracts from its weight." *Universal Camera Corp.*

*v. NLRB*, 340 U.S. 474, 488 (1951).

A court "[is] obliged to set aside Commerce's determination if it is unsupported by substantial evidence on the record[ ] or otherwise not in accordance with law.  To fulfill that obligation, . . .  Commerce [must] examine the record and articulate a satisfactory explanation for its action."  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (internal quotation marks and citations omitted).

"[W]hen a statute grants an agency power to administer fact-intensive inquiries, the agency's conclusion should be reversed only if the record is 'so compelling that no reasonable factfinder' could reach the same conclusion."  *Cooper (Kunshan) Tire Co. v. United States*, 45 CIT __, __, 539 F. Supp. 3d 1316, 1325 (2021) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

"To be in accordance with law, the agency's decision must be authorized by the statute, and consistent with the agency's regulations."  *Yama Ribbons & Bows Co. v. United States,* 36 CIT 1250, 1253, 865 F. Supp. 2d 1294, 1297 (2012). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted).  A reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## DISCUSSION

**I.    Whether Commerce's calculation of the benchmark price for plywood, veneer and fiberboard is supported by substantial evidence and otherwise in accordance with law**

The court addresses first Baroque's challenge to Commerce's calculation of the plywood, veneer and fiberboard benchmarks.  Baroque challenges in particular Commerce's decision to exclude the ITTO TTMR export price dataset.

For the reasons described below, the court concludes that Commerce's decision to exclude the ITTO TTMR data for plywood and veneer is not supported by substantial evidence.  Commerce's decision to exclude domestic price data for plywood and fiberboard is in accordance with law and Commerce's decision to include non-grade specific data for plywood is supported by substantial evidence and otherwise in accordance with law.

### A.    Additional Background

On November 15, 2023, Baroque submitted benchmark data for Commerce's valuation of reported inputs, including for plywood, veneer and fiberboard.  *See* Riverside Resubmission of Benchmark Data (Dec. 5, 2023) ("Baroque Benchmark Submission"), PR 283-287.  This submission included ITTO TTMR price data for: (1) plywood export prices from Ghana, Peru and Brazil; (2) veneer export prices from Ghana, Peru and Brazil; and (3) domestic prices in Brazil for plywood and fiberboard. *Id.* at Ex. 3.

The same day, domestic petitioner American Manufacturers of Multilayered Wood Flooring ("AMMWF") submitted benchmark data including: (1) UN Comtrade export data for plywood, veneer and fiberboard; (2) ITTO Biennial Review Statistics

("BRS") export data for plywood and veneer; (3) Stats.NZ export data for plywood; and (4) Global Trade Atlas ("GTA") export data for plywood and fiberboard.  *See* Petitioners' Benchmark Data Submission (Nov. 15, 2023) at 2-3, Ex. 1-A, 2-A, 3, 4, PR 253-264. Mandatory respondent Jiangsu Senmao ("Senmao") submitted also UN Comtrade data for plywood, veneer and fiberboard.  *See* Jiangsu Senmao Benchmark Data Submission (Nov. 15, 2023) at 1-2, attach. 2, 7, PR 240-242.

In its preliminary results, Commerce calculated a tier two benchmark price for plywood, veneer and fiberboard inputs by averaging data that reflected a "world market price."  *See* PDM at 41-46.  These averaged data included the ITTO TTMR dataset submitted by Baroque.  *Id.* at 43-44.  Commerce excluded the UN Comtrade dataset submitted by AMMWF because the underlying data lacked verified information as to "exports to China," which did not "allow [Commerce] to exclude exports to China from the exports to world data that the petitioner provided."  PDM at 43.  Commerce kept the UN Comtrade dataset submitted by respondent Senmao because the underlying data "allow[ed] [Commerce] to exclude exports to China from the world data when utilizing UN Comtrade data, consistent with this practice."  *Id*.

In the Final Results, Commerce excluded both of the ITTO benchmark datasets.[4] *See* IDM. at 49-58. Commerce determined instead to calculate benchmarks for wood product inputs by averaging only the UN Comtrade data submitted by Senmao (not the data submitted by AMMWF), the Stats.NZ data and the GTA data.  *Id*.

---

[4] The ITTO TTMR dataset and the ITTO BRS dataset.

### B.      Legal Framework

A countervailing duty is "a remedial measure that provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014).  The countervailing duty imposed shall be "equal to the amount of the net countervailable subsidy."  19 U.S.C. § 1671(a).

A subsidy is countervailable if: (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5).

A benefit is conferred where "goods or services are provided for less than adequate remuneration ["LTAR"]," which is "determined in relation to prevailing market conditions for the good . . . which is subject to the investigation or review."  *Id.* § 1677(5)(E)(iv).  Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*

To determine whether goods were provided for less than adequate remuneration, "Commerce must determine the proper benchmark price."  *Essar Steel Ltd. v. United States,* 678 F.3d 1268, 1273 (Fed. Cir. 2012) (citing 19 C.F.R. § 351.511).  The benchmark price is "the price that could have constituted adequate remuneration."  *Fine Furniture,* 748 F.3d at 1368.  To measure the adequacy of remuneration, Commerce "compares the respondent's reported costs for the input in question . . . with the calculated benchmark price, which is representative of the market price for the good at

issue."  *Beijing Tianhai Indus. Co. v. United States*, 39 CIT __, __, 52 F. Supp. 3d 1351,

1356 n.9 (2015) (citing *Fine Furniture,* 748 F.3d at 1368).

Under 19 C.F.R. § 351.511(a)(2), Commerce sets forth the "bases for identifying

an appropriate market-based benchmark for measuring the adequacy of the

remuneration of a government provided good or service."  *Id.*  In order of preference,

the potential benchmarks are as follows: "(1) market prices from actual transactions

within the country under investigation for the government-provided good (e.g., actual

sales, actual imports, or competitively run government auctions) ("tier one"

benchmarks); (2) world market prices that would be available to purchasers in the

country under investigation ("tier two" benchmarks); or (3) prices consistent with market

principles based on an assessment by the Department of the government-set price ("tier

three" benchmarks)."  *Id.* (citing *High Pressure Steel Cylinders from the People's*

*Republic of China: Preliminary Affirmative Countervailing Duty Determination and*

*Alignment of Final Countervailing Duty Determination with Final Antidumping Duty*

*Determination*, 76 Fed. Reg. 64,301, 64,304 (Dep't of Commerce Oct. 18, 2011)).

If there is no tier one benchmark — defined as a "useable market-determined

price with which to make the comparison" — then Commerce will calculate a tier two

benchmark that "measure[s] the adequacy of remuneration by comparing the

government price to a world market price where it is reasonable to conclude that such

price would be available to purchasers in the country in question."  19 C.F.R. §

351.511(a)(2)(ii).  In calculating a tier two benchmark, if "there is more than one

commercially available world market price," Commerce is required to "average such

prices to the extent practicable, making due allowance for factors affecting

comparability."  *Id.*  "These factors ensure that the composite benchmark reflects prevailing market conditions in the [producer's] home country.  [The factors] include 'price, quality, availability, marketability, transportation, and other conditions of purchase or sale.'"  *RZBC Grp. Shareholding Co. v. United States,* 39 CIT __, __, 100 F. Supp. 3d 1288, 1305 (2015) (citing 19 U.S.C. § 1677(5)(E)).

"The court's role is not to assess whether the benchmark data Commerce used was [sic] the 'best available,' but rather whether Commerce's choice was reasonable."  *Guizhou Tyre Co. v. United States*, 42 CIT __, __, 348 F.Supp.3d 1261, 1274 (2018) (citing *Peer Bearing Company-Changshan v. United States*, 27 CIT 1763, 1770, 298 F.Supp. 2d 1328, 1336 (2003)).

## C.    Analysis

In the Final Results, Commerce excluded the ITTO TTMR dataset for two reasons: (1) the *export* price data did not permit Commerce to disaggregate exports destined for China; and (2) the *domestic* price data did not contain all the information necessary to construct delivered prices from these data.  IDM at 51-52.

Baroque presents three reasons challenging Commerce's decision to reject the ITTO TTMR dataset, arguing that the determination was not supported by substantial evidence or was otherwise contrary to law.  The court addresses each reason in turn.

### 1.  Whether Commerce's decision to exclude the ITTO TTMR export price data was supported by substantial evidence

Baroque argues that Commerce's decision to exclude the ITTO TTMR export price data was not supported by substantial evidence.  In particular, Baroque asserts that Commerce failed to identify anything in the record indicating that the data included exports to China.  *See* Baroque Br. at 12-13.

Commerce determined in the IDM that the export price data in the ITTO TTMR dataset contained unverified export destinations such that those data *could* include China as a destination.  IDM at 51-52.  Commerce explained that "if it is not possible to exclude exports of an input to a market where Commerce has found that input market to be distorted," Commerce "typically will not use this export data source in constructing benchmarks pursuant to 19 C.F.R. 351.11(a)(2)(ii)."  *Id.* at 51.  In sum, Commerce determined that including these data would compromise the integrity of the benchmark calculation.

Baroque maintains that Commerce's decision to exclude the data based solely on the *absence* of information regarding the destinations of the reported exports constitutes "speculation" and that such "speculation" does not amount to a reasonable inference that would support Commerce's determination.  See Baroque Br. at 13; *see also* Pls.' Reply Br. ("Baroque Reply Br.") at 5, ECF Nos. 32-33.

Commerce's decision to draw an inference that a dataset covering exports to unverified destinations may have included exports to China was reasonable.  *See Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (holding that substantial evidence supports Commerce's inference).  It is not Commerce's burden to build the record.  *See QVD Food Co., Ltd., v. United States*, 658 F. 3d 1318, 1324 (Fed. Cir. 2011) ("The burden of creating an adequate record lies with [the interested party] and not with Commerce.") (citing *Tianjin Mach. Imp. & Exp. Corp. v. United States,* 16 CIT 931, 937, 806 F.Supp. 1008, 1015 (1992)).

Baroque cites to *Catfish Farmers of Am. v. United States*, 37 CIT 717 (2013), to argue that Commerce's inference was in fact speculation: "[S]peculation does not

amount to reasonable inference, as it provides no factually-grounded basis for sustaining an agency's determination."  *See* Baroque Reply Br. at 5 (citing *Catfish Farmers*, 37 CIT at 733).  *Catfish Farmers* is not apposite.  In *Catfish Farmers*, the Court held that Commerce's inference was not "factually-grounded" because it rested on speculation *contradicted* by information on the record.  *Catfish Farmers*, 37 CIT at 733.  Here, Commerce drew a reasonable inference from the record, which, Commerce noted, showed that export destinations were "[un]reliable" because they were not "provided in a way that permits Commerce to exclude exports to China" and could not be disaggregated.  IDM at 51.

As Commerce explained, the "record of a case must establish that potential benchmarks 'do not include . . . export prices . . . into China.'"  IDM at 51 (quoting *Certain Non-Refillable Steel Cylinders from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 Fed. Reg. 53,323 (Dep't of Commerce Aug. 28, 2020).  Upon reviewing the record, Commerce found that the ITTO TTMR export data — which report exports of veneer and plywood from Ghana, Peru and Brazil to "all destinations" — were not provided in a way that permitted Commerce to ascertain if some prices in the dataset related to exports that were destined for China.  IDM at 51.  Therefore, Commerce determined that the record lacked the information necessary to ensure the exclusion of exports destined for China.  *Id*.

Baroque argues further that Commerce's decision was unsupported by substantial evidence because Commerce "fail[ed] to consider record evidence that detracts from its determination," and that Commerce's determination was based on a

factual error.  Baroque Br. at 15; Baroque Reply Br. at 7.  In the IDM, Commerce explained that "the [ITTO] TTMR data report AUVs for exports of certain species of veneer and plywood from Ghana, Peru, and Brazil to *all destinations*."  IDM at 51 n. 217 (emphasis supplied). This statement was overly broad because Commerce did not address record evidence indicating that some of the export price data are to specified destinations.[5]

Baroque argues that the record shows that the export price data for plywood from Brazil are based entirely on exports to the European Union ("E.U.") and the data for plywood from Peru are based entirely on exports to Mexico.  *See* Baroque Br. at 13-15 (citing Baroque Benchmark Submission, Ex. 3).   At oral argument, the government conceded that Commerce's characterization of the dataset as reflecting exports to "all destinations," did not account for entries identifying specified destinations for plywood from Brazil and Peru.  Oral Arg. Tr. at 8:3-7.  In the IDM, however, Commerce did not address whether those specified entries undermined Commerce's conclusion that the ITTO TTMR dataset lacked sufficient detail to permit Commerce to exclude potential exports to China.

Baroque maintains that the record establishes also that the data for plywood and veneer from Ghana are based on exports to "regional markets," which Baroque asserts "cannot reasonably be considered China, a continent and ocean away from Ghana." Baroque Reply Br. at 6; *see also* Baroque Br. at 12; Baroque Benchmark Submission, Ex. 3.  The government agrees that the data for plywood and veneer from Ghana are

---

[5] At oral argument, the government conceded that it was "not completely accurate" to say that the data report exports "to all destinations."  Oral Arg. Tr. at 5:25-6:1.

based on exports to "regional markets" rather than exports to "all destinations."  Def.'s

Resp. to Pls.' Mots. for J. on the Agency R. ("Def. Br.") at 15, ECF No. 29.  However,

the government maintains that a reference to "regional markets . . . does not definitively

establish the location of the exports included in the dataset, such that Commerce was

unreasonable in its determination" that the data from Ghana "do not permit [Commerce]

to exclude export prices into China."  *Id*. at 14-15 (citing Baroque Benchmark

Submission at Exhibit 3).

Commerce erred in stating that the ITTO TTMR export data reported exports to

"all destinations"; however, that error does not necessarily render Commerce's

determination unsupported by substantial evidence.  If Commerce's determination "is

still supported by substantial evidence — even with the errors — the errors are

harmless."  *CVB Inc. v. United States*, 47 CIT__, ___, 675 F. Supp. 3d 1324, 1343-44

(2023).

Baroque concedes that, based on the record, certain portions of the dataset —

including veneer exports from Brazil and Peru — list unspecified export destinations,

meaning that those destinations could include China.  *See* Baroque Br. at 12, 14 (citing

Baroque Benchmark Submission, Ex. 3).  However, at oral argument, Baroque

maintained that those segments of the dataset could be disaggregated from the dataset.

*See* Oral Arg. Tr. at 6:11-16.

Commerce in the IDM stated that there is "no means of breaking out and

removing" the underlying data.  IDM at 51 n. 217.  However, at oral argument,

Defendant acknowledged that Commerce did not analyze whether the data could be

separated into entries with specified export destinations and those with unspecified

export destinations.  Oral Arg. Tr. at 8:8-12.  Defendant confirmed that "Commerce would … need to address and consider" on remand whether the data can be separated into specified and unspecified export destinations (i.e., those data that *could* include China as a destination), so that the existence of any groups of entries with unspecified export destinations reasonably led Commerce to conclude that it could not ensure that the *entire* ITTO TTMR benchmark did not include exports to China.  *Id*.[6]

In light of Commerce's erroneous overstatement that the *entire* ITTO TTMR dataset contained possible exports to China as unspecified destinations, and Defendant's concession at oral argument that Commerce was prepared to address on remand whether the data can be disaggregated, the Court remands to Commerce to: (1) correct its factual misstatement; (2) identify which portions of the ITTO TTMR export dataset contain specified export destinations and which contain unspecified export destinations; (3) explain whether the export price data from Ghana to "regional markets" permit Commerce to exclude exports to China; (4) reconsider whether Commerce can disaggregate the remainder of the dataset (other than Ghana's exports to "regional markets") to exclude only data that contain unspecified export destinations; and (5) reconsider whether Commerce can construct a benchmark price using any segregated data that do not include unspecified destinations.  Finally, if Commerce determines on remand that it *can* segregate (as specified above) the export price data from Peru, Brazil or Ghana, Commerce is directed also to address the issue of grade specificity in its decision whether to include those data.

---

[6] "I can't say right now whether or not Commerce would be able to completely break [the verifiable] data out, but that is something that . . . if there is a remand, that Commerce would . . . need to address and consider."  Oral Arg. Tr. at 8:8-11.

### 2. Whether Commerce's rejection of the ITTO TTMR domestic price data was contrary to past practice

In view of Defendant's statements at oral argument with respect to Commerce's willingness to reconsider whether it can use the ITTO TTMR export data for a benchmark price to measure adequate remuneration, the court does not consider at this time the past practice argument as to the export data.

However, as noted, Baroque challenges also Commerce's rejection of the ITTO TTMR *domestic* price data for plywood and fiberboard as contrary to past practice. *See* Baroque Br. at 15-16. In the IDM, Commerce rejected the ITTO TTMR domestic Brazilian price data because "the record does not contain all the information necessary to construct delivered prices from these data as required by 19 C.F.R. § 351.511(a)(2)(iv)." IDM at 50.

Under § 351.511(a)(2)(iv), Commerce is required to "adjust the comparison price to reflect the price that a firm . . . would pay if it imported the product." 19 C.F.R. § 351.511(a)(2)(iv). This adjustment in the comparison price "will include delivery charges." *Id*. Commerce has separately said that inland freight charges count as delivery charges. *See* IDM at 52 n. 226 (citing previous reviews in which Commerce required inland freight prices).[7] In the IDM, Commerce found that "the record reveals no party provided an amount for Brazilian inland freight and, accordingly, it is not possible

---

[7] *See Countervailing Duty Investigation of Certain Polyethylene Terephthalate Resin from the People's Republic of China: Final Affirmative Determination*, 81 Fed. Reg. 13,337 (Dep't of Commerce March 14, 2016), and accompanying IDM at cmt. 14 (citing *Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, 74 Fed. Reg. 20,923 (Dep't of Commerce May 6, 2009), and accompanying IDM at cmt. 13).

to adjust these domestic Brazilian prices to a price that a Chinese manufacturer would have paid" as required by § 351.511(a)(2)(iv).  IDM at 52-53.

Baroque argues that because Commerce previously accepted the same domestic price data as provided without inland freight values in the 2020 MLWF review, Commerce has a "practice" of not requiring those values.  *See* Baroque Br. at 15-16.  Baroque asserts that Commerce's determination was "arbitrary and capricious" because Commerce failed to provide a reasonable "explanation" for its change in practice.  *See id.* at 6, 16.

An agency action that deviates from an established practice without a reasoned explanation is arbitrary and capricious.  *See Huvis Corp. v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  But to identify an established agency practice, the party challenging the administrative action must show "the existence of 'a uniform and established procedure . . . that would lead a party, in the absence of notification of a change, reasonably to expect adherence to the established practice or procedure.'"  *In re Section 301 Cases*, 46 CIT __, __, 570 F. Supp. 3d 1306, 1347 (2022) (citing *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 884-85, 74 F. Supp. 2d 1353, 1374 (1999).  An agency's exercise of discretion on a "case-by-case" and fact-specific basis "complicates any efforts to divine 'rules' from past agency practice."  *Fujian Yinfeng Imp & Exp Trading Co., Ltd. v. United States*, 46 CIT __, __, 607 F. Supp. 3d 1301, 1316 (2022).

Baroque has not cited any evidence demonstrating the existence of an established procedure or methodology.  Baroque cites only to Commerce's use of ITTO

TTMR Brazilian domestic price data in the 2020 MLWF review.[8]  *Cf. Shadong Huarong Machinery Co., LTD. v. United States*, 30 CIT 1269, 435 F. Supp. 3d 1261 (2006) (concluding that "two prior determinations are not enough to constitute an agency practice that is binding on Commerce.").

Commerce did not consider the issue of inland freight price data as required to satisfy 19 C.F.R. § 351.511(a)(2)(iv) in the 2020 MLWF review.  *Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 34,828 (Dep't of Commerce May 31, 2023). In that review, Commerce considered only whether it should exclude categorically domestic price data from a tier two benchmark because the data reflected domestic, rather than export, prices, which the petitioner argued were not reflective of "world market" prices.  *See id.* at cmt. 9.  Commerce rejected the argument that domestic prices must be excluded categorically and explained that it "typically considers third-country domestic prices to be available to purchasers on the world market" absent evidence demonstrating that such prices are not available to foreign purchasers or are otherwise distorted.  *Id*.

The inland freight adjustment issue was not examined in the 2020 MLWF review. Where "the issue was never examined in prior administrative reviews . . . it is not

---

[8] Baroque argues also that Commerce's decision is contrary to past practice because Commerce relied on the ITTO TTMR domestic price data in the preliminary results but then excluded the data "for the first time in the Final Results."  Baroque Br. at 11.  This Court has recognized that "Commerce is not bound by the positions taken or the methodologies employed in its preliminary determinations."  *U.S. Steel Corp. v. United States*, 34 CIT 252, 281, 712 F. Supp. 2d 1330, 1355 (2010) (citing *Peer Bearing Co. v. United States*, 22 CIT 472, 481–82, 12 F. Supp. 2d 445, 456 (1998); *Kumho Tire (Vietnam) Co., Ltd. v. United States*, 48 CIT __, __, 741 F. Supp. 3d 1277 (2024).

possible to determine whether prior facts were identical to this review and whether Commerce altered the analytical framework." *Venus Wire Indus. Pvt. Ltd. v. United States*, 43 CIT__, __, 424 F. Supp. 3d 1369, 1376 (2019).  Baroque identifies no evidence demonstrating that the domestic Brazilian price data on the record in the 2020 MLWF review lacked inland freight values or that Commerce considered this issue.

In addition, Commerce has required inland freight data in prior proceedings in which it used domestic price data to construct a tier two benchmark.  *See* IDM at 52 n. 226 (citing *Countervailing Duty Investigation of Certain Polyethylene Terephthalate Resin from the People's Republic of China: Final Affirmative Determination*, 81 Fed. Reg. 13,337 (Dep't of Commerce March 14, 2016), and accompanying IDM at cmt. 14 (citing C*ertain Hot-Rolled Carbon Steel Flat Products from India: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, 74 Fed. Reg. 20,923 (Dep't of Commerce May 6, 2009) ("*Hot-Rolled Carbon*"), and accompanying IDM at cmt. 13)).  For instance, in *Hot-Rolled Carbon*, Commerce determined that inland freight charges were delivery charges that were required to be included in domestic price data for Commerce to properly "adjust the comparison price to reflect the price that a firm . . . would pay if it imported the product, including delivery charges."  *Id*. at cmt. 13 (citing 19 C.F.R. § 351.511(a)(2)(iv)).

Therefore, the Court concludes that Commerce's rejection of the ITTO TTMR domestic Brazilian price data was not contrary to an established agency practice and was not arbitrary and capricious.

### 3. Whether Commerce's determination that plywood benchmarks need not be grade specific was supported by substantial evidence and otherwise in accordance with law

Baroque argues that Commerce's plywood benchmark calculation was unsupported by substantial evidence and not in accordance with law because the datasets on which Commerce relied contained data on plywood grades that were not comparable to data reflecting the plywood grades that Baroque actually purchased. Baroque Br. at 18. For the reasons discussed below, the court concludes that Commerce's decision to include the UN Comtrade, Stats.NZ and GTA datasets is supported by substantial evidence and in accordance with law.

In the Final Results, Commerce excluded the ITTO TTMR dataset entirely from its wood product input benchmark calculation for the two reasons explained above: (1) the inability to remove export prices to China; and (2) the inability to account for inland freight expenses for Brazilian domestic prices for plywood and fiberboard. *See supra* Sections I.C.1-2; *see generally* IDM at 49-52 (assessing "whether to exclude certain ITTO data").

In the IDM, Commerce addressed also Baroque's argument that "each of the plywood benchmarks . . . must be grade-specific."[9] The plywood market is categorized into grades ranging from Grade A (highest quality) through Grade D (lowest quality).

---

[9] In its administrative case brief, Baroque argued that Commerce should "only use on ITTO [TTMR] grade-specific" prices to value plywood." *See* Riverside Administrative Case Brief (Feb. 8, 2024), P.R. 313 (emphasis supplied). Baroque states that Commerce did not address its arguments concerning plywood grade in the IDM. Baroque Br. at 18. Commerce, however, addressed Baroque's arguments concerning plywood grade, explaining that "to the extent that [Baroque's] argument is that each of the plywood benchmarks we continue to rely on must be grade-specific, we disagree as addressed below." IDM at 53; *see generally* IDM at Comment 5B.

*See* Baroque Br. at 17.  Baroque asserts that it purchased "only" lower-grade C/D plywood and that the ITTO TTMR dataset "is the source on the record that most closely matches Baroque's plywood purchases," compared to the data selected by Commerce, which "cover all grades of plywood, including high priced A grade plywood."  *Id*. at 18. (citing Baroque Benchmark Submission, Ex. 3).[10]  Commerce explained that requiring datasets limited to lower-grade plywood would be inappropriate because Baroque did not provide sufficient documentation to support its claim that it used "only" lower-grade C/D plywood.  IDM at 54.  Commerce determined also that "the grade-specific pricing data on the record . . . calls into question the "significance" of the price differences between plywood grades."  *Id*.

Baroque raises two arguments concerning plywood grade in support of its request that the court instruct Commerce to recalculate its plywood benchmark.  First, Baroque asserts that Commerce's plywood benchmark calculation was unsupported by substantial evidence because Commerce disregarded "information [on the record] demonstrat[ing]" that the data selected by Commerce, which "cover all grades of plywood, including high priced A grade plywood" are "overly broad and distortive." Baroque Br. at 18.  Baroque contends that the record demonstrates that Baroque's purchases were limited to C/D grade plywood and that Commerce disregarded information in the record demonstrating the importance of grade in plywood valuation.

---

[10] The plywood market is categorized into grades ranging from Grade A (highest quality) through Grades B and C, to Grade D (lowest quality), and also includes hybrid grades such as BB/CC or AA/BB.  Baroque Br. at 17.  The ITTO TTMR data for plywood from Ghana are BB/CC grade, the data for plywood from Brazil are C/CC grade, and the data for plywood from Peru are B and C grades.  *See* Baroque Benchmark Submission, Ex. 3.  In the IDM, Commerce stated that "the UN Comtrade, Stats.NZ and GTA data include all grades of plywood," meaning grades A through D.  IDM at 54.

*Id*. Therefore, Baroque argues that the data selected by Commerce, which contain prices for grades A through D plywood, are distortive and not comparable to the plywood actually purchased by Baroque. *See generally id.* at 16-19.

Commerce noted that Baroque provided certifications from "some" of its third-party suppliers stating that the plywood sold to Baroque was made with grade C or D only. IDM at 54. However, Commerce found that these certifications did not cover "*all* of [Baroque's] reported plywood purchases." *Id*. (emphasis supplied). Accordingly, Commerce concluded that Baroque's contention that it exported only grade C/D was not supported by the record. *Id*.

In *Evolutions Flooring, Inc. v. United States,* this Court sustained Commerce's reliance on a dataset that encompassed a broader range of plywood grades than the respondent claimed reflected its plywood purchases because Commerce determined that the respondent there had failed to demonstrate that its purchases were limited to lower-grade plywood. *Evolutions Flooring, Inc. v. United States,* 49 CIT__, __, 776 F. Supp. 3d 1271, 1280 (2025) ("None of the documentation submitted by Baroque demonstrates that Baroque purchased exclusively grade C/D plywood."). Here, as in *Evolutions Flooring*, Commerce determined reasonably that the record was insufficient to support Baroque's assertion that it used *exclusively* lower grades of plywood. IDM at 54.

Baroque's second argument as to grade is that "[s]ince grade is a significant factor affecting comparability and reflects 'prevailing market conditions,' Commerce is mandated by statute to account for it." Baroque Br. at 18 (citing 19 U.S.C. § 1677(5)(E)(iv)). Baroque notes that 19 U.S.C. § 1677(5)(E)(iv) mandates that

Commerce account for "prevailing market conditions" such as "price" and "quality" when performing an LTAR benefit analysis. *Id*. at 9. Baroque argues that, by including datasets which "cover all grades of plywood, including higher priced A grade plywood," Baroque Br. at 18, Commerce did not properly account for prevailing market conditions and, as a result, the calculated benefit was "caused by product differences rather than subsidization." Baroque Reply Br. at 9.

In the IDM, Commerce addressed this argument as well, determining that differences in grade did not have a "significant" impact on pricing. IDM at 54. Commerce found that grade-based price differences reflected in the ITTO TTMR data resulted in only "a relatively small 5 or 10 percent variation," and that record pricing data showed that lower grades were not consistently cheaper, as "prices for B/C grade during the [period of review] were, in some instances, priced lower than C/C plywood." IDM at 54-55. Commerce noted also that other factors, such as plywood thickness, appeared to have a greater impact on price in some instances. *Id*.[11]

Commerce concluded that these broader, commercially available benchmark datasets "would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). In doing so, Commerce made "due allowance for factors affecting comparability" under § 351.511(a)(2)(ii).

---

[11] Baroque disputes Commerce's determination that grade is not a significant factor in plywood pricing, but it raised this argument for the first time in its reply brief. *See* Baroque Reply Br. at 8-9 (arguing that a 5–10 percent price difference is significant). The argument is therefore waived. *See United States v. Ford Motor Co.*, 463 F.3d 1267, 1276 (Fed. Cir. 2006) ("Arguments raised for the first time in a reply brief are not properly before this court.").

In this case, Commerce addressed adequately Baroque's arguments concerning grade specificity, determined reasonably both that the record did not support Baroque's claims to purchases exclusively of lower-grade plywood and that grade-based price differences were not significant.   IDM at 54-55.  Additionally, Commerce cited its "practice to utilize benchmarks derived from broad averages," stating that "these benchmarks need not reflect goods that are identical to the government-provided good." *Id.* at 54; *see also id*. at n. 228 (explaining that "the legal requirements governing Commerce's selection of benchmarks do not require perfection.").  On these bases, Commerce's decision to rely on "the broad market averages that the UN Comtrade, GTA and Stats.NZ data represent" was reasonable.  *See id.* at 54.

Accordingly, the court concludes that Commerce's determination on these points was supported by substantial evidence and was otherwise in accordance with law.

## II.    Whether Commerce's application of AFA to find certain of Baroque's input suppliers to be government authorities was unlawful

The court addresses Baroque's challenge to Commerce's application of AFA to find certain of Baroque's input suppliers to be government authorities. Baroque argues that Commerce's application of AFA was unlawful for two reasons: (1) necessary information was not missing from the record; and (2) Commerce failed to specify deficiencies in the GOC's responses and this failure did not permit the GOC to correct such deficiencies.  Baroque Br. at 7-8.

For the reasons discussed below, the court concludes that Commerce's application of AFA to find that certain of Baroque's input suppliers are government authorities was not in accordance with law.  The court remands to Commerce to take the actions set forth below.

### A.    Additional Background

On April 3, 2023, Commerce issued its initial countervailing duty questionnaire to the GOC.  *See* Letter from U.S. Department of Commerce to Embassy of the People's Republic of China Pertaining to Government of China's Initial Questionnaire (Apr. 3, 2023) ("Initial Questionnaire"), PR 64.

In the "Input Producer Appendix" to the Initial Questionnaire, Commerce requested information pertaining to the ownership and structure of Baroque input suppliers, as well as the presence or involvement of any CCP entities in those suppliers. *See* Initial Questionnaire at II-34 to II-38. Specifically, Commerce asked the GOC "whether a CCP committee, branch or 'primary organization' has been formed" within any of the suppliers and whether "any decisions taken by [a supplier] are subject to review or approval by" the GOC or by any one of nine listed CCP-associated entities (the "nine entities question").  *Id.* at II-36.  Additionally, Commerce asked the GOC to "identify any individual owners, members of the board of directors, or senior managers who were Government or CCP officials during the POR" (the "CCP officials question").  *Id.* at II-37.

Further, Commerce asked the GOC to "explain how [it] developed the information used in [its] response . . . to determine whether or not company owners, members of the board of directors or managers were or were not officials of any of the above nine entities." *Id*.  For this question, Commerce asked the GOC to address the following points: (1) the "records question": "What records did you review to determine the information that was reported in the response?"; (2) the "government sources question": "Explain whether there are sources at the national, provincial, municipal, or local levels

to determine whether company owners, members of the board of directors or managers were officials of any of the above nine entities"; (3) the "annual reports question": "In addition to Government records (including CCP records), is there information in the annual reports of the companies, such as biographical summaries, that would indicate whether company owners, members of the board of directors or managers were officials of any of the above nine entities?"; and (4) the "other documents question": "Explain whether there are any other company records or company documents that are submitted to the Government that would indicate a person's official role with the Government, including the CCP." *Id*.

On June 7, 2023, the GOC submitted its response to Commerce's Initial Questionnaire. *See* Response from DeKieffer & Horgan to Secretary of Commerce Pertaining to Government of China's Section II Questionnaire Response (June 7, 2023) ("GOC IQR"), CR 82-112, PR 97-108. For the 18 input suppliers, the GOC responded to the nine entities question as follows:

[[

]]

*Id.,* Ex. LTAR-1 at 52-57.

For the same 18 input suppliers, the GOC responded to the CCP officials question as follows: "There are no individual owners, members of the board of directors, or senior managers who were Government or CCP officials during the POR at this producer." *Id.* at 71-73.

In response to the records question, the GOC explained that it "sent the relevant questions to the input suppliers" and reported the responses it received from those suppliers. *Id.* at 73-74. In response to the government sources question, the GOC responded that there "is no central informational database to search for such information." *Id.* at 74. In response to the annual reports question, the GOC responded that "[u]nder relevant Chinese laws, companies have no obligation to identify whether their owners, members of the board of directors, or managers are officials or representatives of any" of the nine entities." *Id.* In response to the other documents question, the GOC stated that "no other company records or company documents that are submitted to the government would indicate a person's official role with the government or CCP." *Id.*

On August 24, 2023, Commerce issued a supplemental questionnaire to the GOC. *See* Letter from U.S. Department of Commerce to DeKieffer & Horgan Pertaining to Government of China's Supplemental Questionnaire (Aug. 24, 2023) ("Supplemental Questionnaire"), CR 121, PR 213. Commerce requested additional information as to how the GOC verified its responses (the "verification question"):

> For [[  ]] input producers, you claimed that [[                                    ]]
> and [[                                                      ]]. Please
> explain what, if any, steps you took to verify or further examine the accuracy
> of this information, including what, if any, documentation was reviewed.
> *Provide documentation to support your response.*

*Id.* at 7-8 (emphasis supplied).

On September 7, 2023, the GOC submitted its response to Commerce's Supplemental Questionnaire. *See* Response from DeKieffer & Horgan to Secretary of Commerce Pertaining to Government of China Supplemental Questionnaire Response

(Sept. 7, 2023) ("GOC SQR"), PR 215.  Regarding verification, the GOC stated that it "provided the articles of associations [sic] of [each of] the input producers" and confirmed that the companies' articles of association prevented the involvement of external parties, including the CCP, in company affairs.  *Id* at 10.  Although the GOC provided signed statements from the suppliers, the GOC did not provide government documentation in support of its response.  *Id.*

### B.    Legal framework

A countervailable subsidy may be found where the entity providing the subsidy is an "authority."  19 U.S.C. § 1677(5)(B).  An "authority" is defined as "a government of a country or any public entity within the territory of the country."  *Id.*  Commerce's "longstanding practice" is to treat "most government-owned corporations as the government itself."  *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,402 (Dep't of Commerce Nov. 25, 1998).

Commerce may make determinations on the basis of the facts otherwise available whenever "necessary information is not available on the record" or "an interested party or any other person" (1) withholds information requested by Commerce; (2) fails to submit such information on time or in the form and manner requested by Commerce; (3) significantly impedes the proceedings; or (4) provides information that Commerce is unable to verify.  19 U.S.C. § 1677e(a); *see also* 19 C.F.R. § 351.308(a).

In selecting from facts otherwise available, Commerce may use an inference that is adverse to the interests of a party "if [that] party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1); *see also* 19 C.F.R. § 351.308(c).  A respondent's failure to cooperate to

"the best of its ability" is determined by "assessing whether [the] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). If Commerce determines that a response to a request for information does not comply with the request, Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d).

If Commerce finds that further information submitted in response to such deficiency is unsatisfactory or untimely, Commerce may "disregard all or part of the original and subsequent responses." *Id.* However, Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements . . ." if: (1) the information is timely; (2) verifiable; (3) complete enough to be reliable; (4) the interested party demonstrates that it acted to the best of its ability in providing the information and meeting the requirements established by Commerce; and (5) Commerce can use the information without undue difficulties. *Id.* § 1677m(e).

### C.    Analysis

### 1.    Whether Commerce determined reasonably that necessary information was missing from the record

The court addresses first whether Commerce determined reasonably that it lacked necessary information to analyze whether certain of Baroque's input suppliers are government authorities.

Baroque argues that the GOC provided full and detailed responses to Commerce's inquiries and, therefore, necessary information was not missing from the record.  Baroque Br. at 29-35.

In the IDM, Commerce explained that it asked the GOC to provide "information about the involvement of the CCP in each" of the input suppliers, information that Commerce deemed "necessary to fully evaluate whether the purportedly privately-owned input producers are 'authorities.'"  IDM at 44.  Commerce stated that the GOC's responses were deficient because "the GOC did not provide any *government* documentation to support its claim that the individually-owned suppliers were not government authorities."  *Id.* at 48 (emphasis supplied).  The GOC submitted certifications from the input suppliers denying any CCP influence; however, Commerce explained that those certifications were "not the government documents" required and were "*pro forma* in nature, lacking particular details for examining possible government involvement in each company."  *Id.* at 45.

Commerce explained that without "government documentation, [Commerce cannot] conclude that there is no official CCP presence in any of the . . . input suppliers."  *Id.* at 48.  Accordingly, Commerce determined that the GOC withheld

necessary information and applied an adverse inference that the CCP exerts

"meaningful control over the [input suppliers] and their resources."  *Id*.

Baroque argues that Commerce determined incorrectly that the GOC withheld

necessary information.  *See* Baroque Br. at 30-36.  Baroque maintains that the GOC

provided full responses to Commerce's inquiries and that Commerce failed to explain

what precise necessary information was missing.  *Id*.; *see also supra* Background

Section II.A.

In the IDM, Commerce stated that the GOC's company statements and narrative

denials of CCP influence, without supporting government documentation, did not

provide sufficient detail regarding the nature and extent of CCP involvement in the

suppliers.  *See* IDM at 44-48.  Commerce explained that the inquiry requires more than

mere company statements because "[p]ublicly available information indicates that

Chinese law requires the establishment of CCP organizations 'in all companies, whether

state, private, domestic, or foreign-invested' and that such organizations may wield a

controlling influence in the company's affairs."  *Id*. at 47 (quoting *Certain Metal Lockers

and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing

Duty Determination*, 86 Fed. Reg. 35,741 (Dep't of Commerce Jul. 7, 2021) and

accompanying IDM at cmt. 5; citing *Off-the-Road Tires from the People's Republic of

China: An Analysis of Public Bodies in the People's Republic of China in Accordance

with the WTO Appellate Body's Findings in WTO DS379* (Dep't of Commerce May 18,

2012) at 35).[12]  Commerce noted also that the GOC previously supplied adequate

government documentation indicating CCP involvement in the 2019 MLWF

administrative review.  In that review, the GOC submitted a government summary

report, which "indicate[d] the influence of the CCP over the employees in the

company."  IDM at 47 (quoting *Multilayered Wood Flooring from the People's Republic*

*of China: Final Results and Partial Recission of Countervailing Duty Administrative*

*Review; 2019*, 87 Fed. Reg. 36,305 (Dep't of Commerce Jun. 16, 2022); accompanying

IDM at cmt. 5).

Commerce cited also *Citric Acid and Certain Citrate Salts from the People's*

*Republic of China: Final Results of Countervailing Duty Administrative Review; 2012*, 79

Fed. Reg. 78,799 (Dep't of Commerce December 31, 2014) ("Citric Acid"), stating: "in

past proceedings, the GOC provided and Commerce has verified government

information certifying that no company owners, member of the board of directors or

managers were government or CCP officials."  IDM at 48.  In that review, the GOC

submitted "a certified letter from the CCP Committee of the village indicating that the

owner of the input suppliers was not the Secretary for the Party Committee during the

POR" and "established at verification through official government documentation

---

[12] Baroque argues that the CCP Constitution requires only that "a primary party must be formed in an organization where there are *three or more party members*," and therefore that "where there are not three party members in the company, no primary party is necessary."  Baroque Br. at 32 (citing *Off-the-Road Tires from the People's Republic of China: An Analysis of Public Bodies in the People's Republic of China in Accordance with the WTO Appellate Body's Findings in WTO DS379* (May 18, 2012) ("2012 Public Bodies Analysis") at 35).  Baroque further contends that CCP membership is sufficiently limited such that many companies likely do not meet the three-member threshold.  *Id*. Commerce, however, explained that "[p]ublicly available information indicates that *Chinese law* requires the establishment of CCP organizations *in all companies*."  IDM at 47 (citing 2012 Public Bodies Analysis) (emphasis supplied) (internal citations omitted).

provided by the GOC and the CCP that the owner of the input suppliers did not serve as Secretary for the Party during the POR." *Id.* (citing *Citric Acid* at cmt. 2). Accordingly, Commerce added that its "request for information from the GOC is a request for government information independent from company information." *Id.* at 48.

In sum, Commerce explained adequately and determined reasonably that "necessary information [was] not available on the record," 19 U.S.C. § 1677e(a), because the GOC's responses, which consisted of internal company statements and narrative denials, did not provide a sufficient basis for Commerce to assess the extent of CCP involvement in the input suppliers. IDM at 45. Commerce found that, absent *government documentation* addressing CCP involvement, the information on the record was insufficient to permit a determination of whether the input suppliers were government authorities.[13] *Id*. at 48.

### 2.    Whether Commerce provided the GOC with notice and an opportunity to remedy its deficient responses

The court turns next to whether Commerce provided the GOC with adequate notice and an opportunity to remedy its deficient responses, as required by 19 U.S.C. § 1677m(d).

Baroque argues that Commerce did not inform the GOC that the specific information provided by the GOC regarding the suppliers at issue was deficient, including that Commerce required *government* documentation. *See* Baroque Br. at 32.

---

[13] Given the number of times this precise issue has arisen in Commerce proceedings, the court is puzzled as to why — and frustrated that — there remains any question by any party as to the necessary documentation to be provided.

Baroque notes that neither the nine entities question nor the CCP officials question in the Initial Questionnaire requested supporting government documentation. *Id.* at 30.

Baroque asserts further that the only request for documentation regarding CCP official involvement came in a supplemental questionnaire. Baroque Br. at 31. There, Commerce required the GOC to "explain what, if any, steps you took to verify or further examine the accuracy of this information, including what, if any, documentation was reviewed." GOC Supplemental Questionnaire Response (Sept. 5, 2023) ("GOC Supp") at 9-10, PR 215; Baroque Br. at 31. Baroque maintains that the supplemental questionnaire did not explicitly reference any deficiencies in the GOC's initial responses, thereby denying to the GOC an opportunity to remedy any deficiency such as a failure to provide government documentation. Baroque Br. at 31-32.

The government argues that: (1) Commerce complied with 19 U.S.C. § 1677m(d) by twice requesting supporting documentation from the GOC regarding CCP presence, including in both the initial and supplemental questionnaires. Def. Br. at 26-27; and (2) the GOC had "constructive notice" of the need for *government* documentation. *Id.* at 26.

The court concludes that Commerce did not fulfill its obligations under § 1677m(d).

Section 1677m(d) requires that if Commerce determines that a response to a request for information does not comply with the request, Commerce "shall promptly inform the person submitting the response of *the nature of the deficiency* and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d) (emphasis supplied).

The questions are, therefore: (1) whether Commerce adequately informed the GOC that its responses were deficient for want of government documentation; and (2) whether Commerce provided the GOC with an opportunity to remedy that deficiency.  For the following reasons, the court concludes with respect to both questions that Commerce did not. In the "Input Producer Appendix" to the Initial Questionnaire, Commerce requested information pertaining to the ownership and structure of Baroque's input suppliers, as well as the presence or involvement of any CCP entities in those suppliers.  *See* Initial Questionnaire at II-34 to II-38; *see also supra* Background Section II.A (detailing the nine entities question, the CCP officials question and related records and government sources questions).  Neither the nine entities question nor the CCP officials question requested that the GOC provide supporting government documentation.  *Id.* at II-36; *Id.* at II-37.

In the government sources question, Commerce inquired specifically as to *whether* there existed government source documents sufficient for Commerce to analyze the involvement of CCP-related entities in the input suppliers.  *See* Initial Questionnaire at II-37.  This question did not, however, request that the GOC *provide* such supporting documentation in the event that such government source documents existed.  *Id.*

In the Supplemental Questionnaire, Commerce repeated the nine entities and CCP officials questions almost verbatim from the Initial Questionnaire, without addressing the GOC's prior responses or identifying any specific deficiencies.  Supplemental Questionnaire at 7 ("Please identify whether any owner, director or manager is a member or representative of any of the [nine] entities";

"[P]lease identify which owners, managers, and directors were Chinese government or CCP officials during the POR").  Commerce did not identify a lack of government documentation as a deficiency in the GOC's initial responses, nor did Commerce request that the GOC provide any government documentation in its supplemental responses.[14]

This Court has held that "Commerce satisfies its obligation under § 1677m(d) to place the respondent on notice of the nature of a deficiency in its initial questionnaire response where a supplemental questionnaire '*specifically point[s] out* and request[s] clarification of [the] deficient responses,' and *identifies the information needed* to make the required showing."  *Hyundai Steel Co. v. United States*, 45 CIT __, __, 518 F. Supp. 3d 1309, 1323 (2021) (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)) (emphasis supplied); *see also Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (holding that Commerce satisfied its obligation under § 1677m(d) when the respondent "failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified [the respondent] of that defect").

Here, Commerce failed to satisfy its obligation under § 1677m(d) because Commerce did not "specifically point[ ] out and request[ ] clarification" of the deficiency (i.e., the lack of government documentation) in the GOC's initial responses and did not

---

[14] In the Supplemental Questionnaire, Commerce requested that the GOC provide supporting documentation for its responses to the verification and CCP Opinion questions.  *See* Supplemental Questionnaire at 7-8; *see also supra* background Section II.A.  However, neither of these questions explicitly requested *government* documentation and the GOC did not provide any government documentation in its supplemental responses.  *See* GOC SQR at 10-11.

identify government documentation as "the information needed to make the required showing." *Maverick Tube Corp.*, 857 F.3d at 1361 (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)*; see also Hyundai Steel Co.*, 518 F. Supp. 3d at 1322-23 (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1) ("Broadly drawn initial or supplemental questionnaires may not sufficiently place a respondent on notice of the nature of the deficiency, and deprive it of the opportunity to remedy that deficiency.").

Commerce's repetition alone of the nine entities and CCP officials questions was not sufficient to provide the GOC with notice that its initial responses to those questions were deficient as to government documentation. This Court has held previously that "[s]imilarities in questions between the initial and supplemental questionnaire alone do not serve as evidence that Commerce found the initial questionnaire response deficient." *Hyundai Heavy Indus. Co. v. United States*, CIT __, __, 485 F. Supp. 3d 1380, 1402 (2020).

Commerce's failure to identify the deficiency in the GOC's responses and to identify what information could be provided to cure that deficiency denied the GOC the "opportunity to remedy or explain the deficiency," as mandated by § 1677m(d). Notably, Commerce's questionnaires did not specifically request government documentation. S*ee supra* note 14. The government argues that the GOC had "constructive notice" of the need to provide government documentation because of this Court's prior decisions remanding to Commerce to request "government documentation" from the GOC. Def. Br. at 26 (citing *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 49 CIT __, __, 776 F. Supp. 3d 1290, 1310 (2025); *Baroque Timber Indus. (Zhongshan) Co. v.*

*United States*, 49 CIT __, __, 766 F. Supp. 3d 1296, 1314 (2025).  Constructive notice is not applicable here.  This Court's opinions, which are the only published reference to this issue, were published on April 3, 2025, well after the GOC filed its supplemental questionnaire response in this proceeding on September 7, 2023.  *See* GOC SQR.[15]

Further, § 1677m(d) requires actual notice from Commerce identifying the specific deficiency and the information needed to cure it, which cannot be satisfied by post hoc assertions of "constructive notice."  *See Hyundai Steel Co.*, 518 F. Supp. 3d at 1322 (holding that Commerce must "sufficiently place a respondent on notice of the nature of the deficiency").

It is well established that the burden of creating an adequate record rests with a respondent, *see ABB Inc. v. United States*, 42 CIT __, __, 355 F. Supp. 3d 1206, 1222 (2018); however, Commerce is "obligat[ed] to let the respondent know what information [Commerce] really wants."  *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 23 CIT 804, 820 (1999); *see also Queen's Flowers de Colombia v. United States*, 21 CIT 968, 980, 981 F.Supp. 617, 628 (1997) ("alleged response deficiency cannot support application of [AFA] where the information sought was apparently never requested").

The GOC "cannot logically be faulted for failing to provide information beyond the scope of the question that Commerce asked."  *Jinan Yipin Corp. v. United States*, 31

---

[15] Nevertheless, given the number of times that this precise issue has arisen and that the court has remanded this precise issue to Commerce, the court is puzzled as to why — and frustrated that — Commerce has not yet fully corrected its questionnaires and communications with the parties to obtain the information it seeks and thereby also to conserve Commerce resources, party resources and Court resources.  The court trusts that Commerce will now fully correct its questionnaires, supplemental questionnaires and any other communications to the parties to ensure that this issue does not arise yet again.

CIT 1901, 1916, 526 F. Supp. 2d 1347, 1360-61 (2007).  If Commerce viewed government documentation from the GOC as necessary information, Commerce was "obligat[ed] to let the [GOC] know."  *Ta Chen*, 23 CIT at 820; *see also Jinan Yipin Corp.*, 516 F. Supp. 2d at 1359 ("If . . . it was essential . . . for Commerce to be provided with [certain] information, . . . then *Commerce needed to request that specific information*.") (emphasis supplied).

Accordingly, Commerce did not comply with its obligations under § 1677m(d) and as a result Commerce's application of AFA to find that certain of Baroque's input suppliers were government authorities is not in accordance with law.  *See* 19 U.S.C. § 1677e(a) (stating that Commerce may make determinations on the basis of facts available "subject to" the requirements of § 1677m(d)).  The court directs Commerce, on remand, to: (1) identify with specificity the deficiencies in the GOC's initial or supplemental responses to the nine entities, CCP officials and other related questions; (2) describe precisely and clearly the nature of each deficiency and what information could correct that deficiency; (3) if Commerce continues to determine that supporting *government* documentation is necessary information, request that *government* information explicitly from the GOC; and (4) provide the GOC an opportunity consistent with § 1677m(d) to remedy any specified deficiencies.

## CONCLUSION

In conclusion, the court sustains in part and remands in part Commerce's Final Results.  For the foregoing reasons, it is hereby

**ORDERED** that Commerce's calculation of the plywood and veneer benchmarks is remanded for further explanation; it is further

**ORDERED** that Commerce's calculation of the fiberboard benchmark is sustained; it is further

**ORDERED** that Commerce's decision to apply AFA to find certain of Baroque's input suppliers to be government authorities is remanded for compliance with § 1677m(d); it is further

**ORDERED** that Commerce shall file its remand results within 90 days following the date of this Order; it is further

**ORDERED** that within 14 days of the date of filing of Commerce's remand results, Commerce shall file an index and copies of any new administrative record documents; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the Court.

**SO ORDERED**.


                                                    /s/      Timothy M. Reif
                                                    Timothy M. Reif, Judge

Dated: April 7, 2026
          New York, New York