C-570-971
Remand
Slip Op. 26-32
POR: 01/01/2021 – 12/31/2021
**Public Document**
E&C/OVIII: JS

***Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation v. United States***
**Court No. 24-00106, Slip Op. 26-32 (CIT April 7, 2026)**
**Multilayered Wood Flooring from the People's Republic of China**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation v. United States*, Consol. Court No. 24-00106, Slip Op. 26-32 (April 7, 2026) (*Remand Opinion and Order*). These final results of redetermination concern the final results of the 2021 administrative review of the countervailing duty (CVD) order on multilayered wood flooring from the People's Republic of China (China).[1]

In the *Remand Opinion and Order*, the Court sustained Commerce with respect to its calculation of a fiberboard benchmark. However, the Court remanded Commerce to: (1) correct its factual misstatement regarding the data in the International Tropical Timber Organization Tropical Timber Market Report (ITTO TTMR), identify which portions of the ITTO TTMR export dataset contain specified/unspecified export destinations, evaluate whether Commerce can disaggregate certain portions of the ITTO TTMR data, and reconsider whether it is appropriate to include certain additional data from the ITTO TTMR report, (including the export price data

[1] *See Multilayered Wood Flooring from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2021*, 89 FR 41939 (May 14, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

from Ghana to "regional markets"), in the benchmark for the benefit calculation of the provision of plywood and veneer for less than adequate remuneration (LTAR) programs; and (2) to identify specific deficiencies and request supplemental information, if necessary, for the information provided in supplemental responses regarding certain input suppliers by the Government of the People's Republic of China (GOC) and reexamine Commerce's application of adverse facts available (AFA) finding that certain of the companies that supplied inputs to Riverside Plywood Corp., (Riverside) and its cross-owned affiliate Baroque Timber Industries (Zhongshan) Co., Ltd. (Baroque) are government authorities. On June 17, 2026, Commerce released its Draft Remand to interested parties.[2] On June 24, 2026, we received comments from Baroque.[3] No other interested party filed comments.

As discussed below, pursuant to the Court's *Remand Opinion and Order*, Commerce has addressed Baroque's comments regarding the inclusion of the ITTO TTMR data in the plywood and veneer benchmarks and its application of AFA to find that certain of Baroque and Riverside's input suppliers are government authorities of section 771(B) of the Tariff Act of 1930, as amended (the Act). As explained below, in these final results of redetermination, we continue to find that certain of the ITTO TTMR data are appropriate for inclusion in the plywood and veneer benchmarks. Additionally, Commerce continues to find that it has complied with its obligation under section 782(d) of the Act and that it appropriate to determine based on AFA that certain of Baroque and Riverside's input suppliers of plywood and veneers are government authorities.

---

[2] *See* Draft Results of Redetermination, *Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation v. United States*, Consol. Court No. 24-00106, Slip Op. 26-32 (CIT April 7, 2026), dated June 17, 2026 (Draft Remand).

[3] *See* Baroque's Letter, "Comments on Draft Remand," dated June 24, 2026 (Baroque's Draft Remand Comments).

## II. BACKGROUND

On February 2, 2023, Commerce initiated an administrative review of the CVD order on multilayered wood flooring from China for certain producers and exporters of subject merchandise for the period of review (POR) January 1, 2021, through December 31, 2021.[4] On April 3, 2023, Commerce selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. (Senmao) and Riverside as mandatory respondents.[5] Also on April 3, 2023, Commerce issued its initial questionnaire to the GOC.[6] Between April 17, 2023, and October 17, 2023, Riverside timely filed its initial and supplemental questionnaire responses.[7] The GOC submitted responses to Commerce's initial and supplemental questionnaires between June 7 and November 28, 2023.[8]

On November 15, 2023, the petitioner,[9] Senmao, and Riverside submitted data for Commerce to consider using as benchmarks in the benefit calculations for various LTAR programs.[10] On November 27, 2023, Senmao, Riverside, and the petitioner submitted rebuttal benchmark comments.[11] On December 4, 2023, we rejected Riverside's benchmark submission

---

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 7060 (February 2, 2023).
[5] *See* Memorandum, "Respondent Selection," dated April 3, 2023.
[6] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated April 3, 2023 (Commerce's CVD Questionnaire).
[7] *See* Riverside's Letters, "Section III Affiliations Questionnaire Response," dated April 17, 2023; "Riverside Plywood Initial Questionnaire Response," dated May 26, 2023 (Riverside's IQR); "Riverside Plywood First Supplemental Questionnaire Response," dated August 31, 2023 (Riverside's SQR); "Riverside Plywood Second Supplemental Questionnaire Response," dated September 14, 2023; and "Riverside Plywood Supplemental Questionnaire Response," dated October 17, 2023.
[8] *See* GOC's Letters, "GOC Section II Questionnaire Response," dated June 7, 2023 (GOC IQR); "GOC Supplemental Questionnaire Response," dated September 7, 2023 (GOC SQR); "GOC Ocean Shipping Supplemental Questionnaire Response," dated September 21, 2023; and "GOC Third Supplemental Questionnaire Response," dated November 28, 2023.
[9] The petitioner is the American Manufacturers of Multilayered Wood Flooring and its individual members.
[10] *See* Petitioner's Letter, "Benchmark Pricing Information," dated November 15, 2023; *see also* Riverside's Letter, "Benchmark Submission," dated November 15, 2023 (Riverside's Benchmark Submission); Senmao's Letter, "Benchmark Submission," dated November 15, 2023.
[11] *See* Riverside Plywood's Letter, "Benchmark Rebuttal Submission," dated November 27, 2023 (Riverside's Rebuttal Benchmark); *see also* Jiangsu Senmao's Letter, "Rebuttal Benchmark Submission," dated November 27, 2023 (Senmao's Rebuttal Benchmark); and Petitioner's Letter, "Rebuttal Benchmark Pricing Information," dated November 27, 2023 (Petitioner's Rebuttal Benchmark).

for containing untimely new factual information.[12] On December 5, 2023, Riverside refiled its benchmark data without the untimely new factual information.[13]

On December 28, 2023, Commerce published the *Preliminary Results* of this administrative review in the *Federal Register*.[14] In the *Preliminary Results*, Commerce found that Riverside and Baroque had domestically purchased plywood, veneer, and other input products for LTAR from suppliers that were "authorities" based on AFA.[15] For the calculation of the veneer benchmark, Commerce used world merchandise trade data from UN Comtrade as well as pricing data from the ITTO TTMR, submitted by Riverside, and the ITTO Biennial Review Statistics (BRS), submitted by the petitioner.[16] For the calculation of the plywood benchmark, Commerce used world merchandise trade data from UN Comtrade, GTA, Stats.NZ, ITTO TTMR, and ITTO BRS.[17] In the *Final Results*, published on May 14, 2024, Commerce found that using the export prices in the ITTO TTMR and ITTO BRS data was "inconsistent with Commerce's regulations" as the data did not allow Commerce "to exclude exports to China."[18] As such, in the *Final Results*, Commerce calculated the veneer benchmark for Riverside based on only the UN Comtrade data and calculated the plywood benchmark based on data from UN Comtrade, GTA, and Stats.NZ.[19] Commerce made no changes in the *Final Results* with respect to its determination to apply AFA to find that all of the companies that supplied inputs to the mandatory respondents, including Riverside and its cross-owned affiliate Baroque, are government authorities.[20]

---

[12] *See* Commerce's Letter, "Rejection of November 15, 2023, Submission," dated December 4, 2023.
[13] *See* Riverside Plywood's Letter, "Benchmark Submission: REFILED VERSION" dated November 15, 2023 (Riverside's Benchmark Data).
[14] *See Multilayered Wood Flooring from the People's Republic of China: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 88 FR 89664 (December 28, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[15] *See Preliminary Results* PDM at 13-16 and 48-53.
[16] *Id*. at 41-43.
[17] *Id*. at 43-44.
[18] *See Final Results* IDM at Comment 5.
[19] *Id*.
[20] *Id*. at Comment 4.

**A. Commerce's Plywood and Veneer for LTAR Benchmarks**

Riverside, including its cross-owned affiliate Baroque, reported purchases of plywood and veneer during the POR.[21] As noted above, interested parties submitted data for use in Commerce's benchmark calculations to determine the benefit conferred by Riverside and Baroque's purchases of plywood and veneer for LTAR. Riverside provided the following monthly pricing data from the ITTO TTMR:

(1) For Plywood: Export prices from Ghana for various species (*i.e.*, Ceiba, Ofram, and Asanfina) of BB/CC grade plywood; domestic prices (exclusive of taxes) from Brazil of parica plywood; export prices from Brazil of C/CC grade pinewood plywood of varying thickness; and export prices from Peru of various species (*i.e.*, Copaiba, Virola, Cedar fissilis, and Lupuna) and grade-thickness combinations (*e.g.*, B/C 15 millimeters (mm)).[22]

(2) For Veneer: Export prices from Ghana for core and face veneer of various species (*e.g.*, Ceiba, Ofram, Asanfina, Mahogany); and export prices from Peru for core/face veneer made from Lupuna wood.[23]

As Commerce explained in the *Final Results*, "{t}he TTMR is a published, biweekly narrative discussion of various issues affecting the tropical timber markets in a variety of countries/regions around the globe, presented along with a variety of pricing data series from those markets for a number of timber and wood products."[24] These data are reported only as average unit values (AUVs), with no corresponding transaction quantities.

In the *Preliminary Results*, Commerce included the ITTO TTMR data in the benchmarks for Baroque's plywood and veneer purchases for LTAR.[25] We also agreed with Baroque that the

---

[21] *See* Riverside's IQR at 19-21 and Exhibits 11a and 11b.
[22] *See* Riverside's Benchmark Data at 2 and Exhibit 3. Most of the Peru plywood export price data is identified as pertaining to B/C grade plywood.
[23] *Id*.
[24] *See Final Results* IDM at 50.
[25] *See Preliminary Results* PDM at 44.

evidence it presented demonstrated the difference between its purchases of face veneer and backboard veneer and should be valued using different benchmarks.[26] As such, we used the Ghana core data for only the backboard veneer benchmark and the Ghana face data for only the face veneer benchmark.[27] However, consistent with past reviews, we also used the UN Comtrade plywood data submitted by Jiangsu Senmao and the GTA, Stats.NZ, and ITTO BRS data submitted by the petitioner for both of Baroque's veneer benchmarks, because these data include both core and face veneer.[28]

In the *Final Results*, Commerce found that it was unable to use the ITTO TTMR data and excluded these data from all benchmarks. Specifically, Commerce stated that "the TTMR data report AUVs for exports of certain species of veneer and plywood from Ghana, Peru, and Brazil to all destinations" and noted that the TTMR data could not be disaggregated by destination.[29] We also explained that Commerce's policy is to not use export data when it is not possible to exclude exports to a market where Commerce has found that input market to be distorted, such as China.[30] On this basis, Commerce concluded that it is "inconsistent with Commerce's regulations to use either the TTMR or BRS export price data in constructing the benchmarks" for plywood and veneer "because the information on the record for these sources does not allow us to exclude exports to China."[31] Separately, Commerce found that we could not use the domestic Brazilian price data for plywood and fiberboard because the record lacked information necessary to construct delivered prices from these data as required by 19 CFR 351.511(a)(2)(iv).[32]

---

[26] *Id*.
[27] *Id*.
[28] *Id*.; *see also Multilayered Wood Flooring from China Final AR 2020* IDM at Comment 7C.
[29] *See Final Results* IDM at fn. 217.
[30] *Id*. at 51; *see also Certain Metal Lockers and Parts Thereof from the People's Republic of China: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2020-2021*, 88 FR 61514 (September 7, 2023) (*Lockers from China AR 20-21*), and accompanying PDM at 26, unchanged in *Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 89 FR 11251 (February 14, 2024), and accompanying IDM at Comment 3.
[31] *See Final Results* IDM at Comment 5A.
[32] *Id*. at 52-53.

Accordingly, for the *Final Results*, Commerce calculated a single benchmark for Baroque's and Riverside's purchases of veneer comprised of Senmao's UN Comtrade data and the petitioner's GTA and Stats.NZ data, and a single benchmark for Baroque's and Riverside's purchases of plywood comprised of Senmao's UN Comtrade data and the petitioner's GTA and Stats.NZ data.

**B. Commerce's Application of AFA to Find Certain of Riverside's Input Suppliers to be Government Authorities**

As stated above, Riverside, including its cross-owned affiliate Baroque, reported purchasing plywood, veneer, and other input products during the POR.[33] Commerce requested information from the GOC regarding the companies that produced these inputs purchased by Riverside and Baroque during the POR, in order to evaluate whether the producers are "authorities" within the meaning section 771(B) of the Act.[34] The GOC provided certain of this information pertaining to the ownership and structure (*e.g.*, articles of association) for a small subset of these companies.[35] This included statements from the GOC and the suppliers themselves that there is no primary party organization in the suppliers and that none of the owners, board members, or managers of the suppliers are government or Chinese Communist Party (CCP) officials in any of the nine entities.[36]

In a supplemental questionnaire, Commerce repeated its request for this information from the GOC for all of the reported input suppliers.[37] In response, the GOC did not provide the requested documentation for any additional input suppliers, explaining that it had already

[33] *See* Riverside's IQR at 19 and Exhibits 11a and 11b.
[34] *See Preliminary Results* PDM at 13-14 (citing Commerce's CVD Questionnaire at Input Producer Appendix).
[35] *Id*. at 14; *see also* GOC's IQR at Exhibits LTAR-1 and LTAR-2.
[36] Commerce understands that for each level of Government, *i.e*., central, provincial, municipal, county, township and village ("county, township, and village" will hereafter be referred to collectively as "local"), there are corresponding: (1) Chinese Communist Party (CCP) Congresses, (2) CCP Committees (3) CCP Standing Committees, (4) People's Congresses, (5) Standing Committees of People's Congresses, (6) other Government administration entities, including village committees, (7) the Chinese People's Political Consultative Conferences (CPPCC), and (8) the Discipline Inspection Committees of the CCP. Commerce also understands that, in accordance with the CCP Constitution, a (9) CCP committee, branch, or "primary organization" needs to be formed in any enterprise with three or more party members, regardless of state-ownership. We refer to officials of any of these 9 entities as "Government or CCP officials." *See* Commerce's CVD Questionnaire at II-36.
[37] *See* Commerce's Letter, "2021 Countervailing Duty Administrative Review Section II Supplemental Questionnaire," dated August 24, 2023, at 7-8.

provided the information "for those companies the GOC is able to collect and submit {the} requested documents" in the GOC's IQR.[38] It also confirmed that for these companies "all of the owners, directors, or managers were not Chinese government of CCP officials during the POR," but did not provide any additional supporting documentation.[39] In addition, Commerce asked the GOC to explain whether and how it independently verified these claims about the role of the GOC/CCP in these companies, to which the GOC responded only that it provided the input suppliers' articles of association, which demonstrate that "neither the decision-marker, nor the decision making process, involves participation of external parties except the company itself."[40]

In the *Preliminary Results*, Commerce found that the GOC had withheld information requested of it regarding the CCP's role in the ownership and management of these input suppliers and that Commerce must rely on facts available in conducting its analysis of the producers that supplied the mandatory respondents with certain inputs during the POR.[41] Specifically, Commerce stated that the declarations from the input producers on CCP involvement in company operations were insufficient, and that government documentation, independent of the input suppliers, was necessary for fully evaluating the influence and control the GOC (through the CCP) has over the input suppliers.[42] Commerce also noted that, moreover, the GOC had not provided any of the requested information for the large majority of input suppliers.[43] Therefore, Commerce found that the GOC failed to cooperate by not acting to the best of its ability to comply with its requests for information. Consequently, Commerce determined that an adverse inference was warranted in the application of facts available to find

[38] *See* GOC's SQR at 8-9.
[39] *Id*. at 10.
[40] *Id*.
[41] *See Preliminary Results* PDM at 13-16.
[42] *Id*. at 15-16.
[43] *Id*.

that all companies that supplied inputs to the mandatory respondents (including Riverside and Baroque) were "authorities" within the meaning of section 771(5)(B) of the Act.[44]

In the *Final Results*, Commerce addressed arguments from interested parties that the subset of suppliers that provided certain of the requested company information were not "authorities."[45] Commerce explained that the certifications that the GOC had provided were not the required government documentation necessary to support its claims with respect to this subset of input suppliers, and that the certifications were "*pro forma* in nature, lacking particular details for examining possible government involvement in each company."[46] In its reasoning in the *Final Results*, Commerce relied on *Citric Acid from China 2012*, where a local GOC entity, *i.e.*, a CCP Village Committee, provided a certified letter indicating that the owner of the input suppliers was not a Party Committee Secretary to find that two input suppliers with common ownership were not authorities.[47] Commerce explained that this type of government documentation, rather than statements or certifications from the company, was necessary for its analysis of the GOC/CCP's control in the companies that supplied inputs to the mandatory respondents.[48] On this basis, Commerce continued to apply AFA in the *Final Results* to find all input suppliers, including the subset that provided certifications and other government documentation, to be "authorities" within the meaning of section 771(5)(B) of the Act.[49]

## III. REMAND OPINION AND ORDER

In the *Remand Opinion and Order*, the Court concluded that Commerce did not adequately address certain record evidence relating to the benchmark data used to calculate the benefits for Baroque's purchases of plywood and veneer for LTAR.[50] Specifically, the Court

[44] *Id* at 16.
[45] *See Final Results* IDM at Comment 4.
[46] *Id.* at 45.
[47] *Id*. at 48 (citing *Citric Acid and Certain Citrate Salts Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014) (*Citric Acid from China 2012*), and accompanying IDM at Comment 2).
[48] *Id*.
[49] *See Final Results* IDM at Comment 4.
[50] *See Remand Opinion and Order* at 11-16.

found that Commerce did not address certain record evidence contradicting Commerce's finding that the ITTO TTMR data reflected exports to "all destinations" and therefore were unusable because exports to China could not be disaggregated and excluded.[51] As such, the Court found that Commerce's claim that the entire ITTO TTMR dataset contained possible export to China as unspecified destinations was an "erroneous overstatement."[52]

The Court directed Commerce on remand to: (1) correct its factual misstatement; (2) identify which portions of the ITTO TTMR export dataset contain specified export destinations and which contain unspecified export destinations; (3) explain whether the export price data from Ghana to "regional markets" permit Commerce to exclude exports to China; (4) reconsider whether Commerce can disaggregate the remainder of the dataset (other than Ghana's exports to "regional markets") to exclude only data that contain unspecified export destinations; and (5) reconsider whether Commerce can construct a benchmark price using any segregated data that do not include unspecified destinations.[53] Finally, the Court stated that should Commerce determine it can segregate the export price data from Peru, Brazil, or Ghana, it must address the issue of grade specificity in its decision whether to include those data.[54]

The Court also held in the *Remand Opinion and Order* that Commerce did not satisfy its obligations under section 782(d) of the Act before applying AFA to find that certain companies that supplied inputs to Baroque and Riverside are government "authorities" within the meaning of section 771(5)(B) of the Act.[55] Specifically, the Court found that Commerce failed to properly notify the GOC that Commerce required official documentation from the government or the CCP in its initial or supplemental questionnaire to the GOC prior to applying AFA.[56] Consequently, the Court directed Commerce on remand to: (1) identify with specificity the

---

[51] *Id*. at 14
[52] *Id*. at 16.
[53] *Id*.
[54] *Id*.
[55] *Id*. at 37-38.
[56] *Id*. at 38-39.

deficiencies in the GOC's initial or supplemental responses to the nine entities, CCP officials and other related questions; (2) describe precisely and clearly the nature of each deficiency and what information could correct that deficiency; (3) if Commerce continues to determine that supporting government documentation is necessary information, request that government information explicitly from the GOC; and (4) provide the GOC an opportunity to remedy any specified deficiencies.[57]

Therefore, Commerce addresses below the Court's order to reevaluate its exclusion of ITTO TTMR data in the plywood and veneer benchmarks and fulfills its obligations to notify the GOC of deficiencies with its response prior to applying AFA. As explained below, Commerce finds that certain of the ITTO TTMR data are suitable for inclusion in the veneer and plywood benchmarks. Additionally, based on the information provided by the GOC in response to Commerce's specific requests for necessary supporting documentation, Commerce continues to find that certain companies that supplied inputs to Riverside and Baroque during the POR are government authorities.

**A. Commerce's Calculation of the Plywood and Veneer for LTAR Benchmarks**

As noted by the Court, in the *Final Results*, Commerce did not account for certain record information in our finding that the ITTO TTMR export price data only represented sales to "all destinations."[58] Upon reexamination of the source documentation for the ITTO TTMR data, Commerce notes that the TTMR provides certain additional information about the market destination of the export price data contained therein, which were not evaluated in the underlying review. Specifically, for Peru's export prices of veneer and plywood, the prices are indicated as "FOB Callao," which the table containing the plywood data clarifies as meaning exports to the "(Mexican market)."[59] Likewise, Brazil's export prices are indicated as exports to the "EU

[57] *Id*. at 40.
[58] *See Final Results* at fn. 217.
[59] *See* Riverside's Benchmark Data at Exhibit 3, "ITTO TTM Report: 25: 1 1 – 15 January 2021" at 12.

market."[60] Based on these descriptions, it does not appear that the ITTO TTMR veneer and plywood export price data from Peru and Brazil contain prices to China, and these benchmarks thus are fully appropriately usable in Commerce's tier two benchmarks for these inputs on that basis.

Regarding the export prices from Ghana, Commerce notes that the TTMR do not clearly specify a destination for either the plywood or veneer export price data. However, the narrative sections of the TTMR describing the wood product industry and export market in Ghana suggests that the plywood prices are "to regional markets."[61] The TTMR also indicated veneers as destined for Europe, with Germany, Belgium, and the United Kingdom as key markets.[62] While the TTMR also identifies China as a "key market"[63] for wood product exports and states that 60 percent of Ghana's wood product exports are destined for Asia,[64] these statements do not mention plywood or veneer specifically and appear to refer to other wood products (*e.g.*, sawnwood).[65] Thus, although record evidence is not definitive, the balance weighs in favor of Baroque's claim that the Ghana plywood and veneer export price data represent sales markets other than China, even though the exact destinations are not specified and cannot be disaggregated.[66] Accordingly, based on our reexamination of the record, we find that the ITTO

[60] *Id*. at 11.
[61] *See* Riverside's Benchmark Data at Exhibit 3, *e.g.*, "ITTO TTM Report: 25: 1 1 – 15 January 2021" at 3; "ITTO TTM Report: 25:9 1 – 15 May 2021" at 3 ("…plywood for regional markets…"); and "ITTO TTM Report: 25:23 1-31 Dec 2021" at 3 ("Plywood exports are destined for the regional market").
[62] *Id*. at Exhibit 3, "ITTO TTM Report: 25: 4 16 – 28 February 2021" at 3.
[63] *Id*.
[64] *Id*. at Exhibit 3, "ITTO TTM Report: 25: 2 16 – 31 January 2021" at 3.
[65] *Id*.
[66] The ITTO TTMR data is reported by country of origin (*i.e.*, Ghana, Peru, or Brazil) and product specification, but does not differentiate by destination market, for datasets where the destination is specified and where it is not. As such, the ITTO TTMR data can be disaggregated by country of origin and product specification, but not by destination market.

TTMR plywood and veneer export price data from Ghana are usable in Commerce's tier two benchmarks in this redetermination.

Regarding grade specificity, Baroque argues that the ITTO TTMR data should be used in the benchmarks for veneer and plywood because these price data are more specific to its reported purchases of these inputs. Specifically, Baroque purchases face veneer and backboard veneer, as discussed above, and contends that it purchased exclusively C or D grade plywood. As addressed in the *Final Results*, we disagree with Baroque's arguments that the ITTO TTMR data should be the exclusive source of the benchmarks for plywood and veneers, but for the reasons explained below, Commerce finds it consistent with its practice to include these data in the calculation of the benchmarks, along with the other price data used in the *Final Results*.

Although Commerce disagrees that Baroque *exclusively* purchased C or D grade plywood,[67] record evidence is clear that certain of Baroque's plywood purchases were of lower C or D grade.[68] As such, Commerce finds that the ITTO TTMR plywood data for Ghana (BB/CC grade), Brazil (C/CC grade), and Peru (mostly B/C grade) are comparable to Baroque's purchases and should be included in the benchmark.[69] On this basis, Commerce finds that the ITTO TTMR data are suitable benchmarks for the respondent's veneer and plywood purchases.

Similarly, as outlined above, while the ITTO TTMR Peru data appears to include both core and face veneer, the ITTO TTMR Ghana data for veneer are reported separately for "core" and "face" veneer of certain species. These data appear to describe Baroque's reported purchases of veneer. Because we find that it would be inappropriate to use the Ghanian core data to value Baroque's purchases of face veneer, and *vice versa*, Commerce is valuing Baroque's

---

[67] *See Final Results* IDM at 54.
[68] *See* Riverside's Benchmark Submission at Exhibit 6.
[69] *Id*. at Exhibit 3. Riverside's plywood purchases, which are not identified by any specific grades, presumably encompass all grade of plywood. Thus, the ITTO TTMR data should also be included in the benchmark for Riverside's purchases of plywood.

purchases of backboard veneer and face veneer using separate benchmarks, consistent with the methodology in the *Preliminary Results*.[70]

**B. Commerce's Application of AFA to Find Certain of Riverside's Input Suppliers to be Government Authorities**

As explained below, Commerce continues to determine that government documentation is necessary for its analysis of Riverside and Baroque's input suppliers. As directed by the Court, we issued a supplemental questionnaire to the GOC explicitly requesting government documentation to support its questionnaire response in the underlying review with respect to certain input suppliers.[71] In response, the GOC continued to decline to provide *any* additional documentation, government or otherwise, to substantiate its claims about the role and influence of the GOC/CCP in the input suppliers in question. Instead, the GOC explained that it relied solely on responses to questionnaires the GOC sent to these suppliers and asserted this information is sufficient for Commerce's analysis.[72] Therefore, as explained below, we continue to find that the application of AFA is warranted to find Riverside and Baroque's input suppliers to be government authorities.

On May 5, 2026, Commerce issued a supplemental questionnaire to the GOC regarding deficiencies in the information provided in its initial and supplemental questionnaire responses.[73] In the Remand Supplemental Questionnaire, Commerce requested that the GOC "provide government documentation, *e.g.*, CCP records, database search results, or other GOC and/or CCP documentation from the national or sub national levels to substantiate the GOC's claims that no individual owners, members of the board of directors, or senior managers were Government or CCP officials during the POR," as the GOC reported in its initial questionnaire

[70] *See Preliminary Results* PDM at 44.
[71] *See* Commerce's Letter, "Supplemental Questionnaire Pursuant to Court Remand," dated May 5, 2026 (Remand Supplemental Questionnaire).
[72] *See* GOC's Letter, "Remand Supplemental Questionnaire," dated May 12, 2026 (GOC's Remand SQR) at 3-8.
[73] *See* Remand Supplemental Questionnaire.

responses.[74] The Remand Supplemental Questionnaire also asked the GOC to explain how the input suppliers determined the information they reported to the GOC about the influence of the GOC/CCP in their operations and the steps the GOC took to verify (if any) the information the input suppliers reported to the GOC.[75]

The GOC timely filed its questionnaire response on May 12, 2026.[76] In response to Commerce's request that the GOC provide government (including CCP) documentation in support of its claim that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials during the POR, the GOC stated that "there is no central governmental database to search for the requested information … {t}herefore the GOC cannot provide government documentation as requested by {Commerce}."[77] The GOC explained that it derived its responses from the responses received directly from the input suppliers, which it claimed is sufficient support for the assertion in its questionnaire response that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials during the POR.[78] The GOC also asserts "there is no record evidence suggesting otherwise" and that, as such, "the burden is no longer with the GOC to further prove the negative but the burden has shifted to the party making the allegation to present evidence proving otherwise . . . {t}here is no such evidence . . . ."[79]

This refusal to provide information demonstrates the GOC's failure to cooperate to the best of its ability, and its assertion that solely company information is sufficient for our analysis is incorrect. Commerce determines what information is necessary for its analysis – not the

[74] *Id.* at 6-7 (citing GOC's IQR at Exhibit LTAR-1, pages 51-56 and 72-73 of Exhibit LTAR-1).
[75] *Id*. at 4-6.
[76] *See* GOC's Remand SQR.
[77] *Id*. at 6.
[78] *Id*. at 7.
[79] *Id*.

GOC.[80] Commerce has previously explained why such government information is necessary and outlines the reasons below. However, we note that in the *Remand Opinion and Order*, the Court found our reliance on government documentation to analyze for this purpose to be reasonable in this case. Therefore, we do not revisit the necessity of government documentation for our analysis in detail.

As stated in the Public Bodies Analysis Memo, Commerce's practice is to treat enterprises in China as public bodies (*i.e.*, authorities) for CVD purposes, even with no formal government ownership, if Commerce determines that the GOC exercises meaningful control over the enterprise.[81] As described in the *Preliminary Results*, record evidence demonstrates that the CCP exerts significant control over economic activities in China.[82] Record evidence also demonstrates that the GOC exercises meaningful control over private entities and uses them to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector.[83]

Although the GOC states that it cannot provide the requested information because there is no central GOC database, Commerce did not specify in its request for government documentation to support the GOC's claim that such documentation must be derived from a central government database. To the contrary, Commerce's Remand Supplemental

---

[80] *See ABB Inc. v. United States*, 355 F.Supp.3d 1206, 1222 (CIT 2018) ("Commerce prepares its questionnaires to elicit information that it deems necessary to conduct a review, and the respondent bears the burden to respond with all of the requested information and create an adequate record.").
[81] *See* Memorandum, "Placing Documents on the Record," dated July 13, 2023 (Additional Documents Memorandum), at Attachment 1 (Public Bodies Analysis Memo), p. 28-29.
[82] *See Preliminary Results* PDM at 15 (citing Additional Documents Memorandum at Attachments "Section 129 Determination of the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel Pipe; Light-Walled Rectangular Pipe and Tube; Laminated Woven Sacks; and Off-the-Road Tires from the People's Republic of China: An Analysis of Public Bodies in the People's Republic of China in Accordance with the WTO Appellate Body's Findings in WTO DS379" and "The relevance of the Chinese Communist Party for the limited purpose of determining whether particular enterprises should be considered to be 'public bodies' within the context of a countervailing duty investigation").
[83] *Id*. (citing Additional Documents Memorandum at Attachments, p. 35-36 and sources cited therein).

Questionnaire made clear that the GOC could have provided "other GOC and/or CCP documentation from the national or sub-national levels" in response to substantiate its claims.[84]

Section 782(c) of the Act states that:

> {i}f an interested party, promptly after receiving a request from {Commerce}, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and *suggested alternative forms in which such party is able to submit the information*, {Commerce} shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party (emphasis added).

In its response, the GOC did not suggest any alternative form in which it could provide the requested government documentation. To the contrary, the GOC refused Commerce's open-ended request for supporting government documentation because "there is no central governmental database" where such information could be searched.[85] Commerce intentionally did not limit the scope of its question in order to provide the GOC with sufficient opportunity to provide the government documentation that best supports its claim. Moreover, the GOC's response does not establish whether there are other government databases containing the information at the provincial or any other level of government, as specifically requested by Commerce.

In addition, the GOC's response implies that it is unable to provide any CCP records at all. The GOC in its supplemental questionnaire response states that "the industry and commerce administration does not require companies to provide such government information."[86] This statement focuses exclusively on a single agency in the GOC's official governmental body rather than considering Commerce's request for *any* CCP records, as Commerce specifically requested in its Remand Supplemental Questionnaire. The GOC's assertion implies that the CCP, at all

[84] *See* Remand Supplemental Questionnaire at questions 3d and 4a.
[85] *See* GOC's Remand SQR at 5 and 6.
[86] *Id*. at 6.

levels, maintains no records *or any other mechanism* by which it could determine whether the individual owners, members of the board of directors, or senior managers of the companies that supplied inputs to the mandatory respondents are officials of the CCP. For example, the GOC could have provided screenshots from a national, or sub-national CCP database with the results when searching for each individual owner, member of the board of directors, and senior manager of the input suppliers.

As noted above, in *Citric Acid from China 2012*, the documentation Commerce accepted to find an input supplier to not be an authority was documentation which originated with the CCP.[87] Thus, the GOC has previously been able to provide documents from the CCP specifically and gives no explanation why it is unable to do so here. Because the GOC has previously provided such government documentation in *Citric Acid from China 2012* relating to the status of individual owners, members of the board of directors, or senior managers of the input suppliers as officials of the GOC and/or CCP,[88] Commerce finds that the GOC has failed to provide information requested by Commerce, within the meaning of section 776(a)(2)(A) of the Act. Further, as the GOC has provided government documentation on this issue in prior CVD proceedings, Commerce finds that the GOC has failed to cooperate by not acting to the best of its ability to comply with this request for information. Therefore, Commerce continues to find, as it did in the *Final Results*, that reliance on AFA is warranted.

Having properly notified the GOC of the deficiencies with its questionnaire responses, Commerce has fulfilled its obligation under section 782(d) of the Act, prior to applying AFA. As stated above, the GOC continued not to provide Commerce with requested government, including CCP, documentation, in support of its claim that no individual owners, members of the board of directors, or senior managers of the companies that supplied inputs to Riverside and

[87] *See Citric Acid from China 2012* IDM at Comment 2.
[88] *Id.*

Baroque were GOC or CCP officials during the POR. This information is necessary for Commerce's analysis, because of the meaningful control the GOC exercises throughout the Chinese economy, including in ostensibly private entities, as detailed above. Therefore, Commerce continues to find, based on AFA, that the producers that supplied inputs to Riverside and Baroque are "authorities" within the meaning of section 771(5)(B) of the Act, and, thus, that such producers provided a financial contribution in supplying certain inputs to these respondents for less than adequate remuneration within the meaning of section 771(5)(D)(iii) of the Act.

## IV. INTERESTED PARTY COMMENTS

As noted above, we received comments on Commerce's draft results of redetermination from Baroque.[89] In its comments, Baroque argues that Commerce should revise the density figure used for the plywood benchmark and challenges Commerce's decision to apply AFA to find certain of its input suppliers to be government authorities. No other interested party provided comments. We address Baroque's comments below.

### Issue 1: Whether to Revise the Plywood Density Conversion for Baroque's ITTO TTMR Benchmark Data

*Baroque's Draft Remand Comments:*

The following is a verbatim summary of argument submitted by Baroque (citations omitted). For further details, *see* Baroque's Draft Remand Comments at 2-5.

> {Commerce} should revise the density figure used for the plywood benchmark to convert the ITTO TMR pricing from cubic meters to kilograms. {Commerce} improperly used species specific veneer density figures to convert plywood of the same species to kilograms. Plywood, however, is physically different than veneers, even of the same species and has a different density due to layering and glue. Thus, veneer density figures are not appropriate to use for converting plywood in cubic meters to kilograms.

**Commerce's Position:**

We agree with Baroque that Commerce inadvertently erred in using veneer density figures to convert the ITTO TTMR plywood data from a cubic meter basis to kilograms. In the

[89] *See* Baroque's Draft Remand Comments.

Draft Remand, Commerce stated that it is "valuing Baroque's purchases of backboard veneer and face veneer using separate benchmarks, consistent with the methodology in the *Preliminary Results*."[90] In the *Preliminary Results*, Commerce used the 620 kilogram per cubic meter conversion provided in Baroque's benchmark submission.[91] However, in the Draft Remand, Commerce inadvertently used the conversion factors for veneer, rather than the conversion factor for plywood.[92]

As Baroque explains, the composition of plywood and veneer differ due to the inclusion of glue and varying construction and/or wood type of each layer, resulting in different density than a veneer of the same species.[93] Therefore, for these final results of redetermination, we are using the plywood density conversion factor originally utilized by Commerce in the *Preliminary Results* (*i.e.*, 620 kilograms per cubic meter).[94]

**Issue 2: Whether to Apply AFA to the GOC to Find Certain Input Suppliers to be Government Authorities**

*Baroque's Draft Remand Comments:*

The following is a verbatim summary of argument submitted by Baroque (citations omitted). For further details, *see* Baroque's Draft Remand Comments at 5-10.

> {Commerce} should find that certain of Baroque's input suppliers are not government authorities and that applying {AFA} to the {GOC} is not warranted. The GOC in its questionnaire responses demonstrated that certain of Baroque's input suppliers do not have more than three {CCP} members. As a result, these companies do not have primary party organizations and do not have CCP officials

[90] *See* Draft Remand at 14.
[91] *See* Memorandum, "Preliminary Results Calculations for Riverside Plywood Co., Ltd.," dated December 20, 2023, at Attachment 2; *see also* Riverside's Benchmark Data at Exhibit 3.
[92] *See* Memorandum, "Draft Results of Redetermination Calculations for Riverside Plywood Corporation," dated June 17, 2026, at Attachment 2; *see also* Riverside's Benchmark Data at Exhibit 3.
[93] *Id*. at 4-5. We note that Baroque's reference to thickness as also causing differences in the density of plywood and veneer of the same species is mistaken. Density, being a measurement of weight for a standardized unit of volume, is not necessarily affected by thickness, because it is one of the dimensions used to calculate volume.
[94] *See* Riverside's Benchmark Data at Exhibit 3.

within them. This information is verifiable and should have been accepted, preventing the use of AFA, particularly for Baroque's affiliates.

**Commerce's Position:**

We disagree with Baroque and continue to apply AFA to the GOC consistent with sections 776(a)(1), 776(a)(2)(A), (C), (D) and 776(b) of the Act, as explained below. Baroque argues that Commerce's application of AFA to find that Baroque's input suppliers are government authorities is not supported by substantial evidence.[95] Specifically, Baroque contends that the GOC provided sufficient factual information to demonstrate that no key personnel in the input suppliers in question were GOC or CCP officials.[96] Baroque also argues that record evidence demonstrates that a primary party organization was not required in any of these suppliers and that this information could be verified using company records, thus these suppliers cannot be found to be government authorities.[97] As explained below, we disagree; and continue to find that company information is insufficient for this purpose, a finding sustained by the Court.[98] Further, the GOC did not comply with Commerce's repeated requests to provide government documentation supporting its claims about CCP influence in certain of Baroque's input suppliers. Accordingly, we continue to find it appropriate to apply AFA to find certain of Baroque's input suppliers to be government authorities under section 771(5)(B) of the Act that provided a financial contribution in supplying inputs to Baroque within the meaning of section 771(5)(D)(iii) of the Act.

[95] *See* Baroque's Draft Remand Comments at 5-6.
[96] *Id*. at 6-7.
[97] *Id*.
[98] *See Remand Opinion and Order* at 34 ("In sum, Commerce explained adequately and determined reasonably that "necessary information was not available on the record," {}, because the GOC's responses, which consisted of internal company statements and narrative denials, did not provide a sufficient basis for Commerce to assess the extent of CCP involvement in the input suppliers.") (internal citations omitted).

First despite the Court already addressing this issue in the *Remand Order and Opinion*,[99] Baroque claims that Commerce overstates the conclusions of the Public Bodies Analysis Memo to explain the need for GOC government documentation.[100] Baroque argues that the Public Bodies Analysis Memo only discusses CCP influence in private companies through primary party organizations, and that the GOC's questionnaire responses demonstrate that none of the relevant input suppliers have a primary party organization because no employees are CCP members.[101] Thus, record evidence is sufficient to conclude that the input suppliers are not government authorities.[102] However, Baroque misstates the relevance of the Public Bodies Analysis Memo and the rationale for Commerce's request for government documentation in its authorities analysis. The GOC's questionnaire responses only provide information received from the input suppliers in question, and do not provide any additional government documentation demonstrating that the relevant input suppliers do not have primary party organizations.

The Public Bodies Analysis Memo explains that Commerce's practice is to treat enterprises in China as public bodies (*i.e.*, authorities) for CVD purposes if Commerce determines that the GOC exercises meaningful control over the enterprise. This control can exist through, *inter alia*, the establishment of primary party organizations and/or the presence of Government or CCP officials of the nine entities in the company's individual owners, members of the board of directors, or senior managers. As explained above, record evidence demonstrates that the CCP continues to exert significant control over economic activities in China and exercises meaningful control over private entities to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state

---

[99] *See e.g.*, *Koyo Seiko Co., Ltd. v. United States*, 893 F.Supp. 52, 57 (CIT 1995) ("The phrase 'law of the case' expresses the practice of courts generally to 'refuse to reopen what has been decided.') (citing *Messenger v. Anderson*, 225 U.S. 436 (1912).
[100] *Id.* at 6.
[101] *Id.*
[102] *Id.*

sector.[103] Evidence contained within the Public Bodies Analysis Memo demonstrates the need to fully evaluate each company that supplied inputs under an LTAR program, but is not the only source that demonstrates why government documentation is necessary for Commerce's analysis. The need for government documentation to fully evaluate each input supplier is also established by the GOC's responses to Commerce's questionnaires in the instant proceeding.

In its response to Commerce's CVD questionnaire and the supplemental issued for the purpose of this remand, the GOC stated that, to formulate its responses with respect to GOC/CCP influence, it relied solely on information provided directly by the input suppliers.[104] However, in its initial questionnaire response, the GOC also explained that input producers are not required to report or record in their internal records and documents whether any company owners, members of the board of directors or managers are officials in the nine entities.[105] Indeed, in its supplemental questionnaire response, the GOC indicated that none of the documents or company records the GOC had provided for these input producers would necessarily show whether: (1) a CCP committee, branch or "primary organization" has been formed within the enterprise; or (2) the owners, members of the board of directors or managers of the above companies were officials of any of the nine entities.[106] Thus, the GOC's responses to its initial questionnaire when considered alongside supplemental responses still leave information gaps regarding potential for the GOC to exercise meaningful control over Baroque's input suppliers through CCP party members, and based on this response, we continue to find that government documentation from the GOC is necessary to demonstrate and verify whether a person has an official role within either the GOC and/or CCP.

[103] *See* Public Bodies Analysis Memo, p. 35-36 and sources cited therein.
[104] *See* GOC's IQR at Exhibit LTAR-1, p. 73-74; *see also* GOC's Remand SQR at 3-4.
[105] *Id*. at Exhibit LTAR-1, p. 74.
[106] *See* GOC's Remand SQR at 2-3.

As stated above, Commerce may find ostensibly private businesses to be government authorities if it determines that the GOC exercises meaningful control over them. Although the GOC provided company-specific information, such as articles of incorporation, capital verification reports, company by-laws, business licenses, and internal work plans, this is insufficient without government documentation supporting the GOC's claims about GOC/CCP influence. This company documentation is helpful in identifying the individual owners, board members, officers, and managers of the company; however, this documentation does not demonstrate on its own whether the owners and shareholders of the input suppliers have any CCP involvement. As acknowledged by Baroque, the GOC simply repeated the responses from the input suppliers that none had primary party organizations, rather than providing confirmation or support from a source independent of the input suppliers.[107] Without verifiable supporting government documentation that corroborates these claims, Commerce cannot reliably ascertain whether any owner or other individual with significant control over the operations and decisions of the company was a Government or CCP official during the POR.

Baroque further claims that Commerce discounts this information in the Draft Remand because the requested "government documentation" was not provided.[108] As explained above, given the significant influence of the CCP and GOC in the Chinese economic system and the lack of public reporting requirements, company information and documentation cannot replace government documentation in our analysis of whether the GOC/CCP may exert a controlling influence over a given input supplier. Likewise, we find that the certifications on CCP influence provided by the suppliers cannot represent dispositive evidence about the involvement of the GOC, including the CCP, in the company that provided inputs to mandatory respondents under an LTAR program, because such statements are not, by themselves, verifiable. In contrast,

[107] *See* GOC's Remand SQR at 3-5.
[108] *See* Baroque's Draft Remand Comments at 7.

official government documentation, such as letters from applicable GOC and CCP officials regarding membership and operations of the nine entities or search results from membership database systems, can be verified by Commerce. Mere statements from the input suppliers themselves, with no documentation or other means to verify those claims against official sources, cannot be verified by Commerce.

Baroque asserts that Commerce can verify whether the suppliers have a primary party organization and any key company personnel are Government or CCP officials at each of the input suppliers because the GOC stated that the Human Resources of each company would have records of this information.[109] Baroque is mistaken; as Commerce has previously explained, company information alone is insufficient for this purpose.[110] Based on the GOC's questionnaire responses, we continue to find that government documentation is required to substantiate whether a person has an official role in either the GOC or CCP, as explained above. Thus, reliable verification of such information without the necessary corroborating government documentation would not be possible. Additionally, as noted in the Draft Remand, the company certifications are *pro forma* in nature and lack particular details needed for Commerce to examine possible government involvement in each company. As discussed in the underlying *Final Results* IDM, the GOC refused to provide any verifiable factual record of whether there were any owners, members of the boards of directors, or managers of the inputs producers who were government or CCP officials during the POR; Commerce is unable to verify statements in the company certifications regarding CCP ownership and involvement in the companies without substantiating records.[111] Without such details, Commerce is unable to evaluate the extent of GOC/CCP involvement in each input supplier in order to verify these certifications as Commerce does not have any official documentation to evaluate and review to corroborate or confirm the

---

[109] *Id*. at 6-7.
[110] *See Citric Acid from China* IDM at Comment 5.
[111] *See Final Results* IDM at Comment 4.

suppliers' statements. Verification is not intended to complete the record when parties, such as the GOC in this instance, fail to provide the necessary documentation.[112]

Baroque also argues that Commerce's request for government documentation, and Commerce's example of "screenshots from a national, or sub-national CCP database," is unreasonable and "there is no evidence that such a database exists."[113] However, Commerce's request for government documentation was open-ended to allow the GOC discretion to provide whatever information it believed would best support its claim that no individual owners, members of the board of directors, or senior managers of the input suppliers were GOC or CCP officials.[114] The only requirement Commerce stated in its request to the GOC to provide documentary support for the GOC's claims was that the documentation must originate from Government records, including the CCP.[115] Thus, while Commerce clearly communicated to the GOC that it required government records to corroborate the information provided in company responses, Commerce cannot speculate as to what precise documents the GOC could provide to support its claims, because it is not knowledgeable of what forms of government documentation the GOC is able to provide that would best demonstrate that the key personnel in the input suppliers in question are not officials in the Government or CCP and provide Commerce some reliable way of confirming or verifying the individual claims. As Commerce has repeatedly explained, *Citric Acid from China 2012* demonstrated that such records could be provided by the GOC.

[112] *See e.g.*, *Tianjin Mach. Import & Export Corp. v. United States*, 806 F.Supp.1008, 1015 (CIT 1992) ("{T}he burden of creating an adequate record lies with respondents and not with Commerce…Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." (internal citations omitted)).
[113] *See* Baroque's Draft Remand Comments at 7 (citing Draft Remand at 18).
[114] *See* Draft Remand at 17-18; *see also* Remand Supplemental Questionnaire at 6-7 ("Please provide government documentation, *e.g.*, CCP records, database search results, or other GOC and/or CCP documentation from the national or sub-national levels to substantiate the GOC's claims that no individual owners, members of the board of directors, or senior managers were Government or CCP officials during the POR at this time.").
[115] *Id.*

Based on the documentation from the CCP or any other source the GOC could have provided in response to its questionnaire, as well as any explanation of what its documentation indicated, Commerce would then be able to evaluate such information and consider whether it required additional information or explanation such that it should send an additional supplemental questionnaire. Baroque suggests that Commerce should have issued another supplemental questionnaire to the GOC stating that documentation from a limited local or sub-national CCP database would be sufficient.[116] However, Commerce did specifically suggest that this information would be responsive to its request in the Remand Supplemental Questionnaire.[117] As explained above, the GOC response did not even address the existence of these suggested sources of government documentation.[118] Issuing another supplemental questionnaire to ask again for such information would be fruitless when the GOC is plainly refusing to cooperate to the best of its ability in responding to Commerce's requests.

Further, Commerce cannot conclude that such hypothetical documentation would be sufficient at this point because the GOC has not provided it. Had the GOC provided government documentation, Commerce would have been able to analyze it and notify the GOC of any continuing deficiencies it identified in the response. But the GOC's refusal to provide *any* government documentation precluded Commerce from completing this basic questionnaire response analysis. Baroque raised additional specific critiques of Commerce's request for government documentation,[119] which we address below in more detail.

---

[116] *Id*. at 8.
[117] *See* Remand Supplemental Questionnaire at 6 ("Please provide government documentation, *e.g.*, CCP records, database search results, or other GOC and/or CCP documentation from the national or sub-national levels.").
[118] *See* GOC's Remand SQR at 5 ("There is no central governmental database to search for the requested information on whether any individual owners, members of the board of directors, or senior managers are government or CCP officials, and the industry and commerce administration does not require companies to provide such information. Therefore, the GOC cannot provide government documentation as requested by the Department.").
[119] *See* Baroque's Draft Remand Comments at 7-9.

As explained above, in its response to the Remand Supplemental Questionnaire, the GOC restated its initial questionnaire response that "there is no central governmental database."[120] Baroque asserts that, there being no central database, it is unclear how there could be a "national" database that the GOC/CCP could provide documentation from, as we suggested in the Draft Remand. There may be multiple national databases (*e.g.*, separate databases for each jurisdiction where the nine entities are located) that are not in one "central governmental database." Alternatively, as discussed in the Draft Remand, the GOC appears to distinguish itself from the CCP in its questionnaire response, so perhaps there is a central database that is not "governmental" in the GOC's view because it is maintained by the CCP or a governmental entity other than "the industry and commerce administration."[121]

Likewise, Baroque argues that providing documentation from a local or other sub-national database would not sufficiently answer Commerce's request for government documentation.[122] Again, such arguments are moot when the GOC has provided no government documentation of any kind. The GOC also had the opportunity to explain in its supplemental questionnaire response why providing some sort of limited local or sub-national source of government documentation would not be sufficient or feasible, but it declined to do so.[123]

Finally, Commerce cannot reasonably specify what exact type(s) and form(s) of government documentation the GOC can provide to support its claims, as only the GOC has the understanding of what government documents it, including the CCP, maintain and what those documents can demonstrate. Here, Commerce can only suggest that the GOC could have provided search results from a membership database or its equivalent listing any official position

[120] *See* GOC's Remand SQR at 5-6; *see also* GOC's IQR at Exhibit LTAR-1, p. 74.
[121] *See* GOC's Remand SQR at 5 and 6 ("There is no central governmental database to search for the requested information on whether any individual owners, members of the board of directors, or senior managers are government or CCP officials, and the industry and commerce administration does not require companies to provide such government information").
[122] *See* Baroque's Draft Remand Comments at 7-8.
[123] *See e.g.*, section 782(c)(1) of the Act.

held at the local, provincial or other sub-national/non-central levels because the GOC did not address whether such information exists, nor did it explain whether there was some other source for independently confirming and documenting the GOC's claims. Commerce's non-exhaustive list of examples might not precisely match current GOC or CCP documentation formats, but it would be unreasonable for Commerce to conclude that the GOC lacks access to *any* such information or an ability to procure/produce some form of verifiable government documentation.

Baroque also claims that Commerce's reliance on *Citric Acid from China 2012* is unreasonable because the type of documentation provided in that case was only possible because the owner had previously been a Government or CCP official.[124] However, our reference to *Citric Acid from China 2012* is only to illustrate that the GOC can provide and has provided documentation from the government, including importantly the CCP, that attests to its records of officials. The GOC's insistence that it cannot rely on any official source to demonstrate that the key persons in input suppliers are not officials suggests that the CCP has no tracking of the individuals who are officials in the nine entities. Given that the CCP Constitution requires that all organizations with enough CCP members form primary party organizations,[125] it strains credulity that the CCP has no records with which it can track whether this requirement is followed.

Regarding Baroque's claims that "full and verifiable" ownership information was provided for its two input suppliers that are affiliates,[126] we disagree. As explained above, Commerce requires government documentation for its analysis of whether Baroque's input suppliers are government authorities. Specifically, information from the GOC, including the CCP, is necessary for Commerce to evaluate the GOC's claim that no individual owners, members of the board of directors, or senior managers of the input suppliers were Government or

---

[124] *Id.* at 8-9.
[125] *See* Public Bodies Analysis Memo at 35.
[126] *See* Baroque's Draft Remand Comments at 10.

CCP officials during the POR. Regardless of whether Baroque's affiliated input suppliers were willing to provide additional company information, the deficiencies that Commerce identified with respect to these input suppliers (as well as the unaffiliated ones) could only be remedied by the provision of government documentation by the GOC. Commerce's Remand Supplemental Questionnaire specifically referenced Baroque's affiliated input suppliers,[127] and, as explained above, the GOC did not provide the requested information for these or any of the other suppliers in response. Thus, Commerce's analysis of the GOC's failure to cooperate applies to Baroque's two affiliated input suppliers as well as the unaffiliated input suppliers.

In short, Baroque's arguments have focused on its claims that the company information the GOC provided is sufficient for Commerce's government authorities analysis and that the GOC cannot provide government documentation that would satisfy Commerce's analysis. Commerce explained above why it requires government documentation and noted that Baroque's arguments about what government documentation would be sufficient are speculative because the GOC has provided none. Moreover, Baroque does not challenge that Commerce has complied with the *Remand Opinion and Order*. Commerce issued an additional supplemental questionnaire specifically requesting the government documentation necessary to evaluate whether Baroque's input suppliers are government authorities. The GOC again refused to provide such documentation. The GOC has, in other proceedings, provided government documentation, from the CCP specifically, to support its reported claims about GOC/CCP involvement in private companies.[128]

Therefore, Commerce continues to find that necessary information is missing from the record, that the GOC has withheld information requested of it, significantly impeded the proceeding, and has provided information that is not verifiable and, accordingly, that we must

---

[127] *See* GOC IQR at Exhibits LTAR-1 and LTAR-2; *see also* Remand Supplemental Questionnaire at 4.
[128] *See e.g.*, *Citric Acid from China 2012* IDM at Comment 2.

rely on facts available in conducting our analysis of Baroque's input producers.[129] As a result of repeated incomplete responses to Commerce's questionnaires, we continue to find that the GOC has failed to cooperate by not acting to the best of its ability to comply with our requests for information consistent with section 776(b) of the Act. Consequently, we determine that the application of facts available is warranted to the GOC, and that an adverse inference is warranted in selecting from the facts available.[130] As AFA, we find that CCP officials are present in each of Baroque's privately-owned input producers as individual owners, managers, and members of the boards of directors, and that this gives the CCP, as the Government, meaningful control over the companies and their resources. As explained in the Public Bodies Analysis Memo, an entity with CCP presence on its board, or in management, or in party committees, may be controlled such that it possesses, exercises, or is vested with governmental authority.[131] Thus, for these final results of redetermination, we continue to find Baroque's input producers to be "authorities" within the meaning of section 771(5)(B) of the Act.

## V. FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Opinion and Order*, we have revised Commerce's calculation of the benchmarks for Baroque's plywood purchases. In addition, we issued an additional supplemental questionnaire to the GOC notifying it of certain deficiencies in providing government documentation with respect to Riverside and Baroque's input suppliers, consistent with the Court's *Remand Opinion and Order*, and, having analyzed the GOC's response, continue to find the GOC did not cooperate to the best of its ability. Therefore, for these final results of redetermination, we are continuing to apply AFA to find that certain of

[129] *See* sections 776(a)(1), 776(a)(2)(A), 776(a)(2)(C), and 776(a)(2)(D) of the Act
[130] *See* section 776(b) of the Act.
[131] *See*, *e.g.*, Public Bodies Analysis Memo at 33-36 and 38.

Riverside's input suppliers are government authorities.[132] As a result of these final results of redetermination, the total countervailable subsidy rate assigned to Riverside/Baroque for the POR is now 26.86 percent.[133] Because the total countervailable subsidy rate assigned to Riverside/Baroque is different than the underlying *Final Results*, we intend to publish a *Timken* notice with the amended final results should the Court sustain these final results of redetermination.

7/6/2026

X 

Signed by: CHRISTIAN BUSH

Christian L. Bush
Deputy Assistant Secretary
for Policy and Negotiations

---

[132] Commerce notes that this finding is specific to those input suppliers for which the GOC had responded for and provided the requested company documentation (*e.g.*, articles of association). *See* GOC's IQR at Exhibit LTAR-1. In the *Final Results*, Commerce also applied AFA to the GOC to find that the input suppliers for which the GOC had provided none of the requested documentation were also government authorities. However, the Court's *Remand Opinion and Order* pertained only to the former group of input suppliers.

[133] *See* Memorandum, "Final Results of Redetermination Calculations for Riverside Plywood Corporation," dated concurrently with this remand redetermination.