**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION ,

Plaintiffs,

v.

UNITED STATES,

Defendant,

Court No. 24-00106

**PUBLIC VERSION**

**PLAINTIFFS' COMMENTS OPPOSING REMAND REDETERMINATION**

On behalf of Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation, we provide these comments in opposition to the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand ("Remand") filed on July 7, 2026 (REM-PR 2). Commerce's Remand addresses the application of adverse facts available ("AFA") to the Government of China ("GOC") for the government authority determination for certain of Plaintiffs' input suppliers. Commerce refused in its Remand to change its findings from the challenged review—finding that AFA was still warranted for the GOC for the failure to provide government documentation relevant to the government authority inquiry. This finding is not supported by substantial evidence and is otherwise contrary to law.[1]

[1] Plaintiffs note that this is an almost identical set of facts and finding as the previously challenged reviews currently before the court. Ct. No 23-136 and 22-210. Whatever the Court finds in those cases, will be equally applicable here.

## I. COMMERCE ERRED IN APPLYING AFA TO THE GOC

In its Remand, Commerce continued to find that the application of AFA was warranted for the government authority issue for Baroque's input suppliers despite the GOC remand supplemental questionnaire response. Remand at 14-19. Commerce based this determination on the fact that the GOC was unable to provide "government documentation" to prove that its managers, directors or owners were not Government or CCP officials. *Id*. This finding is not supported by substantial evidence.

First, the underlying basis of Commerce's determination is not supported by substantial evidence. Commerce explains that "Record evidence also demonstrates that the GOC exercises meaningful control over private entities and uses them to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector." *Id*. at 16. This statement is based on pages 35 and 36 of the Public Bodies Memo and overstates the analysis contained therein. *Id*. at n. 82. This portion of the Public Bodies Memo is primarily based on a 2006 Economist article which said:

> The party has cells in most big companies—in the private as well as the state-owned sector -- complete with their own offices and files on employees. It controls the appointment of captains of industry and, in the SOEs, even corporate dogsbodies. It holds meetings that shadow formal board meetings and often trump their decisions, particularly on staff appointments. It often gets involved in business planning and works with management to control pay.

*Id*. The memo goes on to say that:

> The role of this party presence is unclear; it may exert varying degrees of control in different circumstances. For example, based on his discussions with many private business owners, Richard McGregor notes that the stated purpose of the party committee in a private enterprise can range from a formality, to the formation of a study group, to providing "ethical" and "spiritual" guidance. However, McGregor notes that "left unstated by all the entrepreneurs was the fundamental reason for the Party's interest in the private sector. The Party's presence… was more than just a monitoring

> device. It was a kind of political insurance policy…to be activated in a crisis."

*Id* at 35. Thus, the sole manner in which this memo discusses CCP influence in private companies is through the primary party organizations. The memo however notes that "In accordance with the *CPP Constitution*, all organizations, including private commercial enterprises, are required to establish 'primary organizations of the party' (or 'Party committees') if the firm employs at least three party members." *Id*. at n. 34.

In response to this, Commerce states in its Remand that Baroque "misstates the relevance of the Public Bodies Memo and the rationale for Commerce's request for government documentation in its authorities analysis." Remand at 22. Commerce explains that "control can exist through, *inter ali*a, the establishment of primary party organizations and/or the presence of Government or CCP officials of the nine entities in the company's individual owners, members of the board of directors, or senior managers." *Id*. This, however, is circular as the only reference for this claim anywhere on the record is the Public Bodies Memo, pages 35-36.

In its supplemental questionnaire response, the GOC confirmed that none of the relevant input suppliers had primary party organizations because none of them had more than three CCP members. GOC Remand Supp Response at 2-4 (REM-PR 6; REM-CR 6). This was based on signed statements provided by each of the suppliers, which could be confirmed by the company's own records, as well as responses to the GOC questionnaires to the companies. As the GOC explained, the Human Resources department of each company would have records of this information. *Id*. at 2. Thus, whether the supplier has a primary party organization, and whether they have sufficient CCP members that would require a primary party organization can be verified at each of the suppliers. The GOC provided verifiable information, and there is no reason why this should be rejected in favor of a CCP database of which there is no evidence it

exists. The Company would also have records if its employees were representatives of the People's Congresses and the CPPCC at all levels. *Id*. If the employees are not CCP *members*, they certainly cannot be CCP *officials*.

In addition, the GOC also provided the internal work plans of each company and confirmation that there was no outside intervention in those plans or decision making. This information is sufficient to demonstrate that the suppliers are not government authorities and there is no information on the record that contradicts these statements. This provides an alternative means to support and verify this factual statement. The information provided by the GOC is sufficient to demonstrate that the suppliers are not government authorities and there is no information on the record that contradicts these statements. Thus, there is no gap in the record and Commerce cannot create one by requiring government documents. *See Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, 2022 WL 1598896, at *8–9 (Ct. Int'l Trade May 12, 2022) ("under § 1677e(a) the use of facts otherwise available is a method by which Commerce shall fill gaps in the record. It does not authorize the creation of gaps to be filled with information of Commerce's choosing.").

Commerce in its Remand discounts the company specific information submitted and states that AFA is warranted because "government documentation" was requested and was not provided to support the claim that "no individual owners, members of the board of directors, or senior managers were Government or CCP officials." Remand at 15. While the GOC responded that there was no central database with this information, Commerce explained that it "did not limit the scope of its question, for the purpose of allowing the GOC opportunity to provide the government documentation that best supports its claim." Remand at 17. And further, Commerce notes that "the GOC's response does not establish whether there are other government databases

containing the information at the provincial or any other level of government." *Id*. Commerce then states that "For example, the GOC could have provided screenshots from a national, or sub-national CCP database with the results when searching for each individual owner, member of the board of directors, and senior manager of the input suppliers." *Id*. at 18. This is not reasonable and there is no evidence that such a database exists.

First, the GOC already stated that there is no central database thus it is not clear how there would be a "national" CCP database—the GOC never made a distinction between the "central government" and the CCP. Commerce's questionnaire considers them one and it is reasonable for the GOC's response to refer to both.

Second, the reference to "government or CCP officials" implicates the following, according to Commerce's questionnaire: (1) Chinese Communist Party (CCP) Congresses; (2) CCP Committees; (3) CCP Standing Committees; (4) People's Congresses; (5) Standing Committees of People's Congresses; (6) other Government administration entities, including village committees; (7) the Chinese People's Political Consultative Conferences (CPPCC); (8) the Discipline Inspection Committees of the CCP; and (9) a CCP committee, branch, or "primary organization." This covers every level of society in China and hundreds, if not thousands, of entities. Thus, providing some sort of limited local or sub-national CCP database, to the extent that one even exists, would not sufficiently answer Commerce's question because it would not, and could not possibly, cover all these entities.

Moreover, if Commerce believed that this type of limited "government documentation" was acceptable then, in accordance with 19 U.S.C. § 1677m, it should have advised the GOC after the Remand Supplemental Response was filed of this deficiency and asked the GOC more directly to provide that information. Commerce failed to do so. Indeed, to the extent that

Commerce is stating that it is acceptable for the GOC to only provide documentation about local CCP involvement but not provide government documentation about the other entities, then Commerce should expressly state so; the question was not limited to certain entities.

Third, it is notable that Commerce itself cannot identify a possible source of government documentation that would be acceptable beyond a central database to prove the negative regarding the presence of Government or CCP officials in the suppliers. The only documentation that Commerce cites to other than what is noted above is what was provided in *Citric Acid from China 2012*. But that too is not appropriate or supportive of Commerce's position. In that case the issue was that for two individually owned suppliers the owner of both had been Secretary of the Party Committee of Liujiadu Village prior to the POR but no longer held that position during the POR. Commerce explained the information provided in the IDM:

> GOC provided a certified letter from the CCP Committee of the village indicating that the owner of Companies B and C held the position of Secretary from June 2009 to December 2011. 216 The Department established at verification through official government documentation provided by the GOC and the CCP (e.g., stamped originals of election notification from the CCP Committee of Lijiaxiang Town), that the owner of Companies B and C did not serve as Secretary for the Party Committee of Liujiadu Village in the PRC during the POR and that the village does not geographically overlap with the locations of the producers' operations. 217 The Department was also able to establish at verification that another person was elected to the position of Secretary for the Party Committee of Liujiadu Village on December 28, 2011, ending the owner of Companies B and C's tenure as Secretary before the POR. In addition, the December 28, 2011 election notification announced the approval of another person for Secretary of the Party Committee for the village in which Companies B and C are located.

*Citric Acid from China 2012* at IDM Cmt. 2. This type of "documentation" was only possible because the owner *had been* secretary of a specific government entity and then *was no longer* part of that entity. Thus, documentation could be provided from that specific entity that he was no longer part of it. Since this factual scenario is not present here, it is unreasonable to use the

*Citric Acid from China 2012* as the basis for determining that the GOC did not act to the best of its ability in this case. Indeed, it is notable that Commerce did not require in *Citric Acid from China 2012* that the GOC demonstrate with official documentation that the owner was not part of any of the other 9 Entities; it only required documentation to show that the owner was no longer part of the one government entity he had previously been involved with. Organizations maintain records of members and participants, not records of every individual who has never been affiliated with them; the GOC cannot be expected to produce records the Entities had no reason or obligation to create. Here, Commerce mistakenly conflates inability with unwillingness. A refusal presupposes the existence of responsive information that is being withheld. No such information exists. None of the individuals in any of the suppliers are part of any relevant authority—how could the GOC have provided similar information to *Citric Acid from China 2012*.

Fourth, Commerce fails to explain why official company human resource records that identify CCP membership would be insufficient to establish government control. Remand at 25. If none of the employees were CCP members, then there could be no CCP officials and no control. In its Remand, in response to this argument, Commerce makes the conclusory statement that "verification of such information without the necessary corroborating government documentation would be pointless." Remand at 25-26. Commerce fails to explain further. Commerce relies on official company information all the time to demonstrate usage of government subsidy programs. It is not clear why this would not be sufficient to demonstrate whether the company itself has a primary party organization.

Commerce's reasoning is internally contradictory and self-undermining. Commerce's demand for additional corroboration is difficult to reconcile with its own characterization of the

CCP's authority over the Chinese economic system; it is controlling enough to impose obligations on the input suppliers but not controlling enough for those obligations to have any evidentiary significance. Commerce points to "the significant influence of the CCP and GOC in the Chinese economic system," and a consequence of this influence is the provisions laid out in the *CCP Constitution* that requires a Party committee if there are three or more members of the CCP employed at an organization. Remand at 24. The GOC confirmed in its supplemental response that none of the relevant input suppliers had primary party organizations because none of them had more than three CCP members. GOC Remand Supp Response at 2-4. If Commerce believes the CCP is so influential on companies, it cannot reasonably treat its rules as insufficiently reliable when they undermine Commerce's preferred outcome.

This is no different than the long history of the Export Buyer's Credit Program. In those cases, the GOC failed to provide certain usage information regarding this program and, in the alternative, the respondents provided non-use certificates, which Commerce refused to accept. The court repeatedly found that Commerce must accept this alternative information. *See Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 557 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2022) ("As has happened in several cases before this Court, although Commerce explains why it wants the information it seeks, it fails to explain why that information is necessary, i.e., why it is the only information that can verify the U.S. customers' non-use certifications."). Indeed, the court has further cautioned "although using facts available with an adverse inference may be permissible (against the government respondent), doing so when it collaterally affects a cooperating party is disfavored." *Fine Furniture (Shanghai) Ltd. v. United States*, 36 C.I.T. 1206, 1212 n.10, 865 F.Supp.2d 1254 (2012), *aff'd*, 748 F.3d 1365 (Fed. Cir. 2014); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1325 (2018) ("Commerce may

apply AFA even if the collateral effect is to 'adversely impact a cooperating party.' ... Commerce, however, should 'seek to avoid such impact if relevant information exists elsewhere on the record.'" (quoting *Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (2013))). Here, Commerce should have accepted the alternative, verifiable information proffered even though it did not technically meet the "government documentation" request.

Commerce speculates in its Remand of the type of information that could have been provided but was not. Commerce claims that the CCP has a central membership database and that the GOC could easily provide screen shots of that database, which then, of course, Commerce officials would insist on verifying in person and given free rein of. Remand at 18. Just as the U.S. government would never give a foreign government access to a database of its citizens, neither would the GOC, even if such a database exists. It is absurd to suggest such a source. Moreover, to suggest different types of government documents *after* the issuance of the supplemental questionnaires as a basis for the application of AFA rather than *in* the questionnaires is particularly egregious.

Ultimately, the GOC provided sufficient factual information to demonstrate that the relevant suppliers are not government authorities. The record contains: 1) the CCP constitution that requires three party members to create a primary party organization; 2) statements from suppliers that they do not have a primary party organization; 3) explanation that company human resource information could be verified. This factual information demonstrates that a primary party organization was not required in each of these suppliers because there were not more than three CCP members in the company. If there were no, or less than three, CCP members then there is also support for the statements that there were no Government or CCP officials. This

**PUBLIC VERSION**

alternative information to "government documentation" is sufficient to establish that the companies are not government authorities.

Finally, regardless of Commerce's position regarding certain unaffiliated suppliers, Commerce fails to address that two of Baroque's suppliers are non-cross-owned affiliates—[ ] and [ ]. Full and verifiable information was provided regarding these company's ownership by both Baroque and the GOC. Baroque Affiliation Response at 5, 6 and Exhibits 4-7 (PR 68; CR 11-14); GOC Supp at 9-10 (REM-PR 6; REM-CR 6). If Commerce had additional questions, it could have sought this information from Baroque's affiliates, which are subject to this proceeding and could be verified. *See Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012) ("in the context of a CVD investigation, an inference adverse to the interests of a non-cooperating government respondent may collaterally affect a cooperative respondent. While such an inference is permissible under the statute, it is disfavored and should not be employed when facts not collaterally adverse to a cooperative party are available.").

## CONCLUSION

For the reasons outlined in these comments, the Court should remand this case back to Commerce with instructions to revise its government authority determination. Ultimately, the GOC responded to all questions to the best of its ability and responded to those questions fully. There is no legal or factual basis to disregard the GOC's responses and no evidence on the record that impeaches the information submitted. Commerce should not apply AFA to the GOC for certain of Baroque's input suppliers.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Baroque Timber Industries (Zongshan), Co., Ltd. and Riverside Plywood Corporation*

Dated: August 20, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Remand Comments, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 2,953 words—less than the 7,500 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

*Counsel for Plaintiffs Baroque Timber Industries (Zongshan), Co., Ltd. and Riverside Plywood Corporation*